# EXHIBIT 5

```
1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,      )
                                    )
6              PLAINTIFF,           )      CASE NO.
                                    )
7              vs.                  )      CR 20-326-JFW
                                    )
8    JOSE LUIS HUIZAR, et al.,      )
                                    )      PAGES 1 TO 57
9              DEFENDANTS.          )
     _____)

10

11

12

13                    REPORTER'S TRANSCRIPT OF
                          MOTION TO COMPEL
14                    MONDAY, APRIL 25, 2022
                             9:02 A.M.
15                   LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23     _____

24          MIRANDA ALGORRI, CSR 12743, RPR, CRR
              FEDERAL OFFICIAL COURT REPORTER
25            350 WEST 1ST STREET, SUITE 4455
               LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM
```

1        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         UNITED STATES ATTORNEY
5        BY:  MACK JENKINS
         BY:  VERONICA DRAGALIN
6        BY:  CASSIE PALMER
         Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9

10   **FOR THE DEFENDANT HUIZAR:**

11       HILARY L. POTASHNER
         FEDERAL PUBLIC DEFENDER
         BY:  CAREL ALÉ
12       BY:  CHARLES SNYDER
         BY:  ADAM OLIN
13       Deputy Federal Public Defenders
         Central District of California
14       321 East Second Street
         Los Angeles, California 90012

15

16   **FOR DEFENDANT CHAN:**

17       BRAUN & BRAUN, LLP
         BY:  HARLAND BRAUN
18       10880 Wilshire Boulevard
         Suite 1020
19       Los Angeles, California 90024

20

     **FOR THE DEFENDANT SHEN ZHEN NEW WORLD I:**
21

         LAW OFFICES OF RICHARD M. STEINGARD
22       BY:  RICHARD M. STEINGARD
         800 Wilshire Boulevard
23       Suite 1050
         Los Angeles, California 90017

24

25

1             **APPEARANCES OF COUNSEL CONTINUED:**

2

3   **FOR THE DEFENDANTS LEE AND 940 HILL:**

4      BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG & RHOW
      BY:  ARIEL A. NEUMAN
5      1875 Century Park East
      23rd Floor
6      Los Angeles, California 90067

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   | |
|---|---|
| | **LOS ANGELES, CALIFORNIA; MONDAY, APRIL 25, 2022** |
| 1 | |
| 2 | **9:02 A.M.** |
| 3 | --- |

<pre>
                 1          LOS ANGELES, CALIFORNIA; MONDAY, APRIL 25, 2022

                 2                         9:02 A.M.

                 3                            ---

                 4

09:01AM          5          THE CLERK:  Calling item 3, CR 20-326(A)-JFW,

                 6    United States of America versus Jose Luis Huizar, et al.

                 7          Counsel, please state your appearances.

                 8          MR. JENKINS:  Good morning, Your Honor.

                 9    Mack Jenkins, Veronica Dragalin, Special Agent Andrew Civetti,

09:02AM         10    and Cassie Palmer on behalf of the United States.

                11          MS. ALÉ:  Good morning, Your Honor.  Carol Alé,

                12    Adam Olin, Charles Snyder from the Office of the Federal Public

                13    Defender's Office on behalf of Mr. Huizar who is present at

                14    counsel table.

09:02AM         15          MR. BRAUN:  Good morning, Your Honor.

                16    Harland Braun, B-r-a-u-n.  I'm alone with Mr. Ray Chan who is

                17    present.

                18          MR. NEUMAN:  Good morning, Your Honor.

                19    Ariel Neuman for Dae Yong Lee whose waiver is on file and

09:02AM         20    940 Hill, LLC.

                21          MR. STEINGARD:  Good morning, Your Honor.

                22    Richard Steingard for Shen Zhen New World I, LLC.

                23          THE COURT:  Good morning to all.  We have on

                24    calendar this morning the defendant's Motion to Compel

09:03AM         25    production of cooperator devices and accounts, communications
</pre>

1    between the Government and cooperators and/or their counsel.

2    That motion was filed on March 3rd of 2022, and it appears as

3    docket No. 381.  The Government filed its opposition which

4    appears as docket No. 418.  And the defendants filed a reply

09:03AM    5    which appears as docket No. 430.  The parties also filed

6    pursuant to my request a joint statement regarding the

7    defendant's Motion to Compel.  That was filed on April 18th and

8    appears as docket No. 431.

9                In the motion, the defendants move for an order

09:03AM    10   to compel the Government to disclose exact duplicate forensic

11   copies of the imaged devices and e-mail cloud storage and any

12   accounts in the Government's possession belonging to the nine

13   individuals that are identified or named in the motion.  I will

14   refer to that portion of the motion as the motion directed to

09:04AM    15   the witness and cooperator devices.

16               The second category, the defendant moves to

17   compel production of all communications and evidence of

18   communications including scheduling notices, nonprivileged

19   notes, or other documentation of communications between the

09:04AM    20   Government and -- in this section there are 14 named

21   individuals, and I will refer to this portion of the motion as

22   the witness and cooperator communications.

23               The defendants argue that the information they

24   seek is subject to disclosure under Rule 16 and

09:05AM    25   *Brady versus Maryland*.  They claim that the requested materials

1    are in the possession, custody, and control of the Government

2    and material to their defense.  The Government argues that the

3    witness and cooperator devices are not within its possession,

4    custody, or control for purposes of Rule 16.  The defendants

09:05AM    5    have not met their burden of demonstrating the materiality.

6         With respect to the witness and cooperator

7    communications, the Government argues that the defendants have

8    failed to establish materiality, and that the Government has

9    already provided discoverable materials and will continue to do

09:05AM    10   so consistent with their obligations under *Brady* and *Giglio*.

11        The legal standard applicable to this motion is

12   undisputed.  Although there is no general constitutional right

13   to discovery in a criminal case, there are three sources

14   establishing the Government's disclosure obligations.

09:06AM    15        Federal Rule of Criminal Procedure 16 establishes

16   guidelines for pretrial production of certain limited materials

17   including items material to preparing a defense.  In addition,

18   under *Brady* and *Giglio*, the Government must disclose to the

19   defense evidence in its possession that is exculpatory or

09:06AM    20   favorable to the defense or that may be used for impeachment

21   purposes.  Such evidence includes material that bears on the

22   credibility of a significant witness in the case.

23        In addition, under Section 3500, the *Jencks* act

24   statements made by a Government witness that relate to the

09:06AM    25   subject matter of the witness's testimony are required to be

```
 1   disclosed after the witness has testified.

 2              I will hear argument from counsel.  The items

 3   that -- I don't think I need any argument.  I think the papers

 4   adequately cover the witness and cooperator devices.  But I

 5   will hear from the defense with respect to the other category

 6   of items which are the cooperator communications with respect

 7   to the 14 identified individuals in the motion.

 8              Who's going to argue the motion on behalf of the

 9   defense?

10       MS. ALÉ:  I am, Your Honor.

11       THE COURT:  All right.  I can tell you that I had

12   a very difficult time following the motion, and specifically on

13   page 14 where you argue the existing discovery illustrates how

14   cooperator and witnesses' testimony changed throughout the

15   investigation.  And you go on to explain or use citing to two

16   examples, one with respect to the interviews of Morrie Goldman

17   and, two, the interviews with respect to Businessperson A.  Is

18   Businessperson A -- I can never remember whether we're still

19   operating under these acronyms or --

20       MS. DRAGALIN:  For now, yes, Your Honor, we would

21   still like to use Businessperson A.

22       THE COURT:  What are the initials of

23   Businessperson A?

24       MS. DRAGALIN:  A.W.

25       THE COURT:  That's what I thought.
```

09:07AM (line 5)
09:07AM (line 10)
09:08AM (line 15)
09:08AM (line 20)
09:08AM (line 25)

1                All right.  The difficulty I have is there -- you

2    cite to the Goldman 302.  There's apparently -- in support of

3    your argument I represent -- I understand this is just one

4    example to support your argument, but it's probably the most

09:09AM    5    important one.  You don't attach the December 5th, 2018, 302

6    which is, as I understand it, the first proffer by Mr. Goldman

7    to the Government.  You do cite to 365, Exhibit 1, which is the

8    ex parte application for the Rule 17 subpoenas.

9                In any event, I was able to find the 302.  It was

09:10AM    10    actually attached but not attached to the motion.  But what I

11    was not able to find is the comparison and the quotes or the

12    characterization of the second proffer which took place in

13    January -- it looks like it's January 16th of 2019.

14                The then 302 was not only not attached to the

09:10AM    15    motion, but I could not find anywhere where the January 16th

16    302 -- if it is part of this record.  In addition, you didn't

17    attach a copy of the transcript of the partial recording that

18    was made by Mr. Goldman's attorney during the course of the

19    first proffer on December 15th, 2018.  I was able to locate

09:11AM    20    that which was not at 341, Exhibit 1, but was the -- attached

21    to the reply in support of the motion to suppress

22    attorney/client which was filed in January which looks like

23    it's docket No. 349.

24                In addition, you argue that the various proffers

09:11AM    25    show how the -- your argument is how the witness's testimony

1    was apparently shaped, but you refer to the plea agreement that

2    was entered into by Mr. Goldman.  But again, the plea agreement

3    is not attached to the motion.

4            So I had a difficult time trying to figure out

09:12AM   5    what -- because I wanted to obviously check the accuracy of

6    your representations made in paragraph 14.  And I did check

7    them, and I found that some of them, at least in my view, are

8    not accurate and certainly overstated that, for example, you

9    indicate that, when the Government interviewed Mr. Goldman on

09:12AM  10    December 5th of 2018, Goldman was unequivocal that there was no

11    quid pro quo.  He consistently rejected any suggestion that

12    Huizar engaged in bribery including with Company M.  I have

13    read that 302, and I understand your argument, but I don't

14    think it is entirely accurate.

09:13AM  15            So I will hear from you.  And I can also tell you

16    that, in my search for these various documents, I had occasion

17    to review Mr. Snyder's declaration which was filed on

18    February 2nd of 2022 and appears as docket No. 65.  And this

19    was in support of the ex parte application for an order issuing

09:13AM  20    early return of subpoena duces tecum.  And my memory serves me

21    this was the efforts to obtain the recording that Mr. Meister,

22    who was representing Mr. Goldman during the course of the

23    initial proffer, had made.  Or at least it's a partial

24    recording.  I guess I can't find that we ever ruled on this

09:14AM  25    ex parte application.  I assume that that issue was resolved

```
 1    and everybody now has a copy of the audio recording?
 2              MR. SNYDER:  No.
 3              THE COURT:  Pardon me?
 4              MR. SNYDER:  No.  It wasn't resolved.
 5              THE COURT:  It wasn't resolved?
 6              MR. SNYDER:  No.
 7              THE COURT:  You still don't have a copy of it?
 8              MR. SNYDER:  No.
 9              THE COURT:  You have a transcript.
10              MR. SNYDER:  We have a transcript of the second
11    half of the interview that the Government recorded.  We don't
12    have a transcript of the part that -- the missing audio.
13              THE COURT:  Okay.  And Mr. Meister, he has
14    possession of it?
15              MR. SNYDER:  Yes.
16              THE COURT:  Is he refusing to give it to you?
17              MR. SNYDER:  So here -- the issue that occurred
18    was --
19              THE COURT:  You're going to have to get to the
20    mic.  Why don't you remain seated and just pull the microphone
21    to you.  I have a hard time with the sound system in this
22    courtroom understanding you.
23              MR. SNYDER:  So the issue that occurred was
24    there's a full recording which, according to the Government,
25    Mr. Meister believes has privileged portions on it.  And we
```

09:14AM (line 5)
09:14AM (line 10)
09:15AM (line 15)
09:15AM (line 20)
09:15AM (line 25)

 1    asked the Government for that recording, and ultimately there

 2    was a breakdown because the Government said that it was going

 3    to redact the privileged portions of the recording that

 4    Mr. Meister had turned over to it.

09:15AM   5                And our position was, well, since he turned it

 6    over to you and he said, why don't you guys redact these

 7    privileged portions, and since they're not actually part of the

 8    same team, he had waived privilege as to those.  So we wanted

 9    the full recording.  And it's our understanding that he's not

09:16AM  10    willing to turn over the full recording.  So that's why we

11    applied for a subpoena to the Court.

12                THE COURT:  And so what is Exhibit 1 that's

13    attached to docket No. 349?

14                MR. SNYDER:  If that's the transcript -- so what

09:16AM  15    happened was they started the proffer, and the proffer wasn't

16    being recorded.  At some point during the proffer --

17                THE COURT:  At least the Government didn't think

18    it was being recorded.

19                MR. SNYDER:  Right.  Right.  It wasn't being

09:16AM  20    openly recorded.  Obviously I wasn't there, so, you know,

21    either Mr. Jenkins or Ms. Dragalin or Mr. Civetti would be the

22    people to tell you what actually happened.  My understanding is

23    at some point they realized that the lawyer is recording the

24    proffer and they say, are you recording?  And so they stop.

09:16AM  25    And he stops his recording, and he agrees to preserve it and

1    turn it over to the Government, and then the Government starts

2    recording at that point in time.  So the transcript that we

3    have is from the second half.

4              THE COURT:  All right.  And the -- all right.  So

09:17AM  5    what's the -- so what's the status of the -- if the Government

6    takes the position that the portions that Meister claims are

7    attorney/client privilege shouldn't be disclosed, I assume

8    there's no problem with editing or preparing a transcript and

9    providing the defense with the balance of the transcript.

09:17AM  10             MS. DRAGALIN:  Your Honor, just for the record,

11   the Government does not have a copy of that recording from

12   Mr. Meister.  He was going to give it to us, but around that

13   same time the defense notified us that they took the position

14   that, if Mr. Meister provided a copy of that recording, he

09:17AM  15   would be waiving privilege.  So, therefore, Mr. Meister is

16   still asserting privilege and has not provided a copy of that

17   first half of the recording to the Government.  So the

18   Government does not have it in its possession.  Only

19   Mr. Meister does.

09:18AM  20             MR. SNYDER:  Right.  And it's laid out in the

21   declaration.  It looked like we were going to have an agreement

22   at the time when we made our position --

23             THE COURT:  I don't want to digress on this

24   issue.  I assume at some point in time we will have to deal

09:18AM  25   with that issue.  I was just under the, I guess, mistaken

1    assumption that the transcript that was attached was the

2    transcript.

3             In any event, I did begin or noted that I had

4    reviewed in the course of my search for these various 302s and

09:18AM  5    the transcript Mr. Snyder's declaration.  In reading -- well,

6    first of all, let me ask.  Is the January 302 somewhere in this

7    record?

8             MS. ALÉ:  Your Honor, I believed that it was, and

9    I apologize that I did not attach the 302s or transcripts to

09:19AM 10    the motion.  It was an attempt to cut down on the paper, but I

11    see now that it created more work for the Court.  So I

12    apologize.

13             THE COURT:  Well, I can't find it anywhere.  It

14    just doesn't exist in the -- there's no -- there's no citation

09:19AM 15    to the January 6, 2019, 302.  I just don't see it.

16             MS. ALÉ:  I apologize if that's the case,

17    Your Honor.  I can submit it --

18             THE COURT:  Is it the case?

19             MS. ALÉ:  I don't know.  I believed that it was

09:19AM 20    part of the record, but if the Court was not able to find it, I

21    will submit an exhibit this morning once the hearing is

22    concluded.

23             THE COURT:  All right.  I didn't look at every

24    document.  I was trying to find these, and I was using the

09:20AM 25    citations.  And why you're referring me to documents -- other

```
 1    documents such as 365 and 341 to go find these exhibits, you
 2    know, I spend enough time in this case.  I don't have time to
 3    go looking for documents.
 4              You have a copy of the Goldman plea agreement, do
 5    you not?
 6              MS. ALÉ:  Yes, Your Honor.
 7              THE COURT:  All right.  That was not attached
 8    either.
 9              MS. ALÉ:  Correct.
10              THE COURT:  All right.  So it seems to me, based
11    upon Mr. Snyder's declaration that I just referred to that was
12    filed in February of 2022, I don't agree necessarily with
13    Mr. Snyder's characterization of some of the items he includes
14    in his declaration although, with respect to the second
15    proffer, I have no way of disputing or questioning the
16    statements in the declaration because I have nothing to compare
17    them with.
18              But it seems to me, based upon this declaration
19    back in February -- I guess that's not too long ago -- February
20    of 2022, that the Government with respect to the example that
21    you're using to support the production of this cooperator --
22    cooperator's statements, schedules, whatever else is in the
23    category, has fully complied with its discovery obligations as
24    to Company M, Mr. Goldman, and Executive M.
25              Are we still using the initials and the letters
```

 1    for those two?

 2              MS. DRAGALIN:  No, Your Honor.  We can use their

 3    true identities which is Carmel Partners and Neils, N-e-i-l-s,

 4    Cotter.

 5              THE COURT:  C-o-t-t-e-r.

 6              So in the -- in Mr. Snyder's declaration, he

 7    begins the declaration by saying the alleged bribe involving

 8    Company M, which is Carmel Partners, is supported by the

 9    testimony of a single cooperator Morrie Goldman who reversed

10    his factual account in exchange for leniency.  Everyone else

11    supposedly involved in the bribe denies that it occurred, and

12    no documents memorialize a quid pro quo.

13              It goes on to say that obviously the supposed

14    bribe by Mr. Huizar categorically denies it.  The supposed

15    briber, Executive M or Mr. Cotter, categorically denied it in

16    multiple meetings with the Government and in surreptitious

17    recorded stings.

18              I assume that you have the -- all of the 302s of

19    Mr. Cotter's interviews with the Government and you also have

20    recordings of -- made by apparently Mr. Cotter in what

21    Mr. Snyder characterized as recorded stings?  You have all

22    those?

23              MS. ALÉ:  Yes, Your Honor.  We do have those.

24              THE COURT:  Who are the recordings with?

25              MS. ALÉ:  I believe they are with Mr. Goldman.

1    He was the one who was doing -- making the calls.

2            THE COURT:  All right.  And then it goes on to

3    state every other Company M executive or employee involved in

4    project M, which is the -- which is Mateo Project; correct?

09:24AM    5            MS. DRAGALIN:  Yes, Your Honor.

6            THE COURT:  Categorically deny knowledge of a

7    bribe.  So I assume there are documents or 302s or some other

8    form of evidence as to every other Company M executive denying

9    the knowledge of a bribe?  You have all that information?

09:24AM    10            MS. ALÉ:  We have that information, Your Honor.

11            THE COURT:  Okay.  And then Company M signed a

12    non-prosecution agreement with no admission of criminal

13    liability.  I take it that you have a copy of the

14    non-prosecution agreement?

09:24AM    15            MS. ALÉ:  Yes.  We do have that, Your Honor.

16    But --

17            THE COURT:  Okay.

18            MS. ALÉ:  It's everything in between that we

19    don't have.

09:24AM    20            THE COURT:  It's what?

21            MS. ALÉ:  It's everything in between from where

22    they started with the denials to when they finally entered a

23    non-prosecution agreement.  We don't have the communications

24    that led to that.  All of a sudden in September 2020, I

09:25AM    25    believe, four Company M or Mateo Project executives or

1    Carmel Partners executives sat down for interviews with the

2    Government.  What prompted those interviews after all four

3    executives denied any liability, after they refused to speak

4    with the Government we don't know.  And that's part of what

09:25AM   5    we're asking for.  We need to tell the story of how --

6                THE COURT:  Wait a minute.  I'm confused.  So the

7    Executive M -- you have all the interviews for -- Mr. Cotter

8    denies in multiple meetings.  You have all the 302s with the

9    multiple meetings with the Government, and you have the phone

09:25AM  10    conversations of the transcripts of the recordings with

11    Mr. Goldman.  You have all that.  In that he apparently,

12    according to the Snyder declarations, categorically denies

13    there was a bribe; right?

14                MS. ALÉ:  That's correct, Your Honor.

09:26AM  15                THE COURT:  Does he change his position now?

16                MS. ALÉ:  He doesn't change his position as to

17    the bribe, but he does enter a non-prosecution agreement.

18    Excuse me, Your Honor.

19                THE COURT:  So what happened -- I mean, so what's

09:26AM  20    the point if -- if you have all this information with respect

21    to executive -- Mr. Cotter who denies that there were bribes

22    and they entered into a non-prosecution agreement, what more do

23    you need?

24                MS. ALÉ:  I'm sorry, Your Honor?

09:26AM  25                THE COURT:  I'm curious to know what Mr. Cotter

1  believed he was paying $100,000 for to the various

2  contributions that he made to PAC A and PAC B and the result

3  that the Mateo Project was not only approved at the

4  PLUM Committee but also it was approved in accordance with the

09:27AM  5  Carmel Partners's request that the 11 percent low income

6  housing provision be reduced, and ultimately it was approved I

7  think at 4 percent.  In any event, that's neither here nor

8  there.

9              I just don't understand what it is you're missing

09:27AM  10  in between these interviews where he denies it was a bribe and

11  the non-prosecution agreement.  Why do you need that

12  information?  I mean, you already have a record that he

13  apparently is going to get on the witness stand and he's going

14  to testify that the hundred -- whatever it was.  Was it a

09:28AM  15  hundred thousand dollars that was paid?

16              MS. ALÉ:  I believe so, yes, Your Honor.

17              THE COURT:  He is going to testify that, given

18  the various payments he made -- I think they were 25,000,

19  25,000, and then there was an additional I think in connection

09:28AM  20  with the -- at least the allegations in the First Superseding

21  Indictment when apparently, as Mr. Lee ran into labor union

22  problems, that the Mateo Project ran into labor union problems,

23  and there was an additional request or ask for an additional I

24  believe it was $50,000 in connection with resolving that

09:28AM  25  particular labor issue with respect to the Mateo Project.

|     |     |
| --- | --- |
| 1 | So what is it that you think?  That the |
| 2 | Government is going to have some surprise with respect to |
| 3 | Mr. Cotter's testimony at trial? |
| 4 | MR. SNYDER:  Your Honor, do you mind if I say |
| 5 | something about this?  I know Ms. Alé is arguing, but I'm |
| 6 | pretty familiar with Mateo. |
| 7 | So if I can answer your question, so kind of the |
| 8 | history of what happened here, at least as I understand it -- |
| 9 | and we're trying to piece this together as best as possible -- |
| 10 | is that, you know, this investigation -- |
| 11 | THE COURT:  First of all, it's pretty easy to |
| 12 | piece together based upon the allegations of the First |
| 13 | Superseding Indictment. |
| 14 | MR. SNYDER:  Right.  So that's -- |
| 15 | THE COURT:  And the First Superseding Indictment, |
| 16 | those overt acts in connection with the Mateo Project which |
| 17 | begin at 241 are pretty consistent also with the -- as I went |
| 18 | back and tried to match some of the items in these various |
| 19 | overt acts are consistent with the factual basis for the plea |
| 20 | that Mr. Goldman entered into. |
| 21 | MR. SNYDER:  If you will just give me a second, I |
| 22 | will explain very briefly kind of what's happening. |
| 23 | So the First Superseding Indictment and the pleas |
| 24 | are the end result of a long process.  As we understand it, |
| 25 | what happened here is that this investigation starts and the |

09:29AM (lines 4-6)
09:29AM (line 10)
09:29AM (line 15)
09:30AM (line 20)
09:30AM (line 25)

Case 2:22-cr-00482-JHW   Document 59-75   Filed 07/06/23   Page 21 of 58   Page ID #: 2906

1    Government starts reaching out to all of the potential

2    witnesses in this case.  I believe -- we don't have

3    communications for everyone, but I believe that the position

4    that each of the Carmel executives took at the outset is, if

09:30AM  5    you bring us into the grand jury or if you bring us to your

6    office, we will refuse to testify under an invocation.

7            At some point between let's say the beginning of

8    2020 and September, there were communications between the

9    Government and the lawyers for each of the executives at

09:31AM  10    Carmel.  These people are represented by extremely talented

11    lawyers, you know, people who are some of the most reputable

12    lawyers in the country or the state.  They're not going to walk

13    their clients into a meeting without knowing what's happening.

14            At some point between, you know, early January of

09:31AM  15    2020 and September when they all show up to meet, there is some

16    sort of understanding.  The way that cooperation works in a

17    case like this is that --

18            THE COURT:  You don't have to tell me how

19    cooperation works because I read your papers, and what you left

09:31AM  20    out of how cooperation works is that, when somebody is asked to

21    or consideration -- considering cooperating with the

22    Government, the flip side of what you argue is that that

23    cooperator would typically go to an initial meeting with the

24    prosecutors and his counsel to get an understanding of what the

09:32AM  25    nature and extent of what the Government is investigating.  And

then that cooperator, who may not have all the information

available to be able to proffer to the Government on that

particular initial meeting goes back, reviews records and text

messages and any other items that may assist to refresh the

09:32AM    memory of the witness, because these events take place several

years ago, and then goes back to a second session with the

Government and is able to more intelligently make a pitch to

the Government that this particular witness does have

information that may be of some value to the Government.

09:32AM             MR. SNYDER:  So I don't think that's how it

worked in this case.

THE COURT:  I'm not -- you're talking -- you were

talking about in general you were going to educate me in terms

of how cooperation with the Government works.  I don't need

09:32AM    that education because I've been on both sides and I fully

understand the process.

MR. SNYDER:  Understood.  I think -- I think the

point is about how it's worked in this case which is the

lawyers for the cooperators and the key witnesses have been

09:33AM    conduits for information before and after the proffer.  So,

yes, we have 302s from the proffers but the 302s, like the plea

agreements, like the First Superseding Indictments are the end

result of a process where, before someone comes in to sit with

the Government, it's not -- it's not like, you know, they don't

09:33AM    have a theory coming in.  Before someone comes in to sit with

1   the Government, there are communications with their lawyers.

2   Those communications exist.  I don't think there's any dispute

3   they exist.  There were phone calls.

4           THE COURT:  Communications with their lawyers,

5   obviously they exist.

6           MR. SNYDER:  Right.

7           THE COURT:  Lawyers communicate with their

8   clients because lawyers need to understand what the facts are

9   that the client has so that client can or cannot be considered

10  as having information that the Government needs or doesn't

11  need.

12          MR. SNYDER:  I mean, communications between the

13  lawyers and the Government.  So in advance of these meetings

14  and then after the meetings.  We have all -- each of us I think

15  in this case have had this experience where someone goes in and

16  they sit down and then there's feedback provided about, well,

17  we think this was right.  We don't think that was right.  There

18  may be a number of calls or e-mails or communications.  That

19  all goes into what then is said next.

20          I will turn it back over to Ms. Alé.  But I think

21  when it comes to the Carmel Project and those executives in

22  particular, I think that the history is very clear that they

23  all initially invoked.  At some point after that invocation, no

24  doubt as a result of communications between the lawyers, they

25  all come in in the fall of 2020, and they all sit for an

interview, and shortly thereafter there is a non-prosecution

agreed to, and none of those people are charged.

That didn't just happen kind of with those being

the only data points.  What must have happened in between there

09:35AM   is that the lawyers were going back and forth both before and

after those proffers.  There were negotiations about the

non-prosecution agreement.  No doubt there was some

conversation about who was going to be charged and who wasn't

going to be charged if they came in and if they talked and what

09:35AM   the Government's view of the case was.  And we don't have any

of that.  Yes, we have the 302s from the proffers.  We have the

First Superseding Indictment.  We have the plea agreement that

the Government drafted for Morrie Goldman.  But that's like

giving us the end result without showing us how the process

09:35AM   happened.

What they want to do is they want to put on the

end result of this cooperation without letting us get into and

show the jury, well, how did that product come about?

THE COURT:  The end result of the process was a

09:35AM   non-prosecution agreement.

MR. SNYDER:  Right.  And the question is --

THE COURT:  So.

MR. SNYDER:  So why -- I mean, I think the

question is, well, if the Government's theory of this case is

09:36AM   Neils Cotter bribed a sitting city councilman, right, and

people in this multi-billion dollar private equity firm either

knew about or there would be imputed knowledge to the firm, why

were none of those people charged?  I think that's a legitimate

question to ask.  And I think the Court was even just alluding

to that.

Well, the reason they're not charged is either

there's something else going on behind the scenes or there's a

question about the facts or there's a question about the

information.  All we have is the end result which the

Government wants to present.  And what we're asking to do,

which we're entitled to do, is to get at what's going on behind

the scenes and to see how that end result was created.

THE COURT:  But see, now you're being more

factually specific, but none of that is in the motion, and

that's the problem I have with the motion.  I'm supposed to be

piecing together bits and pieces from missing documents because

you have to make a showing.  And there hasn't been any showing.

The first time I've heard about these series of executives that

have been parading into the U.S. Attorney's Office all

represented by superior counsel and whatever you suspect they

were doing or not doing, that's not in front of me.  And that's

the problem I have with the motion.

You continually ask me to rule on things on an

inadequate record, and I'm not going to do that.  Your

declaration enlightens me in terms of -- I take it Executive M

09:38AM

is going to continue -- Mr. Cotter is going to continually deny

that the hundred thousand dollars that apparently he was the

head of this Mateo Project was contributing to the various PACs

had nothing to do with the bribe.  I guess it was just a normal

way that Carmel Partners did business.

MR. SNYDER:  Well, I think the reality of what's

going to happen is that, when we want to call Neils Cotter to

testify at trial to say exactly that, his lawyer, who is well

qualified, is going to say, if you call Mr. Cotter, he's going

09:38AM

to invoke.

So what ends up happening is through this process

the Government immunized some people.  It leaves some people

out there in the wind like Mr. Cotter who, if called to

testify, would say that he didn't bribe.  He wasn't involved in

09:38AM

a quid pro quo.  And so -- so I think what we're getting at --

and this is, just as we've been talking about, this is just one

example, but it's one example of an overall process which has

gone into shaping the end result which is the First Superseding

Indictment that the Court has seen which is the 302s that we

09:39AM

have.  And what we're trying to get at is, well, what was

behind that product, the end product?  And we're entitled to

that.

THE COURT:  Well, I don't think you are based

upon the showing.  In any event, so why can't you put into

09:39AM

evidence the non-prosecution agreement?

         1          MS. ALÉ:  Your Honor, and that was -- again, I

         2   drafted the motion, and I apologize about that.

         3          Again, my attempt at directing the Court's

         4   attention to where the non-prosecution agreements were found

09:39AM  5   was clearly an error but an attempt to limit the number of

         6   exhibits and things that would be clouding the record.  So if

         7   the Court would like, I can refile the motion with the

         8   necessary exhibits for the Court's review.

         9          THE COURT:  Well, in my view, you haven't made a

09:39AM 10   sufficient showing.  I mean, you use -- you call to my

        11   attention an example which is the Goldman/Mateo Project and

        12   Mr. Cotter and Carmel Partners, and I spent a good couple days

        13   trying to understand the transaction and relationship to the

        14   First Superseding Indictment as well as Mr. Goldman's factual

09:40AM 15   basis for the plea.

        16          And uncovering or discovering Mr. Snyder's

        17   declaration, I conclude and I continue to conclude that the

        18   Government has, up to this point in time, given the information

        19   that's included in this declaration, has complied with its

09:40AM 20   discovery obligations.  If there's more out there -- apparently

        21   there is more out there that hasn't been presented to the

        22   Court, I'm here to rule.  But I'm not going to continue to

        23   review these motions and make rulings on an inadequate record.

        24          All right.  So does anybody have anything else

09:41AM 25   they want to say because I'm going to rule?

1          MR. NEUMAN:  Can I say something, Your Honor?

2          THE COURT:  Sure.

3          MR. NEUMAN:  This is -- we joined the motion for

4    a variety of reasons.  But it really sort of came to light in

09:41AM  5    the last week why we need these communications between counsel

6    and the Government.

7          We on Friday got a 302 of a March 2019 meeting

8    between Justin Kim, his attorney, and the Government.  And this

9    302 was drafted ten days ago.  We had no record that this

09:41AM  10   meeting occurred prior to receiving this 302.  We would have

11   known about it, presumably, if we had communications between

12   counsel and the Government.  I have my theories of why we got

13   it now.  I think it has to do with the motions in limine that

14   are pending.  But strangely, here we are, you know, a month

09:42AM  15   before trial getting a 302 that is documenting a purported

16   meeting over three years ago for which there is no agent notes

17   we're being told.

18          And it really demonstrates why we need to see

19   that back-and-forth between counsel and -- defense counsel and

09:42AM  20   the Government counsel.  We need to understand what other

21   meetings potentially are out there, what other discussions are

22   out there.  How did Mr. Kim in this case -- this is

23   Justin Kim's, I think, his first, quote/unquote, cooperation

24   meeting with the Government.  You know, where did this come

09:42AM  25   from?  And are there other meetings that we don't know about

1   that the Government may have forgotten to write a 302 about at

2   the time?

3               THE COURT:  Well, I assume that the Government

4   has until, what is it, April -- what's today? -- April 29th

09:43AM  5   under the current schedule to provide all the *Brady/Giglio*

6   material under the Lee scheduling order as well as the

7   *Jencks Act* material on April 29th.

8               Again, to the extent the Government wants to run

9   the risk of not disclosing what they're obligated to disclose,

09:43AM 10   they may end up in the same place that the Government ended up

11   in the Avenatti case, and that is a dismissal.

12               MR. NEUMAN:  That may be, Your Honor, and I

13   appreciate the comment.  I think the concern here, as I read

14   this 302, I don't think the Government would view this as

09:43AM 15   *Brady*.  I think the Government would say this is potentially

16   inculpatory of our client.

17               But my concern is what else is out there that is

18   relevant to my case?  I need to know when Mr. Kim was meeting

19   with the Government, what his lawyer was negotiating with the

09:43AM 20   Government.  As the Court knows, he's the central witness

21   against my client, and this sort of three years later

22   production gives me real concern.

23               THE COURT:  All right.  Mr. Jenkins, what about

24   the more pressing and that is Mr. Neuman, who we're set for a

09:44AM 25   June trial, and Government's obligations -- I don't have all

1    the dates in front of me, but they seem to be coming up fairly

2    soon.

3            MR. JENKINS:  Yes, Your Honor.  And Mr. Neuman's

4    statement is exactly a product of that.  We continue to prepare

09:44AM  5    for, analyze what discovery has been produced, what discovery

6    has not been produced, what's been redacted, what needs to be

7    unredacted.  As the Court just noted, the production he just

8    explained was produced in advance of the Court's deadline.  I

9    believe all other deadlines have been met with and will

09:44AM  10   continue to be met with by the deadline or, if not, in advance.

11           THE COURT:  What about this current 302 that was

12   just recently produced?  What's the history behind that?

13           MR. JENKINS:  So as we prepare for that

14   production of -- what the Government is currently doing is

09:44AM  15   looking for basically everything Justin Kim related.  As the

16   Court may recall, one of the directives from a prior motion to

17   compel related to Justin Kim --

18           THE COURT:  You're going to have to get closer to

19   the microphone.  Your voice is trailing.

09:45AM  20           MR. JENKINS:  So one of the last relevant court

21   directives was related to a prior motion to compel related to

22   Justin Kim because Justin Kim had provided information related

23   to Defendant Huizar, Defendant Lee, and others.  And so there

24   are redactions.  So one of the things the Government has went

09:45AM  25   back and done and reviewed and unredacted a lot of information

1    consistent with the Court's order and in that same process

2    reviewing Justin Kim references in other case files.

3             And one of the things that AUSA Dragalin noticed

4    was that there was a calendar entry or a meeting that existed

09:45AM  5    for which there was not a report, and so she identified that

6    through that diligent process and got a report drafted to

7    document exactly what Mr. Neuman just pointed out, something

8    that is what, we would say, is significantly inculpatory.

9             The existence of the meeting was documented and

09:46AM 10    provided to them in advance of the deadline of the trial.  We

11    will continue to, of course -- I think Mr. Neuman is correct

12    that that highlights the need to go through the exact process

13    we are doing collectively.  I think Ms. Dragalin's

14    identification of that meeting is corroborative of those

09:46AM 15    efforts, Your Honor.

16             THE COURT:  When was the meeting and who

17    participated in the meeting?

18             MR. JENKINS:  The meeting was March 18th --

19    March 2019.

09:46AM 20             MR. NEUMAN:  March 19, 2019, according to the

21    302.  Present were Mr. Kim, his attorney David Vaughn, and

22    Ms. Dragalin and Mr. Jenkins according to the 302.

23             MR. JENKINS:  And, in addition, the agent who

24    authored the report Tony Logan, but otherwise that is correct.

09:46AM 25             Thank you, Mr. Neuman.

1          THE COURT:  What was the sum and substance of

2   that meeting?

3          MR. JENKINS:  At this point I will similarly hand

4   off the baton, with the Court's indulgence, to AUSA Dragalin

09:47AM  5   who located this document.  Or meeting --

6          THE COURT:  It wasn't a document.  It was some

7   reference to a meeting somewhere and a document was prepared to

8   memorialize the meeting?

9          MR. JENKINS:  That is correct, Your Honor.

09:47AM  10          THE COURT:  Okay.

11          MS. DRAGALIN:  Yes, Your Honor.  On March 20th --

12          THE COURT:  You can remain seated.

13          MS. DRAGALIN:  On March 20th Justin Kim met with

14   David Lee and recorded his meeting with David Lee.  Transcripts

09:47AM  15   of that recorded meeting have been produced.  As we were

16   preparing for trial, I recalled that, obviously to be able to

17   record that meeting, Justin Kim must have been given a

18   recording device, and it reminded me that we met with Mr. Kim

19   before that recorded meeting to instruct him how to use the

09:47AM  20   device and to give him instructions about the recorded meeting

21   that he was to have the very next day.

22          And so the meeting we had with Mr. Kim and his

23   counsel was very limited to just the recording device and

24   instructions on what to say during that recorded meeting the

09:48AM  25   next day.  And so the report that was drafted reflected the

1   information we learned from Mr. Kim during that short meeting,

2   and it was before he sat down to actually proffer all of the

3   information he subsequently told us about later.

4                   MR. NEUMAN:  And so, Your Honor, that summary by

09:48AM  5   Ms. Dragalin only highlights the point that I'm making because

6   none of what she just said is in that 302.  And so there is a

7   problem between what was going on at the time this calendar

8   entry that exists.  The 302 doesn't say anything about giving

9   him a recording device, instructing him on the recording

09:48AM  10  device.  None of that is in here.

11                  It relates a conversation or a statement by

12  Mr. Kim about conversations he supposedly had with my client.

13  This is old.  And I'm not complaining that it was produced now.

14  They're within -- I'm not saying it's late production.  What

09:48AM  15  I'm saying is they didn't know about it until she happened to

16  see a calendar entry.  We didn't know.  We have been wondering

17  how did this recording come to be, the March 20th recording.

18  And now my concern is what else is out there that they might

19  miss, not necessarily exculpatory in that sense but certainly

09:49AM  20  relevant to the defense and how Justin Kim came to make the

21  statements he makes about my client.

22                  THE COURT:  Well, I'm sure that they're going to

23  continue their efforts in connection with their preparation for

24  trial.

09:49AM  25                  All right.  Anybody want to add anything else

1    before I rule?  Anything for the Government?

2             MS. DRAGALIN:  No, Your Honor.

3             THE COURT:  Defense?

4             MS. ALÉ:  Nothing else.

09:49AM  5             THE COURT:  The Government makes the -- I'm

6    sorry.  The Court makes the following ruling:

7             With respect to the witness and cooperator

8    devices, the defendants, as I indicated, seek imaged copies of

9    the digital devices for the nine cooperating defendants and

09:50AM  10  witnesses identified in their motion.  Specifically, the

11    devices at issue include forensic copies of imaged devices and

12    accounts for seven of these individuals that were searched

13    pursuant to search warrants.  Esparza also consented to the

14    search and imaging of three additional devices provided the

09:50AM  15  search was consistent with the scope of the original omnibus

16    search warrant that was issued in November of 2018.

17             Businessperson A's phone was searched and imaged

18    pursuant to a limited consent.  Moreover, the Government never

19    executed a search warrant or obtained consent to search and has

09:50AM  20  not searched the devices belonging to Mr. Morrie Goldman.  It,

21    therefore, does not have any forensic imaging of his devices or

22    accounts in his possession.

23             The Government contends the defendants fail to

24    establish that it has possession of the devices or that any

09:51AM  25  information contained therein would be material to their

defense.

As to possession, according to the 9th Circuit in the *United States versus Bryan*, B-r-y-a-n, at 868 F.2d 1032, a document is in the possession, custody, or control of the Government if the prosecutor has knowledge of and access to the documents sought by the defendant.

The Government originally obtained search warrants for most of the digital devices and accounts at issue in this motion. The Government imaged and searched these items for material that fell within the scope of the warrant and later produced all of that data to the defendants. The Government utilized the same process with respect to the devices imaged and searched pursuant to the consents.

The Government claims it no longer has legal authority to further access and search any of these devices because the warrants have expired and none of the individuals have consented to any further searches or disclosure, and in fact, counsel for those defendants or individuals have submitted written objections which are attached to the Government's opposition.

The Court rejects the defendants' contention that the Government continues to have authority to either search the devices again for discoverable material or simply turn them over to the defendants. The Court finds the district court's -- district court case *United States versus Collins* at

409 F.Supp. 3d is instructive.  In *Collins* defendants asked the

Court to -- asked the Court to order the Government to search

an uncharged co-conspirator's nonresponsive iCloud data that

has been searched pursuant to a search warrant for *Brady* and

Rule 16 material.  The district court denied the motion because

the Government does not have the legal authority to go back and

search materials that are outside the scope of the search

warrant and thus did not have possession.

The Court noted that, as we have in this case,

the third party has a privacy interest in the data, the

Government obtained that data through the use of a search

warrant, and as a result of the Government's possession of and

ability to review that data was necessarily circumscribed by

the 4th Amendment.

Defendants attempted to distinguish *Collins* by

arguing that in that case, unlike here, the Government had

initially searched the data for potential *Brady* Rule 16

material.  The *Collins* court however specifically stated that

it found the defendant's argument legally flawed even if it

assumed that the Government's initial search pursuant to the

warrant was insufficient under *Brady* and Rule 16.

Like *Collins,* the basic premise of the

defendants' argument is that the *Brady* obligation somehow

trumps an individual's 4th Amendment rights, but in my view,

that's simply not the case.  The Court concludes that, because

the Government is without the requisite legal authority, it is

not in the possession of the data for discovery purposes.  The

Government's possession of the devices and the data that were

obtained by search warrant is necessarily circumscribed by the

4th Amendment nor have any of the individuals who own the

devices searched pursuant to the warrant consented to a further

review of their data.

The Court arrives at the same conclusion with

respect to the devices that were searched and imaged pursuant

to the consent agreements.  The two individuals who consented

did so under specific limiting conditions.  Those conditions

circumscribed the Government's legal authority over the data,

devices, and accounts and do not authorize the wholesale

disclosure as sought in this case.

Defendants also argue that the cooperation plea

agreements with the cooperating defendants establish the

Government's possession of the devices under *Brady* and Rule 16.

The defendants point out that the cooperating defendants

entered into plea agreements whereby they agreed to produce all

documents, records, and other tangible evidence relating to

matters about which the United States Attorney's Office may

require.

In support of their argument, defendants cite

three district court cases concluding that the Government's

ability to require cooperating defendants to produce evidence

at its request may establish the requisite possession and
control over such evidence.

The Court declines to adopt the reasoning of
those cases under the circumstances of this case.  Defendants
are asking to examine the entirety of the individual phone and
e-mail accounts.  These items contain private, personal, and
highly sensitive data.  Indeed, the entirety of people's lives
in this day and age are typically reflected on their phones,
their messages, and e-mails.  A cooperating defendant does not
give up and, frankly, should not have to give up the right to
protect information of the most personal and private nature
when entering into a cooperation agreement with the Government.
This is especially true given that the defendants have failed
to show in any meaningful way that the information they seek
may be material to their defense.

As to materiality, a defendant must make a
threshold showing of materiality which requires a presentation
of facts that would tend to show that the Government is in
possession of information helpful to the defense.  Neither a
general description of the information sought nor conclusory
allegations of materiality suffice.

Defendants make a general claim that the
requested data on the devices and accounts is material because
it may contain information relating to interactions between
Esparza and Kim and other key figures that might allow

defendants to develop a defense that cooperators were acting on their own behalf rather than on behalf of the alleged RICO enterprise.

Defendants provide no specific information regarding the other cooperating defendants and witnesses.  They offer only a broad general allegation that, because the Government's case stands or falls on the testimony of numerous individuals engaged in varying levels of cooperation with the Government, they're entitled to examine without limitation the complete devices and accounts of each and every cooperating witness.

The Court concludes that this showing is speculative and falls well below that required to demonstrate materiality.  Defendants have received voluminous and broad discovery from these devices, yet fail to indicate with any particularity what may be missing.

The Court agrees with the Government that what the defendants really seek here is a fishing expedition into each of the witnesses' and cooperating defendants' personal and private information to which they are simply not entitled.

The next category, which is the witness and cooperator communications, the Government represents it has made broad disclosures and produced discovery beyond its obligations in this case including reports of witnesses' interviews, notes from these interviews, and text messages and

e-mails between witnesses and agents.

The Government has also produced certain substantive communications between the Government and counsel for witnesses where appropriate and consistent with its discovery obligations.  Despite this discovery, defendants now request that the Government also produce all communications between the Government and any witnesses or cooperators and their counsel including non-privileged notes, scheduling notices, and all records of communications.  The Government notes that, because it has already produced reports of witness interviews, the material in dispute consists of communications between the Government and third parties and their counsel.

As I indicated, the Court is not entirely clear as to what has already been produced that complies with the defendants' broad discovery request but assumes, based upon the defendants' reply, that, while the Government has produced communications containing the substance of witness statements, it has not produced a full set of the scheduling notices and e-mails.

The Government's letter to the public defender -- federal public defenders dated April 28th to which the Government cites to show what has been produced provides some clarification surrounding the parties' discussion on the matter but does not refer to definitive categories or give the Court the clarity it needs in order to make any ruling.

1    So for all of the -- the defendant contends that

2    a full set of the requested communications is material in order

3    to attack the character and quality of the investigation

4    including attacking the means by which the Government has

09:59AM    5    handled cooperating witnesses.  In their reply, the defendants

6    argue the timing of the contacts between counsel for

7    cooperating defendants and the Government may help establish

8    how witnesses' testimony was shaped and changed in order to

9    align with the Government's theory and obtain greater benefits

10:00AM    10    for themselves.

11    The Government claims that it has produced and

12    will continue to produce Rule 16, *Brady/Giglio*, and *Jencks Act*

13    discovery consistent with its duty to make decisions about what

14    falls within this category.

10:00AM    15    The Court is confident that the Government will

16    continue to comply with all its discovery obligations in this

17    case.  Indeed, the Court has requested and the Government has

18    consented to what the Court considers and has referred to as an

19    open file discovery in this case.  Based upon the prosecution

10:00AM    20    team handling of this case to date, the Court concludes that

21    the prosecutors fully understand and will continue to comply

22    with their discovery obligations.

23    The Government's understanding and compliance

24    with its obligation is evidenced by the incredibly detailed

10:00AM    25    description defendants were able to make in their motion and

```
 1    reply briefs and in Mr. Snyder's declaration that I have been
 2    referring to regarding the alleged changes in Goldman and
 3    Businessperson A's testimony which are obviously based on
 4    discovery already produced and can and will be used to impeach
 5    both witnesses.
 6              The Court thus denies the defendants' motion for
 7    additional discovery relating to those communications.  Should
 8    the defendants believe that the Government is not in compliance
 9    with its discovery obligations, the defendants are free to
10    raise these issues at an appropriate later point in time,
11    hopefully with a full record so I can make a determination
12    without spending an enormous amount of time going through all
13    of the documents.
14              So for all the foregoing reasons, the Court
15    denies the defendants' motion to compel.
16              All right.  We have another issue that I wanted
17    to discuss.  Mr. Steingard, this relates to what I discovered
18    this weekend is yet to be ruled on, and that is the pending
19    request for Defendant Shen Zhen New World's second application
20    for issuance of early return of subpoenas duces tecum that was
21    filed March 21st of 2022.  It appears as docket No. 44.  This
22    was filed after I issued in July of last year a minute order
23    denying the ex parte application for issuance of Rule 17
24    subpoenas.  The denial was without prejudice.
25              I also issued a separate minute order that, if
```

10:01AM (line 5)
10:01AM (line 10)
10:01AM (line 15)
10:02AM (line 20)
10:03AM (line 25)

1    defendant was going to file a revised ex parte application and

2    continued to request the gag order, that the parties prepare a

3    joint statement setting forth their respective positions with

4    respect to the gag order.  That appears as docket No. 197.

10:03AM    5    And as I indicated, on March 31st you filed the

6    second ex parte application.  Thereafter, there were requests

7    which I granted for continuances of the joint statement, but

8    that joint statement was filed on March 29th.  That doesn't

9    make any sense with respect to the -- anyway, it was filed.

10:04AM   10   Let me see if I can find it here.  It was filed on March 29th.

11   It appears as docket No. 415.  It was the joint filing re

12   subpoenas.

13   Mr. Steingard, I will hear from you, but it's --

14   I want to know how you want to proceed because I haven't -- I'm

10:04AM   15   not making a final ruling, but my tentative ruling is that I'm

16   not going to issue a nondisclosure order that the parties or

17   the persons or parties who are subpoenaed are not going to be

18   precluded from discussing the subpoena.

19   I'm not sure that you're aware, but I can tell

10:05AM   20   you my normal practice is that, when a Rule 17 -- a return for

21   a Rule 17 subpoena the documents are produced, they're produced

22   to the Court.  And the Court then notifies counsel, and all

23   counsel have an opportunity to review the documents that are

24   produced.  That's my normal practice.  I don't know what you

10:05AM   25   want me to do with the ex parte application.

|    |    |
|----|----|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:06AM | 5 |

                    Quite frankly, I don't see how any of the

requested documents -- I know the argument is always that they

reveal trial strategy.  I can't imagine how any of these

documents reveal trial strategy.  There's nothing in your

showing that would give me any indication in terms of what the

trial strategy is save and except for perhaps for paying bribes

with someone else's money.

                    MR. STEINGARD:  I'm not sure what the Court

refers to there, but you have several documents before you.

                    THE COURT:  Yes.

                    MR. STEINGARD:  One, of course, is the ex parte

application -- the ex parte application for a -- for the

subpoena duces tecum.  And in that document we have included my

declaration, and that is where for the most part we laid out --

I laid out what I believe would have been the basis for the

nondisclosure.  And in the joint filing I referenced that

without getting any more specific because obviously that was

filed in camera.  So you would have to circle back, Your Honor,

to the ex parte filed in camera --

                    THE COURT:  No.  I have that.

                    MR. STEINGARD:  I understand.  I understand.  And

that -- in response to your question that you don't see any

trial strategy issues, I'm simply saying to you that the

showing that we made or we attempted to make would be contained

in that document.  If you find that inadequate, then there is

1         Quite frankly, I don't see how any of the

2    requested documents -- I know the argument is always that they

3    reveal trial strategy.  I can't imagine how any of these

4    documents reveal trial strategy.  There's nothing in your

10:06AM  5    showing that would give me any indication in terms of what the

6    trial strategy is save and except for perhaps for paying bribes

7    with someone else's money.

8         MR. STEINGARD:  I'm not sure what the Court

9    refers to there, but you have several documents before you.

10:06AM  10         THE COURT:  Yes.

11         MR. STEINGARD:  One, of course, is the ex parte

12    application -- the ex parte application for a -- for the

13    subpoena duces tecum.  And in that document we have included my

14    declaration, and that is where for the most part we laid out --

10:07AM  15    I laid out what I believe would have been the basis for the

16    nondisclosure.  And in the joint filing I referenced that

17    without getting any more specific because obviously that was

18    filed in camera.  So you would have to circle back, Your Honor,

19    to the ex parte filed in camera --

10:07AM  20         THE COURT:  No.  I have that.

21         MR. STEINGARD:  I understand.  I understand.  And

22    that -- in response to your question that you don't see any

23    trial strategy issues, I'm simply saying to you that the

24    showing that we made or we attempted to make would be contained

10:07AM  25    in that document.  If you find that inadequate, then there is

```
 1    your answer.  I can't go into that any further in open court,

 2    but I would be prepared, of course, to go in chambers with the

 3    Court.

 4              THE COURT:  I'm not going to go in chambers.  If

 5    you want to file some supplemental declaration -- basically one

 6    of the thrusts, which I don't know is a trial strategy, is

 7    making a more complete record.

 8              MR. STEINGARD:  Okay.  I don't disagree with

 9    that.

10              THE COURT:  Okay.

11              MR. STEINGARD:  I don't disagree with that as a

12    partial of what we're trying to do, yes.

13              THE COURT:  That's somehow trial strategy?

14              MR. STEINGARD:  Well, let's talk in the

15    hypothetical if that's all right.

16              THE COURT:  Sure.

17              MR. STEINGARD:  In the hypothetical, the

18    Government calls an expert witness who says, I reviewed these

19    ten documents.  And in the hypothetical the defense calls an

20    expert witness that says, I reviewed those ten documents too

21    but they -- they didn't look at these ten documents which shed

22    light on the ten that the -- that the Government did look at.

23    We view that as a trial strategy, vis-à-vis, or in regards to

24    where we have got a prepared witness -- a prepared expert

25    witness where the Government -- which would negate, refute,
```

10:08AM (line 5)

10:08AM (line 10)

10:08AM (line 15)

10:08AM (line 20)

10:09AM (line 25)

1  rebut the Government's witness in that hypothetical.  I guess I

2  would call that a trial strategy.

3           THE COURT:  Well, you can characterize anything

4  as a trial strategy.

5           MR. STEINGARD:  Well, I guess.  But why wouldn't

6  it be?  Why wouldn't it be that we're trying to say we don't

7  want to be the party to prepare the Government's witnesses?

8           THE COURT:  So you're basically saying use the

9  Rule 17 subpoena in order to obtain documents that you believe

10 are necessary for impeachment.

11          MR. STEINGARD:  I don't think that's necessarily

12 impeachment.  It could be impeachment.  Part of it would be

13 impeachment.  If we showed the expert witness the extra ten

14 documents that the Government hadn't looked at and the witness

15 said, gee, I've never seen these before, therefore, I can't

16 comment, that would be impeaching.

17          THE COURT:  Well, if you want to file something

18 else, I will take a look at it.  But those are my tentative

19 views.

20          MR. STEINGARD:  That's fine.  And could I just

21 address one other point, Your Honor?

22          THE COURT:  Sure.

23          MR. STEINGARD:  You mentioned that your normal

24 practice is to, when the materials are received by the Court,

25 to call all counsel, it sounds like, and invite them to come

1    and inspect the documents.  I would ask that the Court

2    consider, because this is a defense subpoena, simply providing

3    those documents to the defense, allowing the defense to make a

4    determination whether they're going to be used at trial, and if

10:10AM    5    so, of course, the defense has their own obligations under

6    Rule 16.

7                THE COURT:  Right.  Because you're ultimately

8    going to have to give the documents to the Government in any

9    event.

10:10AM    10                MR. STEINGARD:  Only if they're going to be used.

11                THE COURT:  Right.  In your hypothetical that

12    we're talking about, your expert is going to be testifying as

13    to the missing documents because those ten that the expert

14    didn't look at, those ten documents are going to have to be

10:11AM    15    turned over to the defense as part of your obligation.

16                MR. STEINGARD:  What I'm saying is, in the

17    production to the Court in this hypothetical, 20 documents,

18    50 documents were produced and the defense selected 10 that

19    they wanted to use, those, of course, would have to be produced

10:11AM    20    to the Government but not the other 40.

21                THE COURT:  Right.  That's why all these Rule 17

22    subpoenas and all this alleged trial strategy, you know,

23    especially in this case where it's been my effort to make sure

24    that there are no surprises that occur at the time of trial,

10:11AM    25    obviously it's more slanted toward making sure that the defense

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:12AM | 5 |

doesn't have any surprises but also that there are no surprises

for the Government although that's a different issue.

     In any event, I still don't see it.  More

importantly, it seems like many of these documents should be

available without the necessity of a subpoena.

     MR. STEINGARD:  I wish that to be true,

Your Honor.  I believe the documents we're talking about are

not available to the defense with just a phone call.  I wish it

was -- I wish it was different, but I can tell you we have made

phone calls.  We haven't --

     THE COURT:  Maybe it takes a visit.

     MR. STEINGARD:  Well, that would be okay.  That

would be okay with me.

     THE COURT:  In any event, then you can have --

you know, you can have all of the boxes of documents, and if

they're voluntarily produced to you, you can do whatever you

want with them.

     MR. STEINGARD:  Absolutely right.  If that was

the case, we wouldn't have submitted any kind of an application

to the Court.  May I just suggest, Your Honor, that you sit on

this for two weeks?

     THE COURT:  Sure.

     MR. STEINGARD:  And give me an effort with

co-counsel --

     THE COURT:  We're talking about an October trial

1  date.

2            MR. STEINGARD:  Correct.

3            THE COURT:  I know these documents are

4  potentially voluminous, but given -- I think, once they're

10:13AM  5  produced, it should be a fairly easy task to accomplish what I

6  understand you're trying to accomplish.

7            MR. STEINGARD:  I agree.

8            THE COURT:  So you can -- two weeks, three weeks

9  is fine with me.

10:13AM  10           MR. STEINGARD:  Okay.  You will have it within

11  two weeks.  Again, that will be filed in camera.  You already

12  have the joint filing with the Government which lays out our

13  respective positions.  You will have a full plate then.

14           THE COURT:  Right.  And then with the -- of

10:13AM  15  course, again, you know, all this Rule 17 stuff is -- you know

16  exactly what happens, and obviously the request for your gag

17  order or the nondisclosure order is, as soon as a subpoena is

18  served, the first call is to the Government saying, guess what,

19  I got this subpoena.  What do I do with it?  So that's why all

10:14AM  20  of this to me is just -- in any event.

21           MR. STEINGARD:  I agree the system isn't perfect,

22  Your Honor, but it's the one we're playing with.  So we have to

23  go -- I agree with you that may well happen.  In fact, it

24  likely will happen.  But at least we can take steps to try to

10:14AM  25  prevent it.

1    THE COURT:  I understand.  Maybe somebody should

2    consider changing Rule 17 to make it work like the defense

3    lawyers want it to work.  I mean, I had a case where I had to

4    put a stop to the practice -- I didn't understand it -- but the

10:14AM    5    Federal Public Defender's Office was having Rule 17 subpoenaed

6    documents delivered to their office instead of delivered to the

7    Court which I found to be -- not in this case and not any of

8    these lawyers, but I found that to be highly unusual and put a

9    stop to that practice quickly.

10:15AM    10    MR. STEINGARD:  All right.

11    THE COURT:  All right.  Anything else?

12    MS. DRAGALIN:  Your Honor, we do have the

13    stipulation to continue the RICO trial for --

14    THE COURT:  Right.  I was going to sign that

10:15AM    15    today, but I see Mr. Braun is rising and he had some problem

16    with --

17    MR. BRAUN:  I just thought the last thing we

18    needed is another motion or hearing in this case.  There has

19    been some issue raised about my competence and communication

10:15AM    20    with my client in terms of the offers.  So I think the simplest

21    way is for me to just have my client prepare a declaration as

22    to what his knowledge is and file that with the Court.  The

23    Court can then decide whether or not any further inquiry is

24    necessary.

10:15AM    25    He's fully prepared to testify, and he's brought

```
 1   all the documents, but I think it would be better just to file
 2   a declaration.
 3             THE COURT:  Well, that issue has never been
 4   raised with me.
 5             MR. BRAUN:  It's been raised by the Government
 6   with me, and I think I will just -- if it's okay with the
 7   Court, we will file a declaration by my client saying here's
 8   what he knows about the case, here's what the offers are, and
 9   he's fully aware of them, and that should end that issue.
10             THE COURT:  But you're going to file that in
11   camera.
12             MR. BRAUN:  We can do it in public.  There's no
13   issue.
14             THE COURT:  All right.  Whatever you want, I'm
15   unaware of the issue.  The only issue I was aware of is at one
16   stage of these proceedings the Government had attached several
17   e-mails that were exchanged between you and the Government and
18   the Government rightly was taking offense to some of the
19   statements that were made in those e-mails.
20             MR. BRAUN:  I think they left out some of the
21   better e-mails.  We will put together a declaration,
22   Your Honor.
23             THE COURT:  All right.  Well, I am going to sign
24   that stipulation for a continuance of the trial to February.
25             All right.  Anything else?
```

          1                    MR. JENKINS:  Just to clarify, if Mr. Braun's

          2        position now is that Mr. Chan is waiving to that date, he just

          3        noted it was agreeable, so originally he had objected between

          4        January to February, he's agreeing now, just for the record,

10:17AM   5        that would be helpful.

          6                    MR. BRAUN:  I hate to be technical.  I don't

          7        think you can waive.  We can stipulate there's a good cause.  I

          8        don't think you have a right to waive a Speedy Trial Act.  We

          9        will stipulate to the good cause.

10:17AM  10                    THE COURT:  Is that sufficient, Mr. Jenkins?

         11                    MR. JENKINS:  That is.  Thank you, Your Honor.

         12                    THE COURT:  Do you want to redo the stipulation?

         13                    MR. JENKINS:  I definitely do not, Your Honor.

         14        But --

10:17AM  15                    THE COURT:  The order?

         16                    MR. JENKINS:  We can amend the order, Your Honor.

         17                    THE COURT:  Why don't you just submit an amended

         18        order.

         19                    All right.  How many motions in limine are we

10:17AM  20        anticipating in the Lee case?

         21                    MR. NEUMAN:  I think there's three.

         22                    THE COURT:  Three?

         23                    MR. NEUMAN:  Yes.  And two of them are

         24        relatively -- I will see what the Government's opposition is.

10:18AM  25        Two of them are relatively short.  One is longer.

```
 1              THE COURT:  All right.  In terms of the time

 2    estimate for trial, where are we at?

 3              MS. DRAGALIN:  Your Honor, we estimate that the

 4    trial -- the Government's case in chief will run approximately

 5    five court days.  So we anticipate we would spill it over into

 6    the following week of after June 14th.  But we do think we

 7    should be finished by the end of that week.

 8              THE COURT:  Do you agree, Mr. Neuman?  The

 9    reason, I have a custody case that I have to -- I have to try.

10    I want to make sure that this trial doesn't interfere with that

11    custody case.  How long do you anticipate the defense case to

12    take?

13              MR. NEUMAN:  No more than a day or two if there

14    is a defense case.  I haven't had a chance to talk about this

15    with the Government.  There's I think, just from memory, 23 or

16    so witnesses on their list.  I think some of them are

17    cumulative and don't have relevant evidence.  We will discuss

18    that with the Government and, as necessary, raise it with the

19    Court before they testify.

20              THE COURT:  Okay.

21              MR. NEUMAN:  Given the Court's mention of

22    scheduling, does the -- I know the Court had concerns about in

23    custody trials.  Is the June 14th date still looking like it's

24    going to work?

25              THE COURT:  The June 14th date I -- I have
```

10:18AM  (line 5)
10:18AM  (line 10)
10:18AM  (line 15)
10:19AM  (line 20)
10:19AM  (line 25)

```
 1    guarded the June 14th date so we can get this case tried.  I
 2    had to set the custody case that I'm referring to to commence
 3    after the June 14th date.  It's going to be -- I think we will
 4    have sufficient time.
 5              Again, I'm sure you all realize that we're
 6    continuing to operate under this system which I hope we can
 7    abolish.  But I have to make a request for a jury panel for a
 8    particular day, and there's no assurance that I will be able to
 9    have a jury panel on June 14th.  But I'm going to make some
10    efforts this week to make sure that I can lock in that date
11    because the timing is going to be such that we're going to
12    be -- I want to make sure that we get this case tried and allow
13    my custody case to go because we're all --
14              MR. NEUMAN:  I take it this custody case is set
15    for June 28th.  Is that --
16              THE COURT:  Yes.
17              MR. NEUMAN:  So if the Government is talking five
18    days, that goes to the 21st or so.  I think that's probably
19    sufficient to get the case at least to the jury by the end of
20    the week.
21              THE COURT:  Right.  That's my -- that was my game
22    plan when I set the custody case for the 28th.
23              MR. NEUMAN:  Is the -- maybe we're too far in
24    advance.  Is the Court anticipating the sort of spread out jury
25    that I see here?
```

10:20AM (line 5)
10:20AM (line 10)
10:21AM (line 15)
10:21AM (line 20)
10:21AM (line 25)

1        THE COURT:  This is the way we have been

2  conducting.  We pick a jury in Courtroom 1 and then -- because

3  we can have a sufficiently -- a larger panel than doing it in

4  here and I don't have to use the video.  And then after we pick

5  the jury and I give them preliminary instructions, then we come

6  back up here, and then we spread out consistent with the

7  numbers that you see which gives us, along with all the

8  plexiglass, some social distancing.

9        That's an issue I can raise with counsel now.  I

10  have been asking for fully vaccinated juries and have done so

11  in the last four or five cases that I have tried.  Does anybody

12  have any objection to that?

13        MS. ALÉ:  Your Honor, are you asking for Huizar?

14        THE COURT:  No.  I'm not asking you.  I'm asking

15  Mr. Neuman who is coming to trial on the 14th.

16        MR. NEUMAN:  Just off the top, no, but I would

17  like to have a moment to think if there is any reason.

18        THE COURT:  Sure.  If you do have an objection,

19  just let us know.  It -- quite frankly, I have noticed that it

20  really has not had any impact on the composition of the panel.

21  Although we all know that vaccination plus booster may not

22  be -- may not be fully protecting everybody, I have noticed,

23  when I speak to the jurors afterwards -- and Shannon, when she

24  speaks to them during the day -- they're much, much more

25  comfortable knowing that the panel -- their fellow jurors are

```
 1    fully vaccinated.  Even if we still separate them like this,

 2    they still go on breaks together and it's just -- it makes the

 3    jury panel and it makes the Court more comfortable in terms of

 4    whatever may be happening on June 14th.

 5                MR. NEUMAN:  That's fine.  When does the Court

 6    need an answer?  I can get back to you.  I just need time.

 7                THE COURT:  The next couple days.

 8                MR. NEUMAN:  No problem.  Thank you, Your Honor.

 9    We will be a little bit crowded because I anticipate having a

10    translator between me and my client, an attorney from my firm,

11    but she will be serving that role.

12                THE COURT:  We have the benefit of the back row.

13    The interpreter typically works through headphones.

14                MR. NEUMAN:  Right.  I'm not talking about my

15    client understanding what's happening in court.  I'm talking

16    about he and I being able to talk during the proceedings.  My

17    co-counsel Mr. Seilie will be -- it may be a little more

18    crowded than it otherwise might be.

19                THE COURT:  Okay.  All right.  Does the

20    Government have any objection?

21                MR. JENKINS:  Provided that the defense agrees,

22    the Government has no objection.

23                THE COURT:  All right.  Well, I'm obviously not

24    going to do it if there's an objection.  But I just think

25    it's -- for whatever is going on with the -- who knows what
```

10:23AM (line 5)
10:23AM (line 10)
10:24AM (line 15)
10:24AM (line 20)
10:24AM (line 25)

1    variant it may be by June 14th.

2                MR. NEUMAN:  I take it the Court is not requiring

3    participants to be masked during the proceedings.

4                THE COURT:  I am.  The jury -- the last trials

5    that we have had, the jury has -- the jurors have all worn

6    masks.  I have counsel wear masks unless they're speaking.  The

7    witnesses do have not to -- they have to wear masks -- they

8    don't have to wear masks while testifying.  But you know, we

9    still have the mask rule in effect.  I see everybody is

10   violating the mask rule this morning.

11               MR. NEUMAN:  Followed Government counsel's leads.

12               THE COURT:  So I will issue sanctions against

13   Mr. Jenkins personally for violating the rules.

14               MR. JENKINS:  I will endeavor to do better next

15   time, Your Honor.

16               MR. NEUMAN:  Thank you, Your Honor.

17               THE COURT:  Thank you very much.  We will be in

18   recess.

19                     (Proceedings concluded at 10:25 a.m.)

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5               I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6 COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7 THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8 PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9 FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12 CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13 THE UNITED STATES.

14

15                   DATED THIS  19TH  DAY OF JUNE, 2022.

16

17

18                   /S/ MIRANDA ALGORRI

19                   MIRANDA ALGORRI, CSR NO. 12743, CRR
                      FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25