CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GEORGINA WAKEFIELD (Bar No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JERRY NEHL BOYLAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JERRY NEHL BOYLAN,<br><br>Defendant. | Case No. 2:22-CR-00482<br><br>**MOTION TO DISMISS INDICTMENT; MOTION FOR INJUNCTION, DISCOVERY, AND JURY INSTRUCTION REGARDING GOVERNMENT MISCONDUCT**<br><br>Hearing Date: September 28, 2023<br><br>Hearing Time: 8:00 a.m. |

Jerry Nehl Boylan, through his attorneys of record, Deputy Federal Public Defenders Georgina Wakefield, Gabriela Rivera, and Julia Deixler, hereby moves this Honorable Court for an order dismissing the Indictment for the government's substantial interference with witnesses, in violation of Due Process.

In the alternative, Mr. Boylan moves for an order: (1) compelling discovery regarding other instances of potential government misconduct; (2) enjoining the government from engaging in further improper questioning of trial witnesses; and (3) providing a curative jury instruction regarding the government's misconduct in

1

1   improperly influencing trial witnesses.

2          This motion is based upon the attached memorandum of points and authorities,

3   all files and records in this case, and such evidence and argument as may be presented

4   at the hearing on the motion.

5                                              Respectfully submitted,

6                                              CUAUHTEMOC ORTEGA
                                               Federal Public Defender
7

8

9   DATED:  August 31, 2023          By   */s/ Julia Deixler*
                                          _____
10                                         GEORGINA WAKEFIELD
                                           GABRIELA RIVERA
11                                         JULIA DEIXLER
                                           Deputy Federal Public Defenders
12                                         Attorneys for JERRY NEHL BOYLAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           2

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ...................................................................................... 1

II.    FACTUAL STATEMENT ......................................................................... 1

    A.    Background of the Case ................................................................ 1

    B.    The Government's Witness Interviews ......................................... 2

         1.    Interview of Roy Hauser, Former Owner of Truth Aquatics ........... 2

         2.    Interview of Milton French, Surviving *Conception* Crewmember ... 8

         3.    Other Interviews in Which the Government Commented on Mr. Boylan's Guilt ................................................................................... 9

         4.    Unrecorded Interviews ................................................................. 11

III.    LEGAL STANDARD ............................................................................. 12

IV.    ARGUMENT ........................................................................................... 14

    A.    The Court should dismiss the Indictment due to the Government's improper interference with testimonial evidence. ...................................... 14

    B.    If the Indictment is not dismissed, other remedies are needed to address the government's misconduct and prevent ongoing witness tampering. ............................................................................................. 19

         1.    Additional discovery is necessary to determine which other witnesses may have been improperly influenced. ........................... 19

         2.    A curative jury instruction is necessary. ....................................... 20

         3.    The Court should enjoin the government from engaging in similar tactics as the parties prepare for trial. ................................. 21

V.    CONCLUSION ....................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Berg v. Morris*,
   483 F. Supp. 179 (E.D. Cal. 1980) ........................................................................ 13

*Chambers v. Mississippi*,
   410 U.S. 284 (1973).............................................................................................. 12

*N. Mariana Islands v. Bowie*,
   236 F.3d 1083 (9th Cir. 2001) .............................................................................. 14

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ................................................................................ 13

*United States v. Hawkins*,
   2004 WL 3419420 (N.D. Cal. Dec. 27, 2004) ..................................................... 14

*United States v. Juan*,
   704 F.3d 1137 (9th Cir. 2013) .............................................................................. 13

*United States v. Loud Hawk*,
   628 F.2d 1139 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)...................... 20

*United States v. Sivilla*,
   714 F.3d 1168 (9th Cir. 2013) .............................................................................. 20

*United States v. Vavages*,
   151 F.3d 1185 (9th Cir. 1998) .........................................................12, 13, 14, 18

*Washington v. Texas*,
   388 U.S. 14 (1967).............................................................................................. 12

*Webb v. Texas*,
   409 U.S. 95 (1972).............................................................................................. 12

**Federal Statutes**

18 U.S.C. § 1115.................................................................................................... 17

U.S. Const. amend. V ............................................................................................. 12

U.S. Const. amend. VI ............................................................................................ 12

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Regulations**

46 C.F.R. § 185.410 ................................................................................................ 2

**Other Authorities**

Mark Puente, et al., *Before Conception boat fire, some captains say Coast Guard safety rule was ignored*, LOS ANGELES TIMES (Dec. 29, 2019), *available at* https://www.latimes.com/california/story/2019-12-29/conception-boat-fire-several-captains-didnt-designate-roving-watches-to-spot-dangers ................................................................. 11, 12, 18

# I. INTRODUCTION

Jerry Boylan worked as a crewmember for Truth Aquatics boats for decades, and earned a sterling reputation from other company employees for his skills as a captain and his attention to safety.  But within days (if not hours) of the tragic accident on the *Conception* that took the lives of 34 individuals, Mr. Boylan became the target of a federal criminal investigation.  Federal prosecutors intervened in the safety investigation led by the National Transportation Safety Board ("NTSB") by limiting the agency's access to key witnesses.  Prosecutors then began interviewing witnesses themselves, and immediately instilled in those witnesses the government's preferred theory of how and why the accident occurred, and who was responsible.  In several interviews with former Truth Aquatics employees, prosecutors and government agents repeatedly asserted the Mr. Boylan was guilty of the offense for which he is now charged.  The government also used aggressive interviewing tactics to shape the testimony of those who spoke favorably of Mr. Boylan, and fed witnesses legal authority and facts that were not already in their knowledge.  The cumulative effect of these improper tactics has altered the evidence that will be presented at trial, prevented the defense from securing witnesses without the taint of government interference, and violated Mr. Boylan's Due Process rights.

The Constitution does not tolerate such conduct by the government.  This Court should dismiss the Indictment.  If the Indictment is not dismissed, the Court should impose other remedies to address the government's misconduct and prevent ongoing witness tampering.

# II. FACTUAL STATEMENT

## A. Background of the Case

Jerry Boylan was the captain of the *Conception*, a 75-foot passenger boat owned by the Fritzler Family Trust and operated by Mr. Boylan's employer, Truth Aquatics, Inc.  On September 2, 2019, a fire broke out aboard the *Conception* while it was anchored overnight at Santa Cruz Island.  The fire spread quickly, and the boat burned

to the waterline.  Five people, including Mr. Boylan, who was serving as the captain of the *Conception*, escaped with their lives and survived the accident.  Thirty-three passengers and one crewmember tragically perished.  All the decedents were sleeping in the bunkroom below deck, and both exits from the bunkroom led to the same area of the boat, which was engulfed in flames.  As a result, Mr. Boylan and the other survivors were unable to access or save any of the thirty-four people sleeping below deck.

The United States Attorney's Office led a criminal investigation with the Coast Guard Investigative Service (CGIS), the FBI, and the ATF.  The ATF conducted an investigation into the potential cause and origin of the fire, conducting intermediate scale testing in March and April of 2020, and full-scale testing in October and November of 2020.  The ATF issued a report on January 4, 2021, which hypothesized that the fire originated in a garbage can on the main deck.  ATF could not determine the cause of the fire.  The NTSB also conducted an investigation and published a report on October 20, 2020.  The NTSB concluded that the origin of the fire was likely inside the aft portion of the salon, not in the garbage can identified by the ATF.  The report also identified contributing causes to the accident and to the loss of life.

On December 1, 2020, the government filed an indictment charging Mr. Boylan with seaman's manslaughter, and filed a First Superseding Indictment on July 19, 2022. On September 1, 2022, this Court dismissed the government's First Superseding Indictment for failure to allege an essential element of the offense, gross negligence. On October 18, 2022, the government filed the current indictment, which alleges that Mr. Boylan "acted with a wanton or reckless disregard for human life by engaging in misconduct, gross negligence, and inattention to his duties on [the *Conception*] through, among other things: 1) his failure to maintain a night watch or roving patrol, despite his duty to do so set forth in the [COI] … and 46 C.F.R. § 185.410."  (ECF No. 1).

**B. The Government's Witness Interviews**

### 1. Interview of Roy Hauser, Former Owner of Truth Aquatics

Less than two weeks after the accident, on September 13, 2019, agents from the

2

CGIS and Santa Barbara Sheriff's Office served Roy Hauer, the former owner of Truth Aquatics, with a Grand Jury subpoena.  On September 18, Mr. Hauser was interviewed at his residence by AUSA Joseph Johns (then the Chief of the Environmental and Community Safety Crimes Section of the USAO in this District), along with two CGIS special agents.  *See* Ex. A (Hauser Tr.).

Mr. Hauser founded Truth Aquatics in 1970.  After suffering a scuba-diving accident in 1978 that left him partially paralyzed and confined to a wheelchair, Mr. Hauser surrendered his captain's license and brought on Glen Fritzler as a co-owner of Truth Aquatics.  Mr. Boylan was fired by Truth Aquatics in 1984, starting as a deckhand on the *Conception* where Mr. Fritzler served as captain, and then rising to captain himself in 1985.[1]  Mr. Hauser sold his stake in the company to Mr. Fritzler in 1999, and Mr. Fritzler was the sole owner of Truth Aquatics until the accident.

During the course of the three-hour interview of Mr. Hauser, AUSA Johns asked questions and made comments to influence the statements made by Mr. Hauser regarding his adherence to roving patrol requirements and the purpose of a roving patrol.  AUSA Johns also repeatedly asserted the criminal liability of Mr. Boylan, just two weeks into what would be a more than year-long, multi-agency investigation.

*i.   The government influenced Mr. Hauser to change his testimony regarding his use and the purpose of a night watchman.*

During the interview, Mr. Hauser stated that when he owned and captained Truth Aquatics boats, which included time periods when Mr. Boylan was initially hired, trained, and worked for the company, he did not implement a roving patrol or "standing watch" at night.  Ex. A at 68:

> AUSA Johns:   Okay, um, do you remember the watch standing requirement that says that whenever a T boat, which is a small passenger vessel, uh, under 100 gross ton, tons, whenever you have, at night, whenever you have passengers in the stateroom or, or the bunks or the berthing area, you must have a suitable number, at least one watchman, awake and essentially patrolling the vessel to sound the

---

[1] NTSB, Marine Accident Report at p. 49, § 1.9.2.

3

|   |   |   |
|---|---|---|
| | | alarm for fire, man overboard, or other dangerous situations? |
| Roy Hauser: | | We had wheel watches and we had anchor watches at night. |
| AUSA Johns: | | Did you have a watchman, did you have somebody standing watch that was also on the lookout for other dangerous situations, like fire or man overboard? |
| [CGIS agent]: | | Roving patrol? |
| Roy Hauser: | | No, not when I was on the boat. |

AUSA Johns then showed Mr. Hauser the 2019 Coast Guard Certificate of Inspection ("COI") for the *Conception*, and asked Mr. Hauser if he would have complied with it had he been the master of the *Conception*.[2]  Mr. Hauser indicated that he was unable to answer the question, stating, "Well, that's hard to say though.  I don't answer hypothetical questions," and later, "I don't know.  I don't know, I've never seen that before."  *Id*. at 73.  But AUSA Johns continued to push the line of questioning, and Mr. Hauser ultimately relented, providing the answer that AUSA Johns was looking for:

| | | |
|---|---|---|
| AUSA Johns: | | Okay. It's a simple question. You've told us repeatedly that you followed the rules, you followed the regulations, you followed the requirements, right? |
| Roy Hauser: | | Yeah. |
| AUSA Johns: | | Okay. Now, I've showed you this certificate of inspection, which shows that the *Conception* going all the way back to at least 1999, and I can show you every other certificate of inspection up until today's date, they all have the roving patrol requirement, which says that anytime a passenger is below deck in that berthing or stateroom area, whether underway, at night, during the day, a member of the vessel's crew shall be designated by the master as a roving patrol. I'm asking you if you would've complied with that. We're trying to understand what people in these situations do. Are you the type of person that would've just ignored that and blown it off and not complied?  Or would you have complied with the operating license issued by the Coast Guard for that vessel? |
| Roy Hauser: | | I would follow the rules and regulations. |
| AUSA Johns: | | Okay. Even if you felt that it was unnecessary, you would have complied? |
| Roy Hauser: | | Yes sir. |

---

[2] The COI states, "A member of the vessel's crew shall be designated by the master as a roving patrol at all times, whether or not the vessel is underway, when the passenger's bunks are occupied."  NTSB, Marine Accident Report at p. 65, § 2.6.

4

*Id*. at 73-74.  The previously verbose Mr. Hauser then began to limit his answers to a series of clipped "Yes sirs," agreeing to every question about a requirement that, just moments prior, he said he was not aware of.  Ex. A at 74-75:

| | |
|---|---|
| AUSA Johns: | I take it that because the certificate of inspection says you have to have a roving patrol with passengers of below decks, that you would have complied with that? |
| Roy Hauser: | Yes sir. |
| AUSA Johns: | Okay. And would you expect when... It, when you were off your shift, and your second mate or your second master was in control of the vessel, would you expect your second master to comply with that roving patrol as well? |
| Roy Hauser: | Yes sir. |
| AUSA Johns: | Whenever Mr. Fritzler, back when he used to captain the *Conception*, when you guys were partners, and even in the years after that, would you have expected him to do the same thing? To comply with the operating license and the requirements of the certificate of inspection? |
| Roy Hauser: | Yes sir. |
| AUSA Johns: | How about Captain Jerry Boylan? And let's talk about the trip from a couple weeks ago. Would you have expected him to comply with the roving patrol requirement on the *Conception*'s certificate of inspection? |
| Roy Hauser: | Yes sir. |

*See also* Ex. B (Hauser Audio) at 01:36:35-01:37:43.

In response to further questioning by the government, Mr. Hauser changed his testimony entirely from his initial statements regarding a watchman.  Although he previously stated that he was unaware of a night watchman requirement, two hours into the interview, Mr. Hauser agreed that he complied with it.  Ex. A at 91-92:

| | |
|---|---|
| AUSA Johns: | Okay. I'd like you to read you [the oath for a Merchant Mariner's License] if I could. I do solemnly swear or affirm that I will faithfully and honestly, according to my best skill and judgment, and without concealment and reservation, perform all the duties required of me by the laws of the United States. I will faithfully and honestly carry out the lawful orders of my superior officers aboard a vessel. That ring a, ring a bell? Does that sound familiar? |
| Roy Hauser: | If that's what it was, that's what I signed, that's what I will do. |
| AUSA Johns: | Including following and complying with the laws of the United States? |
| Roy Hauser: | Absolutely. |
| AUSA Johns: | Which include the T boat regulations for small passenger vessels. |

5

| | |
|---|---|
| Roy Hauser: | Absolutely. |
| AUSA Johns: | You would've, you would've complied with those regulati- ah, ah, forget that. You *did* comply with those laws and those regulations when you operated a- [ ] . . . And you complied with the watch standing and the operating requirements, correct? |
| Roy Hauser : | Yes I did. |
| AUSA Johns: | And you would expect any second master or any other master that worked for you in your business to do the same? |
| Roy Hauser: | Well, yeah. They were hired there. They know the rules and regulations. |

The Government also influenced Mr. Hauser to change his testimony regarding the *purpose* of a roving patrol.  When first asked about its purpose, Mr. Hauser struggled to find the desired answer, then suggested that its purpose was to watch for anchor drift.  AUSA Johns then supplied the specific answer he was looking for:

| | |
|---|---|
| AUSA Johns: | Do you know what the purpose of that roving patrol requirement is? |
| Roy Hauser: | Yes sir. |
| AUSA Johns: | What? |
| Roy Hauser: | To have a roving patrol on the boat. |
| AUSA Johns: | To look for what? |
| Roy Hauser: | Anything. |
| AUSA Johns: | Well, anything what? Are they, I mean, are they looking to make sure people have a warm cup of coffee? Are they looking... What are they looking for? What are they trying to prevent? |
| Roy Hauser: | Make sure the anchor, make sure the vessel is securely at anchor. |
| AUSA Johns: | How about fire? Are they looking for fire aboard the vessel, so they can put it out or sound the alarm? |
| Roy Hauser: | Yes sir. |

Ex. A at 75; Ex. B at 01:37:50-01:38:26.  Later, when Mr. Hauser said again that the primary purpose of a night watch was to check for anchor slippage, AUSA Johns again redirected Mr. Hauser to agree that the purpose was for detecting fire.  Ex. A at 98:

| | |
|---|---|
| AUSA Johns: | Okay. Would you ever have allowed a situation where all of the crew and all of the masters and captains aboard the second Truth or the *Conception* were all asleep at the same time? |
| Roy Hauser: | No. |
| AUSA Johns: | Why not? |
| Roy Hauser: | Well because you don't want your boat to end up on the rocks at the middle of the morning. |
| AUSA Johns: | If there was anchor drift? |

| Roy Hauser: | Well, yeah. You have an anchor watch. Always. |
|---|---|
| AUSA Johns: | Okay. And would it also be helpful if a fire broke out like it did in 1976 with the starter, it's also helpful to have somebody awake to smell the fire, detect for that, right? |
| Roy Hauser: | Yes. Yes. |
| AUSA Johns: | So that was how you operated the vessel when you were in charge? |
| Roy Hauser: | Yes. |

ii.   *The government asserted that Mr. Boylan was guilty of criminal negligence during the interview of Mr. Hauser.*

The government's misconduct was not limited to influencing Mr. Hauser to change his testimony.  Through both indirect and direct statements, AUSA Johns also suggested to Mr. Hauser that Mr. Boylan was guilty of criminal negligence.  In one such instance, AUSA Johns questioned Mr. Hauser about whether a captain's failure to follow a rule or regulation would constitute a "breach of their duty."  *Id*. at 97:

| AUSA Johns: | Do you feel, is it your opinion, that the master of a vessel like the Truth, Vision, or *Conception*, that they can pick and choose what rules and regulations? |
|---|---|
| Roy Hauser: | Absolutely not. |
| AUSA Johns: | If there's a rule, if there's a safety regulation, they have to comply with it, right? |
| Roy Hauser: | Yes. |
| AUSA Johns: | Okay. And if they don't that's a breach of their duty, is it not? As the captain? |
| Roy Hauser: | Yes. |

At the conclusion of the interview, AUSA Johns addressed the issue even more directly.  He told Mr. Hauser that had there been a night watch on the *Conception* on the evening of the accident, "34 people would be alive."  *Id*. at 143:

| AUSA Johns: | You do understand that if Captain Boylan and if Glenn Fritzler had made sure that Captain Boylan is complying with the-the watchmen requirement, and if Captain Boylan was also complying with the roving patrol requirement, you do understand that that fire would have been found and detected, and 34 people would be alive. And you seem very angry a-about this. I-I and you seem upset that other dive-ship company operators are-are-are also, you know, still out there operating, but if you're aware that the entire industry and the other captains just don't comply with the regulations, you should tell us, because we'll go out- |
|---|---|

AUSA Johns then went one step further, not only repeating his legal conclusion that Mr. Boylan was guilty but also relaying the statements made by another witness, Michael Kohls, during his government interview.  AUSA Johns told Mr. Hauser that Mr. Kohls "was not acting as a watchman" or "roving patrol."  *Id*. at 145:

| Roy Hauser: | Now, I don't know what procedures, what operations, what took place, who was where, when, I was only told, mind you, that there was a crewman in the galley within 30 minutes prior. |
|---|---|
| AUSA Johns: | Yeah, well, we interviewed that crew member.  And we know why he was there. |
| Roy Hauser: | I have no idea- |
| AUSA Johns: | He was not acting as a watchman.  He was not acting as a roving patrol.  He went down to wash the wine cups, the coffee, you know the-the- the mugs from the birthday celebrations that night.  He went down there to wash them to get a jump on the following morning.  That's all. That's all. It wasn't because he was acting as a watchman, it wasn't ... because he was acting as a roving patrol. If there had been a watchman, if there had been a roving patrol, those 34 people would still be alive. [ ] . . . |
| AUSA Johns: | The point is, is that a fire can grow awful large and get awful big in the space of 30 minutes.  That's my point. If-if somebody had been awake, if somebody had been conducting the roving patrol, if somebody had been at the wheel house like you were in 1976, on the second Truth, they would've smelt the fire when it was still the size of a dinner plate or smaller.  That's all.  That's the only point. |

## 2. Interview of Milton French, Surviving *Conception* Crewmember

Milton French was the first deckhand on the *Conception* and one of the five survivors of the accident.  He was interviewed by the government just weeks after the accident—on September 24, 2019.  AUSA Johns asked Mr. French about the practices of Truth Aquatics as compared to other companies when it came to "watch standing requirements or roving patrol requirement[s]."  Mr. French stated, "I talked to Glen [Fritzler] about it and I specifically just said that … I've been working for this company for a while.  I always thought it was my impression you guys were very safe…"  Ex. C (French Tr.) at 81.  In order to disabuse Mr. French of that impression, AUSA Johns told Mr. French the requirements of the COI and T-boat regulations, suggesting that Truth Aquatics and Jerry Boylan did not comply with those requirements.  *Id.* at 81-82:

| AUSA Johns: | If I would tell you that Certificate of Inspection requires a roving patrol to look for dangerous situations and to sound the alarm in |
|---|---|

| | | |
|---|---|---|
| | | case of fire and man overboard things like that |
| | Milton French: | Hmm. |
| | AUSA Johns: | When anybody is down in the bunk or berthing area ... um whether at night or during the day. |
| | Milton French: | Hmm. |
| | AUSA Johns: | How would you feel about Truth Aquatics compliance with its operating license? |
| | Milton French: | Um |
| | AUSA Johns: | Would you say… would you feel if they were in compliance with their operating license and C.O.I? |
| | Milton French: | No. |
| | AUSA Johns: | If I were to tell you that there is a regulation of t-boat regulations [UI] regulations 185 point 4-10 which requires at any time at night. Whether on the way or not [UI] passengers are below um the bunking area that there must be a watch stood on that vessel to sound the alarm in case of fire, man over board or other dangerous situation. Would you feel that Truth Aquatics and Captain Boylan were in the compliance with the law? |
| | Milton French: | No. |

Later, when Mr. French did not wholeheartedly agree with AUSA Johns's suggestion that a roving patrol would have prevented the loss of life, AUSA Johns asked if Mr. French was lying to try to protect someone. *Id.* at 83:

| | | |
|---|---|---|
| | AUSA Johns: | Do you feel that if there had been a roving patrol, somebody awake and patrolling that vessel at night as required by the C.O. I. that could have made a difference in somebody spotting that fire before it came so big |
| | Milton French: | Ugh. |
| | AUSA Johns: | Logically given the size of that vessel. |
| | Milton French: | I believe it could have but |
| | AUSA Johns: | What gives you hesitancy? |
| | Milton French: | Just simply the fact that we don't know exactly where it started ugh … um I haven't read the regulations even since word for word myself. Um it had been explained to me by a number of people. Um, you know friends or whoever … um but so, I'm not sure what the exact wording is verbiage but um, but I … I mean if you have to patrol the entire the boat and it's fifteen minutes [UI] um yeah, I don't know why I'm hesitate to be honest, its |
| | AUSA Johns: | Are you trying, are you trying to not get somebody in trouble? |

### 3.  Other Interviews in Which the Government Commented on Mr. Boylan's Guilt

In several other interviews, the government continued to suggest to witnesses

9

that Mr. Boylan acted negligently or breached his duties.  For example, AUSA Johns

asked the following of Brian Priddin, who is a licensed captain and worked on a few

trips on the *Conception* with Mr. Boylan:

> AUSA Johns:     So let me ask you this question again. If during the time period that you served as second captain aboard the Conception, if you had been made aware of the requirement on the certificate of inspection that any time passengers or crew are in the bunk area, or the state room area, whether underway or at anchoring at night, that there must be a roving patrol. If you had been made aware of that provision, and you failed, you knowingly and you intentionally failed to comply with that by ensuring that somebody was posted, would you say that you yourself were inattentive to your duties? Or that you were breaching your duties as a credentialed merchant mariner?
>
> Brian Priddin:     Yeah, if I had failed. If I had known and failed to do that, yes, then I would've been failing. I would've been responsible for that, yes.
>
> AUSA Johns:     Fair enough, and I don't mean to put it on you, I'm actually trying to understand how we put in context Captain Boylan's inattention to duties.

Ex. D (Priddin Tr.) at 76.

In other interviews, the government asked former Truth Aquatics employees,

"would you agree, that if a captain failed to abide by what's required of him on the

COI, that he is negligent in his duties?"  Ex. E (Fitts Tr.) at 60; Ex. F(1) (Fitts Audio) at

1:29:40-1:30:07; *see also* Ex. G (Curto Tr.) at 21-22 ("And if a captain fails to comply

with the stipulations of a COI, would you say that he's negligent in his duties?").

One witness, Chris Russello, who was a passenger on Truth Aquatics boats and

later a crewmember, spoke at length about Mr. Boylan's attention to safety and skill as

a captain.  Mr. Russello said that "the crew on the *Conception* was top notch" with

respect to safety, and that Mr. Boylan was "probably one of the top five in the state

who knows how to handle boats.  Safety was number one with him."  Ex. I(i) (Russello

Audio) at 34:18-34:50; Ex. J(i) (Russello Tr.) at 45.  Russello continued that Mr.

Boylan thoroughly conveyed safety information to passengers and crew, conducted

headcounts to ensure all passengers were present for safety briefings, and "went over

and over and over about the safety procedures on the boat, all the time.  All the time."

Ex. I(i) at 35:00-35:22; Ex. J(i) at 45.  Mr. Russello also spoke to how well the

*Conception* crew was trained.  *See* Ex. I(ii) at 7:40-8:00; Ex. J(ii) at 7 (discussing an incident where the crew responded rapidly to a passenger with a medical emergency and stating that "you can tell just by the way they react to a situation how good they're trained.").  Later, the government introduced the term "negligence" to the conversation, asking Mr. Russello if "it was safe to say" that a crew member failed to properly conduct a night watch "was negligent in what he was supposed to be doing."  Ex. I(ii) at 30:50-31:05; Ex. J(ii) at 24.  The agent asked, "If the captain or crew fails to comply with the COI, is that negligence as well, in your view?"  Ex. I(ii) at 31:05-31:12; Ex. J(ii) at 24.  Russello responded that he's "not an attorney."  *See also* Ex. H (ROI) at 3.

### 4. Unrecorded Interviews

Several of the witness interviews were not audio recorded.  For those, the defense is limited to reviewing reports in which case agents distill long interviews into 2-3 page summaries.  Nevertheless, several of the reports suggest that more witnesses were asked similarly inappropriate questions about whether a captain is "negligent in their duties" for failing to abide by a COI or failing to maintain a night watch.  For example, the report on the interview of Robert Horne, a Truth Aquatics employee from 2014 to 2017, stated, "(PK) Horne stated that if a captain failed to abide by the COI, they were negligent in their duties."  Ex. K (Horne ROI) at 3.  One former employee, Don Lee Rowell, was interviewed by the Los Angeles Times and stated that the regulation for a roving patrol "wasn't really followed . . . I don't know if you'd call it a problem or not; it's something that everyone should have and will have from now on."  Mark Puente, et al., *Before Conception boat fire, some captains say Coast Guard safety rule was ignored*, LOS ANGELES TIMES (Dec. 29, 2019), *available at* https://www.latimes.com/california/story/2019-12-29/conception-boat-fire-several-captains-didnt-designate-roving-watches-to-spot-dangers.  When interviewed by the government, however, Mr. Rowell was apparently asked directly about "negligence."  The report of his interview states, "Rowell said that if a captain failed to do what was required on the Certificate of Inspection he would call

this negligence." Ex. L (Rowell ROI).

Other reports suggest that the government also asked witnesses to speculate about whether the lack of a roving patrol was a but-for cause of the deaths in the accident. For example, the report on the interview of James Hrabak, a former Truth Aquatics captain, states, "(PK) Hrabak stated, 'If we would have had a roving watch, this may not have happened.'" Ex. M (Hrabak ROI) at 3. Earlier in the interview, Mr. Hrabak said he never designated a roving watch while working for Truth Aquatics, and also said, "I know how hot and how rapidly fire can move on boats." *Id*. at 2. In an interview for the same Los Angeles Times article that featured comments from Mr. Rowell, Mr. Hrabak said that "he told investigators he knew Jerry Boylan, the *Conception* captain, for 'a long, long, time' and 'considered him 'as fine a skipper of a boat in the industry.' He recalled an agent's reply: 'Then why didn't he run a roving watch?'" Puente et al., LOS ANGELES TIMES (Dec. 29, 2019). The report summarizing Mr. Hrabak's interview does not make reference to this exchange.

### III. LEGAL STANDARD

The Sixth Amendment to the Constitution grants the accused the right to offer the testimony of witnesses to present a defense. *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Supreme Court has held that few rights are more fundamental. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). This constitutional guarantee includes the right not only to summon a witness to court, but also to ensure that the witness can testify without undue governmental pressure or influence. The government violates due process when it substantially interferes with a witness's free and unhampered determination to testify. *See Webb v. Texas*, 409 U.S. 95, 97-98 (1972). "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights. Their role as public servants and as protectors of the integrity of the judicial process permits nothing less." *United States v. Vavages*, 151 F.3d 1185, 1193 (9th Cir. 1998) (citations omitted). The obligation to maintain neutrality extends to the prosecutor's communications with *all* witnesses, not

just defense-friendly ones.  *United States v. Juan*, 704 F.3d 1137, 1141-42 (9th Cir. 2013) ("We see no reason to doubt that the government's substantial interference with the testimony of its own witnesses can violate the Due Process Clause.").

Whether substantial government interference occurred is a fact-specific determination that a defendant must demonstrate by a preponderance of the evidence. *Vavages*, 151 F.3d at 1190.  Factors to consider include statements on the defendant's guilt, misrepresentations of the evidence, assertions that witnesses are lying, and excessive perjury warnings, among others.  *See id.* at 1191; *Juan*, 704 F.3d at 1137; *Soo Park v. Thompson*, 851 F.3d 910, 921 (9th Cir. 2017).  Due process may be violated not only where a prosecutor's tactics "effectively drove the witness off the stand," but also where they lead a witness to change their testimony.  *See Juan*, 704 F.3d at 1142. Indeed, courts have recognized that governmental influence that affects the content of a witness's testimony is, if anything, *worse* than influence that simply keeps the witness from testifying.  *Id.*;[3] *see also Berg v. Morris*, 483 F. Supp. 179, 187 (E.D. Cal. 1980).

To prove a constitutional violation, a defendant need not establish that a government agent specifically and deliberately told a witness to lie, or to change his or her account in a particular way.  Rather, courts have recognized that any message that can be viewed as influencing a witness's testimony in some direction can be sufficient. Even the oft-stated emphasis to "tell the truth" can constitute such pressure, when the surrounding circumstances make it clear that the speaker has a clear sense of what "the truth" is.  *See Berg*, 483 F. Supp. at 183-84 (finding violation based on judge's repeated admonitions to witness to tell the "truth," where judge had indicated what he believed

_____

[3] It also seems clear that the substantial and wrongful interference with a prosecution or defense witness that does not "drive the witness off the stand," but instead leads the witness to materially change his or her prior trial testimony can, in certain circumstances, violate due process. Indeed, such violations have the potential to work *even greater* harm than those that simply result in a blanket refusal to testify. Where a witness is coerced into recanting testimony that was favorable to the defendant, the harm to the defense involves not merely the *prevention* of prospective testimony that *might* have bolstered its case, but the *retraction* of testimony that *did* bolster its case. *Juan*, 704 F.3d at 1142.

13

1  to be the "truth"); *see also Vavages*, 151 F.3d at 1188.

2  ## IV. ARGUMENT

3  ### A. The Court should dismiss the Indictment due to the Government's
4  improper interference with testimonial evidence.

5  Courts are empowered to dismiss an Indictment for government misconduct as
6  an exercise of their inherent supervisory power or to protect a defendant's due process
7  rights. *United States v. Hawkins*, 2004 WL 3419420, at *2 (N.D. Cal. Dec. 27, 2004)
8  (citing *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979); *United States v.*
9  *Basurto*, 497 F.2d 781, 785 (9th Cir. 1974)).  While courts do not invoke dismissal
10  lightly, it is uniquely appropriate here.  The government's improper questioning of
11  witnesses has directly affected the integrity of the fact-finding process by actually
12  altering the evidence that will be presented and the reliability of the trial.  *See Berg*, 483
13  F. Supp. at 185 (granting writ of habeas corpus for witness interference, explaining that
14  it "deprives the trier of fact of highly probative evidence" and "raises serious questions
15  about the integrity of the fact finding process, and implicates values basic to civilized
16  notions of fairness and due process"); *Vavages*, 151 F.3d at 1192-93 (reversing
17  conviction for prosecution's substantial interference with a single witness); *Cf. N.*
18  *Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir. 2001) (government has a
19  "sworn duty . . . to assure that the defendant has a fair and impartial trial").

20  Here, the effect of the government's witness interference is insidious and
21  pervasive.  Within days of the accident, the government shirked its obligations to a
22  neutral fact-finding process in favor of bolstering a criminal case against Mr. Boylan.
23  In repeatedly asserting Mr. Boylan's guilt and feeding its own narrative to numerous
24  fact witnesses, the government has tainted the testimonial evidence that will be
25  presented at trial.  The government has substantially interfered with trial witnesses in
26  several ways that have already prejudiced Mr. Boylan and undermined the integrity of
27  the judicial process.

28  First, the government has repeatedly told witnesses that Mr. Boylan is guilty.

14

Even in the very early days of the investigation, long before the government had any real understanding of the cause and origin of the fire, the government infused its theory of Mr. Boylan's criminal liability in interview after interview. The government introduced thinly veiled hypotheticals about "negligent" captains, clearly meant to represent Mr. Boylan.[4] With other witnesses, the government outright told them that Mr. Boylan was negligent.[5] And prosecutors read verbatim certain regulations and Coast Guard requirements that were not otherwise within witnesses' knowledge.[6] It is, of course, the exclusive province of the jury to determine, based on untainted evidence, whether Mr. Boylan was grossly negligent, and whether that gross negligence caused the deaths of those who lost their lives in the *Conception* accident. But the prosecution team has corrupted this process by repeatedly asserting that Mr. Boylan was negligent and infusing its view of the facts and theory of guilt into the minds of fact witnesses.

These tactics were designed to prejudice the witnesses' own perceptions of Mr. Boylan's conduct. Where witnesses previously believed that Mr. Boylan was exceedingly competent and safety-conscious, they now have been told by the United States government that he was negligent and caused the deaths of 34 people. Even where testimony has not explicitly changed on a specific point, which is difficult for the defense to assess at this stage of the proceeding and with such limited information available in the unrecorded interviews, assertions of guilt implicitly encourage people

---

[4] *See, e.g.,* Ex. A at 97 (Hauser); Ex. C at 81-82 (French); Ex. D at 76 (Priddin); Ex. E at 60 (Fitts); Ex. G at 21 (Curto); Ex. J(ii) at 24 (Russello); Ex. K at 3 (Horne); Ex. L at 3 (Rowell).

[5] *See, e.g.,* Ex. A at 143 ("You do understand that if Captain Boylan and if Glenn Fritzler had made sure that Captain Boylan is complying with the-the watchmen requirement, and if Captain Boylan was also complying with the roving patrol requirement, you do understand that that fire would have been found and detected, and 34 people would be alive"); Ex. C at 81-82 ("Would you feel that Truth Aquatics and Captain Boylan were in compliance with the law?"); Ex. D at 76 ("I'm actually trying to understand how we put in context Captain Boylan's inattention to duties").

[6] *See, e.g.,* Ex. A at 73-74 (showing Mr. Hauser a copy of the current *Conception* COI and questioning him about it despite Mr. Hauser stating he had "never seen that before"); *id.* at 91-92 (reciting to Mr. Hauser the oath for a Merchant Mariner's License); Ex. C at 81-82 (describing the COI and quoting regulations to Mr. French and asking if "Truth Aquatics and Captain Boylan were in compliance with the law")

15

to change their perspectives and discourage witnesses from testifying on Mr. Boylan's behalf at trial.  For example, during the interviews of former crewmembers Milton French and Chris Russello, both began by talking about how Mr. Boylan was a safe operator.  The government responded by telling these witnesses that the vessel's COI required a roving watch and repeatedly asking if and implying that the failure to follow that rule was negligent.  *Supra* Sec. II.B.2-3.  In the case of Mr. French, who will likely be called by the government at trial, the government went so far as to ask, repeatedly and aggressively, whether the accident could have been prevented had the vessel had a roving watch.  *Id.*  As another example, the government's repeated statements to witnesses about roving patrol rules discourage other captains from being truthful about their own practices—practices that are critical to establish a reasonable person standard in a criminal negligence trial.  Discovery in this case reveals that many captains did not use a regular roving patrol; in fact, no captain working for Truth Aquatics appears to have had a designated roving patrol.  But those captains have now been told by the United States government that this practice constitutes criminal negligence, which discourages them from testifying honestly and being exposed to professional or criminal repercussions.  In each case, the government's comments to witnesses immediately after the accident have implanted ideas of guilt that cannot be undone.

Second, the government's conduct has already caused certain favorable witnesses to change critical portions of their testimony.  Even focusing only on Roy Hauser's testimony demonstrates the significance of the government's interference.  Mr. Hauser was the founder of Truth Aquatics and Mr. Boylan's former boss.  When he first told interviewers that he did not use a roving patrol, the government refused to accept that answer, stressing that if Mr. Hauser was a captain who followed the rules and regulations, and if the COI required a roving patrol, he would have used one.  After that line of questioning, Mr. Hauser's responses and demeanor completely changed, and he began to agree with the prosecutor's entire line of questioning with the sole response, "Yes sir."  Ex. A at 74-75; Ex. B at 01:36:35-01:37:43.  The prosecutor similarly fed

16

Mr. Hauser his desired answer about the purpose of a roving patrol.  Although Mr. Hauser first said he was not concerned about fire and a night watch was used to check the anchor, the prosecutor led Mr. Hauser to agree that a night watch should be in place to detect fire.  *See* Ex. A at 98.

This change in testimony is unquestionably significant to Mr. Boylan's defense. Throughout its investigation, the government's chief allegation against Mr. Boylan has been that it is negligent for a captain to operate a vessel without an overnight fire watch and that Mr. Boylan knew or should have known that a roving watch was necessary to keep passengers safe from the threat of fire.[7]  Mr. Hauser was the former owner of Truth Aquatics when Mr. Boylan was hired, trained, and became a captain of Truth Aquatics vessels.  Mr. Hauser also was a licensed captain himself.  Whether he believed that a roving watch was necessary to keep passengers safe from fire is thus a crucial fact going to two key issues in the case; the standard of care (whether it is in fact grossly negligent to operate without a roving watch) and Mr. Boylan's knowledge of the putative risk.

Third, the government misrepresented evidence and speculated regarding the accident in ways that materially misled witnesses and tainted their subsequent understandings of the facts.  For example, the prosecutor's claim to Roy Hauser that "if Captain Boylan was complying with the roving patrol requirement . . . 34 people would be alive" was not only wildly inappropriate, it was unsupported by any basis in fact.  *Id*. at 143.  The interview of Mr. Hauser occurred just two weeks after the accident.  At that time, the government had not even completed its collection of wreckage from the bottom of the ocean, let alone begun testing possible causes of the fire.  In fact, the government had almost no understanding of where or how the fire started or how

---

[7] As the Court knows, the government's interpretation of 18 U.S.C. § 1115 was that it required only simple negligence and it charged Mr. Boylan initially with only simple negligence.  Suggesting to the witnesses that Mr. Boylan was negligent or inattentive to his duties thus framed the facts within the government's preferred legal theory of liability under the statute.

17

quickly it progressed.  Any suggestion that a particular factor would have prevented the loss of life in the accident was completely unfounded and a clear attempt to turn the witness against Mr. Boylan.

Fourth, the government suggested that witnesses were lying when there was no basis to believe so.  *See Vavages*, 151 F.3d at 1190 ("[W]e disapprove of such conduct where the prosecutor lacks any substantial basis in the record for believing the witness is lying. That [a witness's] testimony would have contradicted the testimony of the government's own witnesses does not form a sufficient basis for the prosecutor's warning.").  For example, when Milton French did not fully endorse the government's theory that a roving patrol could have prevented the deaths on the *Conception*, the prosecutor asked, "Are you trying not to get somebody in trouble?"  Ex. C at 83.  But the prosecutor had no basis to believe that Mr. French was protecting anyone.  Mr. French was only relaying his own observations about how rapidly the fire progressed, and doubting that a roving patrol could have prevented it.  The prosecutor engaged in similar tactics with Mr. Hauser, accusing him of attempting to protect Mr. Boylan or Mr. Fritzler when he would not fully adopt the government's theory.  Ex. A at 78 ("It seems like you do not wanna be in a position of saying that Jerry Boylan or Glen Fritzler did anything wrong...").

Finally, the defense believes that the extent of the prejudice to Mr. Boylan is even greater than is currently apparent, due to the government's tactics.  The vast majority of witness interviews have been unrecorded.  All that the defense has to evaluate are very brief reports, the content of which is self-selected by the government. It is clear that many of the lines of inappropriate questioning have not been documented in these reports.  *Compare* Ex. J(ii) at 24 ("If the captain or crew fails to comply with the COI, is that negligence as well, in your view?"), *with* Ex. H (ROI does not contain this question); *compare* Puente et al., LOS ANGELES TIMES (Dec. 29, 2019) (when Mr. Hrabak stated that Mr. Boylan was a skilled captain, an agent replied, "Then why didn't he have a roving watch?"), *with* Ex. M (ROI does not contain this exchange).  Because

18

the government has failed to record every interview, the defense has lost the opportunity to identify a change in testimony or other improper influence that may have occurred with other witnesses. Statements by government investigators that Mr. Boylan was negligent have also discouraged witnesses from coming forward to the defense and being truthful about their own practices.

What is apparent from the limited information available is that the government failed to maintain its role as a neutral investigator in many instances. It repeatedly opined on Mr. Boylan's guilt, including to witnesses who would have otherwise testified favorably for the defense, and has shaped the testimony of both defense and government witnesses. The harm done by this inappropriate influence over witnesses cannot be reversed. The appropriate remedy is therefore dismissal.

**B. If the Indictment is not dismissed, other remedies are needed to address the government's misconduct and prevent ongoing witness tampering.**

**1. Additional discovery is necessary to determine which other witnesses may have been improperly influenced.**

The government has interviewed approximately 235 witnesses in this case, but has only provided complete audio recordings of approximately 40. For the remaining witnesses, the government has only produced in discovery very brief reports, as described above. These reports do not provide the defense with adequate information regarding what questions were asked of the witnesses and how they answered. The defense is therefore limited in evaluating the extent of the prejudice created by the government's improper tactics. The Court should order the government to provide additional discovery regarding each and every witness with whom the government attempted to influence testimony, suggest Mr. Boylan's guilt, or otherwise engage in improper questioning. In particular, the Court should order the government to identify every interview in which the government: (1) asked whether a captain's failure to follow a COI, rule, regulation, or maintain a roving patrol/watchman is "negligent," a "breach of duty," "inattentive to duties," or similar language; or (2) stated directly or

19

indirectly that the decedents in this case would have survived if there had been a roving patrol/night watch on the *Conception*.

## 2. A curative jury instruction is necessary.

Because of the pervasiveness of the government's improper questioning, the defense maintains that dismissal is the only remedy that can properly address the prejudice to Mr. Boylan in this case. However, if the Court does not dismiss the Indictment outright, the defense would request additional remedies to address the government's misconduct. Courts frequently impose a jury instruction where the government has lost or destroyed evidence. *See, e.g., United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring), overruled on other grounds by *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008); *see also United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013). A showing of bad faith is not required for a remedial jury instruction. *Sivilla*, 714 F.3d at 1173.

Here, a similar instruction is appropriate to inform the jury that the government (whether through bad faith or not) tampered with testimonial evidence, and that such evidence could have been presented differently if not for the government's interference. The defense proposes the following instruction:

> There is evidence that in interviewing former employees of Truth Aquatics, including individuals who worked with Jerry Boylan, the government engaged in improper questioning that may have influenced the witnesses' testimony. You may infer, but are not required to infer, that without the government's improper questioning, these witnesses' testimony would have been unfavorable to the government.

*Cf.* Ninth Cir. Model Instruction No. 3.19 ("If you find that the government intentionally [destroyed][failed to preserve] [insert description of evidence] that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government.").

A more specific jury instruction as to Mr. Hauser is required. As the co-owner of Truth Aquatics when Mr. Boylan was hired as a deck hand and worked his way up to captain, Mr. Hauser would have testified that Truth Aquatics did not implement a

20

designated night watch on any vessel.  This is critically exculpatory information that would support an argument that Mr. Boylan was never instructed or trained as a deck hand or captain working for the company that he should have a designated night watch. But because of the government's interference, Mr. Hauer's truthful testimony on this point is now lost.  The only other person who could provide that testimony is Glen Fritzler, who co-owned Truth Aquatics when Mr. Boylan was hired and owned it outright when the accident occurred.  Mr. Fritzler, however, is unavailable as a witness due to his own constitutional right against self-incrimination.  Thus, the defense proposes the following instruction specific to the testimony Mr. Hauser would have provided but-for the government's misdeeds:

> Roy Hauser founded Truth Aquatics in 1970.  In 1978, he brought on Glen Fritzler as a co-owner of the company.  In 1999, Mr. Hauser sold his stake in the company to Mr. Fritzler, and Mr. Fritzler was the sole owner of Truth Aquatics until the accident.  If called to testify in this matter, Mr. Hauser would have testified that Truth Aquatics did not implement a designated roving patrol while he was involved with the company.

### 3. The Court should enjoin the government from engaging in similar tactics as the parties prepare for trial.

Finally, if the Court does not dismiss the Indictment, it should impose an order prohibiting the government from engaging in similar tactics that could further damage the fair presentation of evidence at trial and even further violate Mr. Boylan's Due Process rights.  The defense therefore requests that the Court order the government to refrain from making any statements or suggestions, either directly or indirectly, to fact witnesses regarding Mr. Boylan's guilt.  This should include all statements suggesting that the decedents would be alive if not for conduct or actions of Mr. Boylan or his crew.  The Court should further order that the government refrain from asking fact witnesses to draw legal conclusions or to opine on whether certain conduct constitutes "negligence," "breach of duty," "inattention to duties," or similar legal conclusions. Finally, the Court should order the government to refrain from informing fact witnesses

about the statements of other witnesses in the case and to refrain from providing witnesses with evidence not already known to them.

## V. CONCLUSION

The Court should dismiss the Indictment with prejudice.  In the alternative, the Court should: (1) compel the government to identify all interviews in which it engaged in improper questioning, and produce all discovery relating to those interviews; (2) provide a curative jury instruction addressing the government's improper conduct; and (3) enjoin the government from continuing its improper witness questioning.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  August 31, 2023            By   */s/ Julia Deixler*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
Deputy Federal Public Defenders
Attorney for JERRY NEHL BOYLAN

22