E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental Crimes and Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-8644
      E-mail:  Matthew.O'Brien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 22-482-GW |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (DKT. NO. 79); EXHIBIT |
| v. | |
| JERRY NEHL BOYLAN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, Brian Faerstein, and Juan Rodriguez, hereby files its Opposition to defendant JERRY NEHL BOYLAN's Motion to Dismiss (Dkt. No. 79).

This Opposition is based upon the attached memorandum of points and authorities and the exhibit thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 7, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 MARK A. WILLIAMS
                                 MATTHEW W. O'BRIEN
                                 BRIAN R. FAERSTEIN
                                 JUAN M. RODRIGUEZ
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.    INTRODUCTION.......................................................1

II.   RELEVANT FACTUAL BACKGROUND........................................2

    A.    Procedural History...........................................2

    B.    The Witness Interviews.......................................5

        1.    R.H......................................................5

        2.    M.F......................................................9

        3.    The Other Interviews...................................10

III.  LEGAL FRAMEWORK...................................................12

IV.   ARGUMENT..........................................................13

    A.    The Late Motion Violates the Court's Scheduling Order....13

    B.    The Motion Fails on the Merits..............................15

        1.    The Motion Does Not Identify Any Improper Conduct
              By the Government...................................16

        2.    The Motion Does Not Identify Any Substantial
              Prejudice That the Government's Interviews Caused
              Defendant..........................................19

        3.    The Cases Relied Upon by the Defense Do Not
              Support the Motion.................................21

    C.    Defendant's Alternative Requests Are Unwarranted........24

        1.    Additional Discovery...............................24

        2.    A "Curative" Jury Instruction......................25

        3.    An Injunction......................................25

V.    CONCLUSION........................................................25

**TABLE OF AUTHORITIES**

**FEDERAL CASES:**

Chambers v. Mississippi,
  410 U.S. 284 (1973) ............................................. 22
Soo Park v. Thompson,
  851 F.3d 910 (9th Cir. 2017) .............................. 23, 24
United States v. Barrera-Moreno,
  951 F.2d 1089 (9th Cir. 1991) ...................... 12, 13, 16
United States v. Doe,
  125 F.3d 1249 (9th Cir. 1997) ............................... 13
United States v. Edmonds,
  103 F.3d 822 (9th Cir. 1996) ................................ 12
United States v. Fernandez,
  388 F.3d 1199 (9th Cir. 2004) ............................... 13
United States v. Franco,
  136 F.2d 622 (9th Cir. 1998) ................................ 12
United States v. Juan,
  704 F.3d 1137 (9th Cir. 2013) ............................... 23
United States v. Matta-Ballesteros,
  71 F.3d 754 (9th Cir. 1995) ................................. 14
United States v. Owen,
  580 F.2d 365 (9th Cir. 1978) ................................ 13
United States v. Simpson,
  813 F.2d 1462 (9th Cir. 1987) ............................... 12
United States v. Smith,
  924 F.2d 889 (9th Cir. 1991) ................................ 12
United States v. Torres,
  908 F.2d 1417 (9th Cir. 1990) ............................... 14
United States v. Tucker,
  8 F.3d 673 (9th Cir. 1993) .................................. 13
United States v. Vavages,
  151 F.3d 1185 (9th Cir. 1998) ............................... 22
Washington v. Texas,
  388 U.S. 14 (1967) .......................................... 22
Webb v. Texas,
  409 U.S. 95 (1972) .......................................... 22


**FEDERAL STATUTES:**

18 U.S.C. § 1115............................................... 2, 8

**FEDERAL RULES:**

Fed. R. Crim. P. 12...........................................13, 14

**REGULATIONS:**

46 C.F.R. § 185.410................................5, 10, 16, 17, 20

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

Defendant's fourth motion to dismiss this case is untimely and frivolous.  On May 9, 2023, pursuant to the parties' agreement and defendant's request (Dkt. No. 51), the Court ordered that July 20, 2023 was the deadline for Rule 12 motions (Dkt. No. 52 at 2:7-9).  Nonetheless, the defense filed the instant motion on August 31 – more than a month after the deadline.  There is no excuse for defense counsel's breach of their agreement with the government and disregard for the Court's order.  If the defense truly thinks that the government's conduct has been so "insidious" as to warrant dismissal with prejudice (Mtn. at 14:5), the defense should have filed this motion by July 20.  As a threshold matter, the motion should be denied because it violates the Court's scheduling order.

Even if the Court were to consider the untimely motion on the merits, it should be denied as frivolous.  A close reading of the motion confirms that the government has done nothing improper.  The 661-page motion identifies only <u>one</u> material change in a single witness's statement in a single interview four years ago:  the witness, a former ship captain, first said that in the 1970s he did not deploy roving patrols, and then later in the interview he said that in the 1970s he did deploy roving patrols.  The change in the witness's statement did not occur as a result of any witness tampering.  And even if the government had done something improper (it did not), the single change on one issue by a minor witness, years before trial, would not come close to justifying dismissal.

Oddly, the issue that the motion focuses on – defendant's failure to have a roving patrol onboard the *Conception* on its

overnight trips – is, to the government's knowledge, not even a factual dispute in this case.  Defendant did not conduct or order a roving patrol on the night that his 33 passengers and one crewmember died in the fire.  The applicable regulations and the boat's operating license both required him to do so.  The defense's motion does not address, much less dispute, these facts.

Instead, the defense wants to argue that defendant's failure to deploy a roving patrol did not amount to misconduct, gross negligence, or inattention to duties under 18 U.S.C. § 1115.  The defense can make this argument at trial; it cannot avoid a trial altogether based on salacious yet unsupported allegations of government misconduct.

If the defense believes that the prosecutors and/or investigators improperly influenced witnesses' statements (they did not), that is what trials and cross-examination are for.  There also is no basis for a curative jury instruction:  for that remedy, the motion relies on case law regarding spoliation and evidence destruction.  Here, no evidence has been destroyed and the witnesses at issue can testify at the trial beginning on October 24.  The motion should be denied and defense counsel should be admonished for the untimely and frivolous motion.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Procedural History

In the original case, No. 20-CR-600-GW, pursuant to the parties' stipulation, the Court ordered that June 30, 2022 was the deadline for Rule 12 motions.  (20-CR-600-GW, Dkt. No. 37.)

On June 30, 2022, defendant – represented by the same counsel as now – did not file a motion to dismiss alleging government

misconduct.  Instead, the defense filed three motions to dismiss on unrelated grounds, as well as a motion to suppress and a motion to strike.  (<u>Id.</u>, Dkt. Nos. 40, 42, 43, 44, 45.)

On September 1, 2022, the Court granted one of defendant's motions to dismiss.  The government responded by re-indicting the case within six weeks.  (22-CR-482-GW, Dkt. No. 1.)

On May 8, 2023, defendant filed an <u>ex parte</u> application to continue the trial date from July 11, 2023 to September 26, 2023. (Dkt. No. 51.)  Pursuant to the parties' agreement, the defense requested, under oath, that July 20, 2023 be the deadline for all "[m]otions (other than motions in limine)."  (<u>Id.</u>, Declaration of Counsel, ¶ 3.)  The Court granted defendant's request, ordering that the motion cutoff would be July 20, 2023 and the motions would be heard on August 24, 2023.  (Dkt. No. 52.)

On July 19, 2023, the defense filed an <u>ex parte</u> application to continue the trial date yet again, claiming that the lead defense counsel was too busy.  (Dkt. No. 60.)  The defense did not ask to continue or vacate the July 20 motion cutoff.  (<u>See id.</u>)  The government opposed the application to move the trial date.  (Dkt. No. 62.)

The defense filed no motions on the day of the motion cutoff, July 20, 2023.  The next day, the defense belatedly filed a discovery motion set for the Court-ordered motions hearing on August 24.  (Dkt. No. 65.)  Pursuant to the parties' subsequent discussions, the defense withdrew that motion.

At the hearing on the <u>ex parte</u> application on July 27, the Court agreed, at the defense's request, to continue the trial one last time, to the current trial date of October 24.  (Dkt. No. 67.)  Since

1   the July 20 motion cutoff already had come and gone, not a word was

2   said by defense counsel about extending or vacating it.  (See Exhibit

3   1.)   Likewise, the stipulation and proposed order that the defense

4   submitted following the hearing did not mention any extension or

5   striking of the July 20 motion cutoff.  (Dkt. No. 72.)  Nor did the

6   Court's written order continuing the trial.  (Dkt. No. 73.)

7       Despite agreeing to a July 20 motion cutoff and the Court's

8   order mandating that deadline, the defense filed the instant motion

9   on the night of August 31 (the eve of the anniversary of the 34

10  victims' deaths), without seeking leave of the Court.  That was a

11  Thursday before a three-day weekend, giving the government four

12  business days to respond to the 661-page motion (the Court-ordered

13  briefing schedule provided two weeks for the government to respond).

14      Hours after the defense filed the motion, the undersigned

15  counsel asked defense counsel why they had filed the motion on August

16  31 when their deadline was July 20.  Defense counsel claimed that

17  they thought the motion cutoff somehow had been vacated (and

18  apparently never re-set), despite the absence of anything in the

19  record supporting this assertion.

20      As the defense is well aware, every time the Court has changed

21  the motion cutoff in this case, it has done so in a written order

22  (pursuant to the parties' stipulated, proposed orders).  See 20-CR-

23  600-GW, Dkt. 28 (setting the motion cutoff as January 17, 2022), Dkt.

24  No. 37 (extending the motion cutoff to June 30, 2022); 22-CR-482-GW,

25  Dkt. No. 20 (setting the motion cutoff as May 4, 2023), Dkt. No. 52

26  (extending the motion cutoff to July 20, 2023).  Despite this well-

27  established practice, the defense now claims they thought the Court

28

4

1  vacated the July 20 motion cutoff without telling anyone and without

2  setting a new one.  Such a scenario is dubious on this record.

3      **B.   The Witness Interviews**

4      As the motion concedes, the federal investigation into the

5  *Conception* fire has been thorough and extensive.  Out of the several

6  hundred interviews conducted in the criminal investigation, the

7  motion focuses on two from September 2019:  R.H. and M.F.

8          1.   R.H.

9      As the motion notes, R.H. had been deeply involved with Truth

10  Aquatics (which operated the *Conception* and two sister ships as of

11  2019) in the 1970s, but had stopped working as a captain in 1978

12  (before the *Conception* was built) due to a serious injury.[1]  On

13  September 18, 2019, the government interviewed R.H. in a consensually

14  recorded interview in R.H.'s kitchen.  R.H. was provided a standard

15  warning at the outset about not providing false statements.  (Mtn.,

16  Exh. A, at 4 of 146.)[2]

17      While the motion emphasizes that this interview took place early

18  in the investigation, the defense ignores that by the time of the

19  interview the government already knew two key facts, which remain at

20  the heart of this case and (to the government's knowledge) have never

21  been disputed by anyone:

22      1.   The *Conception*'s Certificate of Inspection (the Coast Guard

23          document governing the ship's operation), as well as 46

24  ────────────────

25  [1] The motion states that defendant "was fired" by Truth Aquatics
    in 1984.  (Mtn. at 3:9.)  This appears to be a typographical error as
26  defendant was hired in 1984.

27  [2] The government produced the audio recording of this interview
    to the defense in April 2023.  The government has not had time to
    verify the accuracy of the transcripts prepared by the defense for
28  the motion (including Exhibit A), but will assume that they are
    accurate for the limited purpose of this brief.

C.F.R. § 185.410, required defendant to deploy a roving patrol on the night of the fatal fire; and

2.   A crewmember who survived the fire told the government that defendant did not deploy a roving patrol on the night of the fatal fire.

The government also knew that R.H. had been friends with defendant and G.F. (defendant's boss and friend) for decades.  R.H. remains so close to defendant that he posted a $250,000 bond as defendant's surety in this case.  (See 20-CR-600-GW, Dkt. No. 30.)

Hence, as often is the case, the witness could be expected to provide answers in a manner that would minimize his friends' potential criminal liability.  Given R.H.'s close relationship with defendant, G.F., and Truth Aquatics, the interviewers knew that they might need to scrutinize some of R.H.'s answers that favored his friends; as is common in interviews during criminal investigations, the interviewers would need to probe deeper to test the witness's credibility to ensure they were getting accurate answers.

    *a.   Compliance with the Roving-Patrol Requirement*

Regarding the roving patrol, R.H. initially said that, when he was a captain on Truth Aquatics' boats in the 1970s, he did not deploy a roving patrol.  (Id. at 68 of 146 (Gov't: "Did you have a watchman, somebody standing watch that was also on the lookout for other dangerous situations, like fire or man overboard?"  R.H.: "No, not when I was on the boat.").)  A prosecutor then informed R.H. that the *Conception*'s Certificate of Inspection as well as the applicable Coast Guard regulations for "T-boats" (which apply to the *Conception*) required a roving patrol when the ship's passenger bunkbeds were occupied.  (Id. at 68-70 of 146.)  In response, R.H. said, multiple

times, that he did not remember if there had been a roving-patrol requirement when he was a captain.  (Id. at 72, 74 of 146.)

Given the centrality of the roving patrol issue to the investigation, and the risk that R.H. was not being truthful, the government asked R.H. follow-up questions.  In response to questions about what he would have done if he were the captain of the *Conception* (which had not yet been built when R.H. was still working as a captain) and its Certificate of Inspection had required a roving patrol, R.H. said that he would have complied with the roving-patrol requirement.  (Id. at 72-74 of 146.)  And R.H. said that he would have expected defendant to do the same.  (Id. at 75 of 146.)

Later in the interview, when asked if he complied with the roving patrol requirement, R.H. said "Yes I did."  (Id. at 92 of 146.)  As the motion points out, that answer contradicted R.H.'s earlier testimony that he did not use a roving patrol.  But, as the transcript confirms, the shift in his testimony was not the result of any improper questioning.

### b.   The Purpose of the Roving Patrol

The motion's focus on R.H.'s testimony regarding the purpose of roving patrols is puzzling because the purpose of a roving patrol is universally understood.  As any ship captain would attest, the point of a roving patrol is to have a crewmember awake in the event of a dangerous occurrence at night, most commonly an anchor drag, fire, or man overboard, in order to alert the passengers and crew and avert disaster.  The government is not aware of any debate in the maritime community over this simple but important fact.

Nonetheless, the motion claims that the government somehow strong-armed R.H.'s testimony on this uncontroversial subject.  When

R.H. was initially asked what the purposes of the roving patrol were, he said the purpose of the roving patrol was to look for "anything." (Id. at 75 of 146.)  When asked to be specific, R.H. said "to make sure the vessel is securely at anchor." (Id.)  The government's very next question was, "What about fire?" (Id.)  R.H. responded, "Yes sir." (Id.)

Later, R.H. covered the same ground.  When asked if he would have let his whole crew sleep through the night, R.H. said that he would not have done so because of the danger of an anchor drag. (Id. at 98 of 146.)  When the government followed up by asking if a roving patrol "would also be helpful if a fire broke out," R.H. responded, "Yes. Yes." (Id.)

Contrary to the motion's claims, there was no change in R.H.'s testimony as to the widely understood purposes of a roving patrol. R.H. never said the purpose of a roving patrol was not to look out for fires; to the contrary, he initially said the purpose was to look for "anything."  On two separate occasions, R.H. first answered that a roving patrol could check for anchor drags, and then said that checking for fires was also a purpose of the roving patrol.  To the government's knowledge, every ship captain of rudimentary competence would say the same thing.

       *c.   The Government's Purported Assertions That Defendant Was Guilty of Criminal Negligence*

Later in the interview, the government asked R.H. a series of questions regarding whether R.H., a former captain, would view a captain's failure to follow regulatory requirements (including the obligation to deploy a roving patrol) as a breach of the captain's duty. (Id. at 97 of 146.)  A violation of 18 U.S.C. § 1115 (one of

8

the potential charges being investigated after the fire) can be the result of defendant's "misconduct, negligence, or inattention to his duties." As such, the government needed to investigate what defendant's duties on the vessel were and if he was inattentive to those duties in violation of the statute. Whether or not defendant complied with the various regulations was a key aspect of this analysis.

Further, this line of questioning did nothing to influence R.H.'s statements. Near the end of the interview, a prosecutor informed R.H. of two obvious facts: (1) in the prosecutor's opinion, the 34 victims of the fire would have been saved if defendant had deployed a roving patrol, and (2) the surviving crewmember who discovered the fire was not acting as a roving patrol. (Id. at 143-145 of 146.) The transcript confirms that R.H. did not change his answers after hearing the foregoing at the end of the interview.

        2.   M.F.

A week later, the government interviewed M.F., a crewmember on the *Conception* in 2019 who survived the fire and thus, unlike R.H., was (and is) a key fact witness. The motion fails to point out that M.F. was (and is) represented by a highly experienced and respected former Deputy Federal Public Defender who attended the entire interview and did not object to any of the questioning at issue.

According to the motion, the government's purported misconduct was limited to three pages of the 122-page interview transcript (which the government produced to the defense in May 2021, more than two years prior to the filing of the instant motion). (Mtn., Exh. C

9

at 230-232 of 632.)³  When a prosecutor asked M.F. if Truth Aquatics was complying with the Certificate of Inspection's requirement of a roving patrol, M.F. said no.  (Id. at 231 of 632.)  Then the prosecutor told M.F. that 46 C.F.R. § 185.410 also required a roving patrol, and asked if Truth Aquatics and defendant were in compliance with that regulation.  (Id. at 231-32 of 632.)  M.F. said no.  (Id. at 232 of 632.)

The prosecutor then asked M.F. if M.F. believed that a roving patrol "could have made a difference in somebody spotting that fire before it [be]came so big."  (Id.)  M.F. responded "I believe it could have" but explained that he did not know enough about what had happened to be sure.  (Id.)  The prosecutor followed up by asking if M.F. was "trying not to get somebody in trouble," and M.F. responded with effectively the same answer that a roving patrol might have helped but he could not be sure.  (Id.)

### 3.    The Other Interviews

The motion cries foul over the unsurprising fact that – in a criminal investigation into issues including whether a ship captain could be criminally liable for failing to use a roving patrol – the government asked additional witnesses their relevant opinions about whether failing to deploy a roving patrol would be a breach of the captain's duties.

- B.P., a licensed captain who briefly had worked on the *Conception*, said yes it would be a violation of a captain's

---

³ The motion's page references to Exhibit C do not correspond to the exhibit's pagination.  For clarity, the government is citing to the ECF pagination.

duties to not deploy a roving patrol on the *Conception*. (Mtn., Exh. C at 76 of 81.)[4]

- T.F. and M.C., licensed captains who had worked for Truth Aquatics, also said that it would be negligent for a captain not to comply with his ship's Certificate of Inspection. (Mtn., Exh. E at 414 of 632; id., Exh. G at 478 of 632.)

- C.R., a former passenger and crewmember on the *Conception*, was asked if it would be negligent for a captain or crewmember to fail to comply with the Certificate of Inspection. (Mtn., Exh. J-2 at 24 of 42.) C.R. responded that he was not an attorney and did not know. (Id.)

- R.H., a former crewmember on the *Conception*, said that it would be negligent for a captain to fail to abide by the ship's Certificate of Inspection. (Mtn., Exh. K at 3 of 3.)

- D.L.R., a former captain for Truth Aquatics, said that Truth Aquatics did not require a roving patrol, despite the Certificate of Inspection's requirement to do so. (Mtn., Exh. L at 3 of 5.) He said it would be negligent for a captain not to comply with the Certificate of Inspection's requirements. (Id.)

- J.H., another former captain for Truth Aquatics, said he did not use roving patrols when he captained Truth Aquatics' ships, and that if defendant had used one on the night of the fire, the disaster might have been avoided.[5]

---

[4] The motion misquotes B.P.'s transcript. (Mtn. at 10:11-12.) The prosecutor appears to have asked B.F. about defendant's "attention" to his duties, not his "inattention." (See Mtn., Exh. C at 76 of 81.)

[5] The motion cites to Exhibit M for these statements, but they do not appear in Exhibit M. At any rate, it makes no difference here.

1    These are not coerced statements that the government somehow
2    tricked witnesses into providing.  They are logical, common-sense
3    assertions that witnesses voluntarily made.

4    **III. LEGAL FRAMEWORK**

5    The motion invokes the Due Process Clause but does not appear to
6    cite any cases applying the Due Process Clause to a pre-trial motion
7    to dismiss.  Rather, most if not all of defendant's case law
8    addresses Due Process violations in the context of convictions at
9    trial.  (See Part IV.B.3, infra.)

10   While the motion repeatedly attacks purported government
11   conduct, the motion is not alleging "outrageous government conduct."
12   Cf. United States v. Franco, 136 F.2d 622, 629 (9th Cir. 1998) (the
13   "due process channel" for dismissal due to outrageous government
14   conduct "is most narrow"); United States v. Smith, 924 F.2d 889, 897
15   (9th Cir. 1991) (to succeed on such a claim, a defendant must meet
16   "an extremely high standard"); United States v. Barrera-Moreno, 951
17   F.2d 1089, 1092 (9th Cir. 1991) (an indictment will be dismissed for
18   outrageous government conduct based on a due process violation only
19   where the government's conduct is "so grossly shocking and so
20   outrageous as to violate the universal sense of justice").

21   The "outrageous government conduct" line of case demonstrates
22   just how egregious government conduct must be to warrant dismissal of
23   an indictment.  See, e.g., United States v. Edmonds, 103 F.3d 822,
24   825 (9th Cir. 1996) (defendant bears the burden of proving that the
25   government's conduct was "so excessive, flagrant, scandalous,
26   intolerable, and offensive as to violate due process") (internal
27   quotations omitted); United States v. Simpson, 813 F.2d 1462, 1466-67
28   (9th Cir. 1987) (the outrageous government conduct doctrine is not to

1  be applied subjectively, but in recognition of "the limits that bind

2  judges in their judicial function.").

3      A court may exercise its supervisory powers to dismiss an

4  indictment in response to government misconduct that falls short of a

5  due process violation.  United States v. Fernandez, 388 F.3d 1199,

6  1239 (9th Cir. 2004).  Specifically, a court may dismiss an

7  indictment under its supervisory powers for three reasons: "to remedy

8  a constitutional or statutory violation; to protect judicial

9  integrity by ensuring that a conviction rests on appropriate

10  considerations validly before a jury; or to deter future illegal

11  conduct."  Barrera-Moreno, 951 F.2d at 1091.

12      "This is a high standard, limiting the availability of the

13  defense to extreme cases, and even in some of the most egregious

14  situations it has not been met."  United States v. Doe, 125 F.3d

15  1249, 1257 (9th Cir. 1997) (internal citations omitted); United

16  States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993) (circumstances

17  under which courts can exercise supervisory power are "substantially

18  limited"); United States v. Owen, 580 F.2d 365, 367 (9th Cir. 1978)

19  (noting that supervisory powers "remain a harsh, ultimate sanction

20  which are more often referred to than invoked") (internal quotations

21  and citation omitted).

22  **IV.  ARGUMENT**

23      **A.  The Late Motion Violates the Court's Scheduling Order**

24      Rule 12(c)(1) provides that "[t]he court may, at the arraignment

25  or as soon afterward as practicable, set a deadline for the parties

26  to make pretrial motions and may also schedule a motion hearing."

27  Fed. R. Crim. P. 12(c)(1).  "If a party does not meet the deadline

28  for making a Rule 12(b)(3) motion, the motion is untimely.  But a

13

1  court may consider the defense, objection, or request if the party

2  shows good cause." Fed. R. Crim. P. 12(c)(3).

3      Here, as explained above, the Court – at defense counsel's

4  request – ordered that the deadline for any Rule 12 motions was July

5  20, 2023. (Dkt. No. 52 at 2:7-9.) Defense counsel filed the motion

6  more than a month after the Court's deadline. Having not complied

7  with the Court's Rule 12 motion deadline, the defense waived its

8  right to file one on August 31. See, e.g., United States v. Matta-

9  Ballesteros, 71 F.3d 754, 766 (9th Cir. 1995), opinion amended, 98

10 F.3d 1100 (9th Cir. 1996) (Rule 12 motion denied as untimely where

11 filed over two months after cut-off set by court); United States v.

12 Torres, 908 F.2d 1417, 1424 (9th Cir. 1990) (Rule 12 motion denied as

13 untimely where filed three months after motions cut-off date).

14     This is not a case where a defendant needs to file an untimely

15 motion because of late-discovered or late-produced discovery, or

16 unexpected twists in a case on the eve of trial, or the substitution

17 of new counsel. To the contrary, the relevant witness statements

18 were all made years ago, and the discovery regarding those witness

19 statements was produced well before the motion cutoff. The motion

20 does not claim otherwise.

21     Defense counsel's claim that they thought the motion cutoff was

22 vacated is not credible on this record. In addition to the fact that

23 there is nothing in the record to suggest that the order was vacated,

24 the implausibility of the defense's excuse is highlighted by two

25 additional facts:

26 • As defense counsel is well aware, the government has insisted

27    that a motion cutoff and briefing schedule be specified in every

28    Court order continuing the trial date in this case. (See 20-CR-

600-GW, Dkt. 28 (setting the motion cutoff as January 17, 2022), Dkt. No. 37 (extending the motion cutoff to June 30, 2022); 22-CR-482-GW, Dkt. No. 20 (setting the motion cutoff as May 4, 2023), Dkt. No. 52 (extending the motion cutoff to July 20, 2023).)  Because the motion cutoff already had passed, the only proposed order where the government did not insist on specifying a motion cutoff was the last one (Dkt. No. 73, submitted on August 10, 2023).

- At the hearing on July 27, 2023 (and in its written opposition on July 20, 2023, <u>see</u> Dkt. No. 62), the government opposed any trial continuance.  The Court granted the continuance based on lead defense counsel's pleas that she was too busy to try the case in September.  Defense counsel said nothing about the already-passed motion deadline to the Court, despite having ample opportunity to do so.  Given the government's opposition to a continuance, the idea that the government silently consented to (or the Court silently ordered) the foregone motion cutoff to be vacated or extended defies credulity.

The defense chose to file this motion on their own terms despite the Court-ordered deadline.  The Court has discretion to deny the motion on untimeliness grounds alone, though, as explained below, the motion also fails on the merits.

**B.   The Motion Fails on the Merits**

Defendant fails to identify any improper government conduct, let alone conduct so egregious as to warrant the extraordinary remedy of dismissal.  The motion's heated rhetoric, designed to generate a smokescreen to mask its lack of merit, does not withstand scrutiny.

### 1. The Motion Does Not Identify Any Improper Conduct By the Government

The defense asserts a constitutional violation without making a prima facie showing that supports such a serious allegation. To justify the exercise of the Court's supervisory powers to dismiss an indictment, government misconduct must (1) be flagrant and (2) cause "substantial prejudice" to the defendant. See Barrera-Moreno, 951 F.2d at 1093. Here, there is no misconduct at all, let alone flagrant misconduct, and no substantial prejudice resulted from anything the government did.

The overarching and fatal flaw in the motion is that, over and over again, the defense makes claims that are not supported by the transcripts they cite. A close and objective review of the transcripts confirms the absence of any misconduct. Specifically:

- There is nothing improper about the government asking a witness during an interview about facts that may be unknown to the witness, such as the roving patrol requirement set forth in the *Conception*'s Certificate of Inspection and 46 C.F.R. § 185.410, especially given that it was defendant's obligation to train his crew regarding these requirements.

- There is nothing improper about the government asking a witness his or her opinion about a subject's conduct, particularly where the conduct is relevant to potential charges, such as whether a witness thought defendant's failure to deploy a roving patrol amounted to negligence.

- There is nothing improper about a prosecutor or agent asking a witness probing follow-up questions to (1) make sure they fully understand the witness's opinions, and (2) assess the witness's

16

credibility, such as when a prosecutor asked R.H. about the multiple safety-related purposes of a roving patrol.

- There is nothing improper about the government telling a witness what another witness said, such as when a prosecutor told R.H. that the crewmember who discovered the fire had said he was not acting as a roving patrol.

- There is nothing improper about the government asking a witness hypothetical questions, such as if the witness thought that the tragedy could have been prevented if defendant had maintained a roving patrol as required.

- There is nothing improper about a prosecutor or agent positing to a witness that a subject's conduct led to tragic results, such as when a prosecutor told R.H. that defendant's failure to use a roving patrol caused the deaths of the 34 victims.

- There is nothing improper about a prosecutor or agent telling a witness that they believe the witness may be trying to protect a friend, such as when a prosecutor asked R.H. and M.F. if they were framing their answers to protect defendant or his boss.

The motion cites no cases disputing any of the foregoing.  (The government discusses the motion's case law below.)  This is remarkable given the extremely high threshold governing the motion. (See Part III, supra.)  Indeed, many questions exactly like these are asked as part of thorough cross-examinations during jury trials, and yet they do not result in cases being dismissed.

Contrary to the motion's repeated claims, the government never told any of the witnesses that defendant was guilty of any crime, or that defendant acted with criminal negligence.  At the time of the supposedly improper interviews, the government had made no decisions

about who (if anyone) to charge or what crime (if any) to charge.  As
a result, and given the unfathomable tragedy, it was incumbent on the
government to conduct a thorough investigation that included
questioning witnesses about many topics and issues.  As discussed
below, the cases that the defense relies upon to support the witness-
tampering allegations are so factually different that they highlight
the appropriateness of the government's conduct here.

The motion claims that the government "misrepresented evidence"
to the witnesses.  (Mtn. at 17:16.)  The government is not aware of
any instance (in the 661-page motion or otherwise) of a prosecutor or
agent misrepresenting evidence to a witness in this case.  Out of
hundreds of interviews, the motion points <u>only</u> to a prosecutor's
<u>hypothetical</u> statement: "if Captain Boylan was complying with the
roving patrol requirement ... 34 people would be alive."  (<u>Id.</u> at
17:18-20.)  That is the <u>opposite</u> of mispresenting evidence:
defendant did not use a roving patrol, and there is no evidence that
he did, so the statement was expressly framed as a hypothetical.

The motion complains that the government "speculated regarding
the accident" in its interviews.  (<u>Id.</u> at 17:16-17.)  This is true in
the loose sense that most of the purportedly improper interviews
happened early in the investigation, before all of the facts were
known (as happens in many cases).  But as explained above, the
government was not speculating about the roving patrol requirement or
the lack of a roving patrol under defendant's watch; these facts were
known to the government (and defendant) prior to the interviews at
issue, and they remain undisputed facts today.  No witness was
misled.

The motion claims that the government had no basis to ask R.H. and M.F. whether through their responses they were trying to protect someone, <u>i.e.</u>, defendant and/or G.F. (the owner of Truth Aquatics). The government had ample basis for its concern.  R.H. had been a friend of, and business partner with, G.F. for decades, and they remained close at the time of the interview in September 2019.  M.F. was an employee of defendant and G.F.  The close ties between the witnesses and the subjects facing potential criminal charges provided an obvious, legitimate basis to ask R.H. and M.F. about their potential explicit and implicit biases.

        2.  <u>The Motion Does Not Identify Any Substantial Prejudice That the Government's Interviews Caused Defendant</u>

The motion also fails because its description of the supposed prejudice defendant purportedly suffered as a result of the government's interviews is a fiction.

To the government's knowledge, all of the witnesses discussed in the motion are available to testify at trial.  The defense is free to call them as witnesses, or to cross-examine them should the government call them as witnesses.  Although the witnesses' statements from years ago about whether they believed defendant acted negligently may be immaterial, they can certainly testify, among other things, about their perception of defendant's discharge of his duties as a captain and whether or not he maintained a roving patrol when he had passengers onboard.

The defense complains that some witnesses had favorable things to say about defendant but then, after being informed (or reminded) about the requirement for a roving patrol, had negative things to say about defendant.  (Mtn. at 16.)  That is not surprising:  defendant

may have had a good reputation in the Santa Barbara maritime community.  Then a fire that defendant failed to detect (because he and his crew were sleeping) killed 34 people on the boat he captained.  That witnesses had good and bad things to say about defendant is to be expected.  The motion cites no case condemning the government for following up on a witness's positive statements about a subject with questions probing the subject's misconduct.  Indeed, this interview technique is commonplace and necessary as part of a thorough investigation.

Defendant's real complaint seems to be that captains who have said they did not use roving patrols in the past may not want to testify about that fact at trial.  (See id.)  If that is true, it is not because of any purported witness tampering on the part of the government.  Rather, it is because of the unsurprising fact that defendant – long after the interviews at issue – was indicted for, inter alia, not deploying a roving patrol on a ship where 34 people were killed.  Other ship captains' reticence to testify on defendant's behalf is the result of defendant being charged for his criminal conduct, not the government's pre-indictment interviews.

As for R.H. (defendant's surety and the captain from the 1970s who said he did not use a roving patrol but then said that he did), again there is no prejudice.  The defense is free to call R.H. as a witness and clarify what he remembers about roving patrols in the 1970s (subject to the government's relevance objections given the four-decade gap).  His inconsistent statements on this issue were not the result of any improper questions, let alone conduct so egregious as to implicate Due Process precedents.

The defense complains that because many of the government's interviews were not recorded, defendant will never have a full account of those interviews.  (Mtn. at 18:19-19:5.)  The government is not required to record its interviews, and many cases are prosecuted without recorded interviews.  Thus the defense's claim that "the government failed to record every interview" (id. at 19:1) presupposes a nonexistent duty.  The bigger problem with the defense's claim is that in the interviews that were recorded, the motion does not identify any misconduct.  So the defense's speculation about alleged nefarious conduct during the unrecorded interviews carries no weight.  As for the actual content of the interview reports, the motion's suggestion that the memoranda of the unrecorded interviews omitted information favorable to the defense (id. at 18-19) is contradicted by the memoranda, which contain numerous favorable statements about defendant.

Moreover, many of the witnesses have been interviewed by investigators untethered to the prosecution team here.  For example, the NTSB separately interviewed many of the same witnesses, and depositions of some of the same witnesses have been conducted in related civil litigation.  The defense has access to the transcripts and third parties' reports about these other interviews, which contain witness statements that are remarkably consistent with the supposedly coerced statements made to the prosecution team here.

        3.    The Cases Relied Upon by the Defense Do Not Support the Motion

The hollowness of the motion is further revealed by looking at the motion's caselaw.  None of the cases involve a situation even remotely similar to the facts here.  To the contrary, the defense's

21

1   cases address interfering with potential defense witnesses <u>at trial</u>,

2   by excluding defense witness testimony or threatening defense

3   witnesses with perjury charges, thereby causing the witnesses to

4   change their testimony or invoke the Fifth Amendment.

5       <u>Washington v. Texas</u>, 388 U.S. 14 (1967), and <u>Chambers v.</u>

6   <u>Mississippi</u>, 410 U.S. 284 (1973) (<u>see</u> Mtn. at 12), both addressed

7   trial courts' exclusion of defense witnesses at trial.  <u>Washington</u>

8   held that, because defendants have the right to compulsory process,

9   they can compel accomplices to testify under the Sixth Amendment

10  notwithstanding a state procedural rule disqualifying alleged

11  accomplices from testifying on a defendant's behalf.  <u>Chambers</u> held

12  that excluding evidence of a third party's confession under certain

13  evidentiary rules and depriving the defendant of the right to cross-

14  examine that third party violated due process.  Neither is remotely

15  applicable here.

16      <u>Webb v. Texas</u>, 409 U.S. 95 (1972), and <u>United States v. Vavages</u>,

17  151 F.3d 1185 (9th Cir. 1998) (<u>see</u> Mtn. at 12), addressed coercive

18  remarks made by judges or prosecutors in order to prevent potential

19  defense witnesses from testifying.  <u>Webb</u> held that it violated due

20  process for the trial judge to single out the sole defense witness

21  and give threatening remarks about how the witness likely would be

22  prosecuted for perjury – remarks that "effectively drove that witness

23  off the stand."  409 U.S. at 98.  <u>Vavages</u> held that the prosecutor

24  engaged in "intimidating" and "especially coercive" conduct in

25  threatening to file perjury charges and to withdraw an alibi

26  witness's plea agreement in an unrelated prosecution if she testified

27  for the defendant.  151 F.3d at 1191.  Again, neither case applies to

28  the conduct at issue here.

1    The motion does not cite a single case that applies the
2    principles of Webb to witness interviews conducted before there
3    is even a trial date (let alone before there is even an indictment (or a
4    defendant)), and the government is aware of none.  Even if Webb did
5    apply (it does not), nothing that the defense points to was coercive
6    or inappropriate, none of the witnesses discussed in the motion have
7    refused to testify, nothing prevents the defense from interviewing or
8    issuing compulsory process to the witnesses, and nothing stops the
9    defense from cross-examining the government's witnesses.

10    The closest case cited in the motion appears to be United States
11    v. Juan, 704 F.3d 1137, 1142 (9th Cir. 2013) (see Mtn. at 12, 13),
12    which states in dicta that "substantial and wrongful interference
13    with a prosecution or defense witness that does not 'drive the
14    witness off the stand,' but instead leads the witness to materially
15    change his or her prior trial testimony can, in certain
16    circumstances, violate due process."  704 F.3d at 1142.  But in Juan,
17    the conduct complained of was the prosecutor's comments made to the
18    judge during trial that the witness had committed perjury and asking
19    the judge to appoint the witness counsel.  Id. at 1140.  Even there,
20    the court found no due process violation where there was no causal
21    link between the threats and the changed testimony.  Id. at 1142.

22    Importantly, Juan nowhere suggests that asking leading
23    questions, expressing disbelief about a witness's answers, and/or
24    suggesting that a witness might be trying to protect someone during a
25    routine witness interview that takes place before charges are even
26    filed constitutes "substantial and wrongful interference."

27    The motion also cites Soo Park v. Thompson, 851 F.3d 910 (9th
28    Cir. 2017) (see Mtn. at 12), a Section 1983 case where a detective

met with a defense witness (who was going to testify about how an alternate perpetrator had been violent to her) to dissuade her from testifying.  851 F.3d at 916.  The detective did so <u>after</u> the defense noticed the witness for trial, and the detective also made veiled threats against the witness, suggesting that the alternate perpetrator was "upset" about her statement.  <u>Id.</u>  The detective also spoke to another police department about filing criminal charges against the witness.  <u>Id.</u>  Here, in contrast, the disputed interviews happened at the outset of the investigation, and there was no effort to dissuade anyone from testifying at a putative trial.

**C.  Defendant's Alternative Requests Are Unwarranted**

Defendant's requests for alternative remedies fail for the same reason as the request for dismissal with prejudice: there has been no misconduct.  The Court should not be tempted to provide a lesser remedy to the defense where the government has done nothing wrong.

**1.  <u>Additional Discovery</u>**

The defense's request for additional discovery does not cite a single case in support.  (<u>See</u> Mtn. at 19:16-20:2.)  Nor does the motion claim that the government is withholding any discovery from the defense.  Defense counsel has never sent the government a discovery request for this information.

Instead, the defense asks for the government to go through the same discovery that the defense already has and compile lists of information for the defense.  (<u>See</u> <u>id.</u> at 19:25-20:2.)  This request (like the motion itself) is a transparent attempt to distract the government from its trial preparation, and should be denied.

24

2.   A "Curative" Jury Instruction

Although the defense cites a few cases about jury instructions, they all relate to lost or destroyed evidence (as the motion concedes).  (See id. at 20:8-13.)  Here, no evidence has been lost or destroyed, rendering those cases inapposite; the witnesses are available to testify and defendant can compel them to.  For the same reason, Model Instruction No. 3.19 has no applicability.  (See id. at 20:14-25.)  Such an instruction would confuse the jury and punish the government where it has done nothing wrong.  The motion's use of made-up phrases like "tampered with testimonial evidence" (id. at 20:15) confirms that the defense is grasping at straws.

Nor is a special instruction required for R.H. (who is not a government witness).  Should the defense call R.H., they are free to delve into whether or not he used a roving patrol in the 1970s (subject to relevance objections) and to attempt to explain his prior inconsistent statement.  However, because there has been no misconduct (let alone any witness tampering), the defense is not free to shield R.H. from government cross-examination on this issue.

3.   An Injunction

Citing no authority, the defense asks the Court to enjoin the government from "engaging in similar tactics."  (Mtn. at 21:16-22:2.) The prosecution team is aware of its professional responsibilities and does not need an injunction to govern its trial preparation. Nothing in the motion supports a conclusion otherwise.

**V.   CONCLUSION**

For the foregoing reasons, the government requests that the Court deny the motion in its entirety and admonish defense counsel for their tactics here.

25