CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GEORGINA WAKEFIELD (Bar No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JERRY NEHL BOYLAN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

JERRY NEHL BOYLAN,

Defendant.

Case No. 2:22-CR-00482-GW

**MOTION FOR SPECIAL JURY SELECTION PROCEDURES GIVEN THE NATURE OF THE CASE AND THE SIGNIFICANT PRETRIAL PUBLICITY IT HAS RECEIVED**

Hearing Date: September 28, 2023

Time: 8:00 a.m.

Jerry Nehl Boylan, through his attorneys of record, Deputy Federal Public Defenders Georgina Wakefield, Gabriela Rivera, and Julia Deixler, hereby files his

/ / /

/ / /

/ / /

/ / /

/ / /

motion for special jury selection procedures given the nature of the case and the significant pretrial publicity it has received.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 7, 2023

By /s/ *Georgina Wakefield*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for JERRY NEHL BOYLAN

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTUAL STATEMENT .......... 1

III. ARGUMENT .......... 4

A. Given the nature of the case and the significant pretrial publicity, the Court should use a written juror questionnaire to guarantee Mr. Boylan's Sixth Amendment right to a verdict by an impartial jury. .......... 5

B. The size of the jury pool for trial should be increased, but prospective jurors from Santa Barbara County, where the accident occurred and has received the most media coverage, should be excluded from it. .......... 9

C. Each side should receive additional peremptory challenges. .......... 10

IV. CONCLUSION .......... 12

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Mu'Min v. Virginia*,
500 U.S. 415 (1991)....................4, 8

*Sheppard v. Maxwell*,
384 U.S. 333 (1966)....................11

*Skilling v. United States*,
561 U.S. 358 (2010)....................1, 4, 7

*Tinsley v. Borg*,
895 F.2d 520 (9th Cir. 1990)....................4

*United States v. Angiulo*,
897 F.2d 1169 (1st Cir. 1990)....................1, 8

*United States v. Bakker*,
925 F.2d 728 (4th Cir. 1991)....................5

*United States v. Beal*,
C.D. Cal. No. 8:19-cr-00047-JLS-1, Dkt. Nos. 293 & 385 (June 2022)....................5

*United States v. Blom*,
242 F.3d 799 (8th Cir. 2001)....................1, 9

*United States v. Blom*,
242 F.3d 804....................11

*United States v. Campa*,
459 F.3d 1121 (11th Cir. 2006)....................1, 11

*United States v. Kechedzian*,
902 F.3d 1023 (9th Cir. 2018)....................4

*United States v. McCollom*,
1987 WL 15387 (N.D. Ill. 1987)....................11

*United States v. Moussaoui*,
2002 WL 1987955 (E.D. Va. 2002)....................11

*United States v. Pepe*,
C.D. Cal. No. 2:07-cr-00168-DSF, Dkt. Nos. 629 & 678 (August 2021)....................5, 9

## TABLE OF AUTHORITIES

Page(s)

*United States v. Petters,*
663 F.3d 375 (8th Cir. 2011) .......... 8

*United States v. Petters*,
No. CRIM.08-364, 2009 WL 3430133 (D. Minn. Oct. 16, 2009) .......... 8, 9

*United States v. Rodriguez*,
581 F.3d 775 (8th Cir. 2009) .......... 8, 9, 10, 11

**Federal Statutes**

18 U.S.C. § 922(g)(1) .......... 9

Sixth Amendment .......... 4, 5, 12

**Other Authorities**

David M. Flores, *Methods of Expanded Voir Dire and Written Questionnaires: Experimental Results on Juror Self-Disclosure and Implications For Trial Practice* at 2, Annual Meetings of the American Society of Trial Consultants (June 9-11, 2011) .......... 6

David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 IND. L.J. 245, 259-61 (1980) .......... 6

https://data.census.gov/profile?t=Civilian+Population:Population+Total&g=050XX00US06083 (last visited September 7, 2023) .......... 3

Jean Yamamura, *'Conception' Victims Memorialized on Anniversary of Deadly Disaster*, THE SANTA BARBARA INDEPENDENT (Sept. 2, 2020), https://www.independent.com/multimedia/conception-victims-memorialized-on-anniversary-of-deadly-disaster .......... 3

Jean Yamamura, *Grim Conjecture in New 'Conception' Lawsuit Against Coast Guard*, The Santa Barbara Independent (Sept. 6, 2021), https://www.independent.com/2021/09/06/grim-conjecture-in-new-conception-lawsuit-against-coast-guard .......... 2

Linchiat Chang & Jon A. Krosnick, *Comparing Oral Interviewing with Self-Administered Computerized Questionnaires: An Experiment*, 74 PUBLIC OPINION QUARTERLY 154, 154-55, 161-63 (2010) .......... 6

Richard Winton and Mark Puente, *Coast Guard Repeatedly Rejected Calls for Tougher Fire Safety Rules for Small Boats*, LOS ANGELES TIMES (Nov. 12, 2019), https://www.latimes.com/california/story/2019-11-12/conception-boat-fire-coast-guard-ntsb-recommendations .......... 3

# TABLE OF AUTHORITIES

**Page(s)**

Richard Winton, *Conception Boat Fire That Killed 34 People Started in Plastic Trash Can, Confidential Report Says*, Los Angeles Times (Sept. 2, 2023), https://www.latimes.com/california/story/2023-09-02/deadly-conception-boat-fire-started-in-plastic-trash-can-atf-report-reveals ....... 2

Richard Winton, *Feds Say Captain Saved Himself as California Boat Fire Killed 34. But Prosecution Hits a Wall*, Los Angeles Times (Sept. 3, 2022), https://www.latimes.com/california/story/2022-09-03/captain-conception-boat-fire-killed-34-people-prosecution-case#:~:text=Federal%20prosecutors%20say%20flames%20engulfed,the%20ship's%20bunkroom%E2%80%9D%20below%20deck....... 2

*Roger Tourangeau & Ting Yan*, Sensitive Questions in Surveys, 133 PSYCHOL. BULL. 859, 863-65 (2007) ....... 6

Stefanie Diaz, *Coast Guard Weighs Safety Reforms After Fatal Boat Fire*, ASSOCIATED PRESS (Feb. 11, 2021), https://apnews.com/article/labor-day-fires-transportation-california-97cd8c4abbf5dc95caa2aef03577519e ....... 4

Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks-Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 CHI-KENT L. REV. 1179, 1194-98 ....... 6

## I. INTRODUCTION

In cases such as this one, with sustained pretrial publicity, courts undertake certain jury selection measures to ensure that criminal defendants receive a fair trial with a jury that has not been biased from the media reporting. Mr. Boylan asks the Court to take some of those steps here and proposes the following with respect to jury selection:

1. Using a written juror questionnaire;
2. Expanding the size of the jury pool;
3. Excluding individuals from Santa Barbara County, where the accident occurred and the media coverage has been most pervasive, especially relative to the size of the county, from the jury pool; and
4. Increasing the number of peremptory strikes per side.

Courts around the country have described each of these measures favorably, as they are less drastic curative measures to preserve a defendant's due process rights in a highly publicized trial than other available remedies, such as a change of venue or lengthy continuances. *See, e.g., Skilling v. United States*, 561 U.S. 358, 388 (2010); *United States v. Campa*, 459 F.3d 1121, 1135-36 & 1144-48 (11th Cir. 2006); *United States v. Blom*, 242 F.3d 799, 804 (8th Cir. 2001); *United States v. Angiulo*, 897 F.2d 1169, 1183 (1st Cir. 1990). Mr. Boylan respectfully requests these jury-selection measures—which are less disruptive to the trial process than any other available remedies—as practical, necessary means of ensuring the fairness of his trial.

## II. FACTUAL STATEMENT

Mr. Boylan incorporates by reference the facts contained in his ex parte application for an order restraining the parties from releasing further information or opinions about this case to the media (ECF No. 81). Those facts describe some of the media coverage in this case, including a recent Los Angeles Times article describing a confidential ATF report and quoting an anonymous official who bolstered the investigation conducted by the ATF.

The coverage of the criminal case has not simply reported the facts of the accident. For example, a headline in the Los Angeles Times read, "Feds Say Captain Saved Himself as California Boat Fire Killed 34. But Prosecution Hits a Wall."[1] The recent Los Angeles Times article describing the confidential ATF report included a quote about sending Mr. Boylan to prison.[2] And an article that appeared in the Santa Barbara Independent discussed an allegation, unsupported by the coroner's findings, that one of the passengers had actually escaped through the emergency escape hatch from the bunkroom.[3]

The accident occurred in Santa Barbara County and the media coverage of the accident there has been particularly pervasive. A member of the defense team searched the websites of several news sources in Santa Barbara for reporting on the accident. A search of KEYT, an ABC and CBS affiliated news broadcast in Santa Barbara, resulted in 52 reports; KSBY, an NBC affiliate, resulted in 43 reports; and the Santa Barbara Independent, a community newspaper, resulted in 36 hits. The Santa Barbara News-Press, the longest-running print daily newspaper in the area, ceased publication earlier this year and no longer has a website to search.

Google Trends is a website by Google the analyzes search queries in Google Search across various regions and languages over time. An analysis of the search query "the Conception dive boat" shows consistent searches since the date of the accident in

---

[1] Richard Winton, *Feds Say Captain Saved Himself as California Boat Fire Killed 34. But Prosecution Hits a Wall*, LOS ANGELES TIMES (Sept. 3, 2022), https://www.latimes.com/california/story/2022-09-03/captain-conception-boat-fire-killed-34-people-prosecution-case#:~:text=Federal%20prosecutors%20say%20flames%20engulfed,the%20ship's%20bunkroom%E2%80%9D%20below%20deck.

[2] Richard Winton, *Conception Boat Fire That Killed 34 People Started in Plastic Trash Can, Confidential Report Says*, LOS ANGELES TIMES (Sept. 2, 2023), https://www.latimes.com/california/story/2023-09-02/deadly-conception-boat-fire-started-in-plastic-trash-can-atf-report-reveals

[3] Jean Yamamura, *Grim Conjecture in New 'Conception' Lawsuit Against Coast Guard*, THE SANTA BARBARA INDEPENDENT (Sept. 6, 2021), https://www.independent.com/2021/09/06/grim-conjecture-in-new-conception-lawsuit-against-coast-guard

September 2019. The top metropolitan area for this search is Santa Barbara-Santa Maria-San Luis Obispo. As of the 2020 census, the population of Santa Barbara county was 448,229.[4]

Immediately after the accident, there was a vigil in Santa Barbara that drew thousands of attendees.[5] There is a permanent memorial dedicated to the decedents installed at the Santa Barbara Harbor. A a ceremony for its unveiling was streamed on network and local television stations.[6]

As the Court knows there was a NTSB investigation, report, and public hearing. This received media coverage. (*See* ECF No. 81.) Congress also held hearings about the accident. The United States House of Representatives Subcommittee on Coast Guard and Maritime Transportation held a hearing on November 14, 2019.[7] Members of the Subcommittee asked the Coast Guard representative what actions the Coast Guard was taking after the *Los Angeles Times* published an investigative story on November 12, 2019, stating the Coast Guard had often failed to implement safety recommendations from the NTSB.[8]

In December 2019, Rep. Salud Carbajal, whose district includes Santa Barbara, Rep. Julia Brownley, and Sen. Dianne Feinstein introduced the Small Passenger Vessel

---

[4] https://data.census.gov/profile?t=Civilian+Population:Population+Total&g=050XX00US06083 (last visited September 7, 2023).

[5] Jean Yamamura, *'Conception' Victims Memorialized on Anniversary of Deadly Disaster*, THE SANTA BARBARA INDEPENDENT (Sept. 2, 2020), https://www.independent.com/multimedia/conception-victims-memorialized-on-anniversary-of-deadly-disaster

[6] *Id.*

[7] Hearing: Commercial and Passenger Vessel Safety: Challenges and Opportunities. House Subcommittee on Coast Guard and Maritime Transportation. November 14, 2019

[8] Richard Winton and Mark Puente, *Coast Guard Repeatedly Rejected Calls for Tougher Fire Safety Rules for Small Boats*, LOS ANGELES TIMES (Nov. 12, 2019), https://www.latimes.com/california/story/2019-11-12/conception-boat-fire-coast-guard-ntsb-recommendations

Safety Act of 2019 to mandate some of the recommended changes.[9] As part of the National Defense Authorization Act, Congress directed the Coast Guard in December 2020 to review its fire safety regulations for small vessels that accommodated passengers overnight.[10]

## III. ARGUMENT

The Sixth Amendment "guarantees criminal defendants a verdict by an impartial jury, and the bias or prejudice of even a single juror is enough to violate that guarantee." *United States v. Kechedzian*, 902 F.3d 1023, 1027 (9th Cir. 2018).[11] When there has been extensive pretrial publicity about a case, the trial court retains broad discretion to craft jury selection processes to guarantee that constitutional mandate. *Skilling v. United States*, 561 U.S. 358, 364 (2010) ("When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense.'") (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). After all, "the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" *Id.* (quoting *Mu'Min*, 500 U.S. at 427).

The criminal justice system can fulfill the constitutional mandate of an impartial jury only where jury selection processes are robust enough to identify all of those jurors whose preexisting attitudes and experiences might bias their decisions and require their exclusion from the jury. In other words, meaningful voir dire and jury selection depend on potential jurors providing complete, honest, and accurate information. These constitutional concerns are present in any case, but they are especially heightened

---

[9] H.R. 5413, Small Passenger Vessel Safety Act of 2019; S. 3042, Small Passenger Vessel Safety Act of 2019.

[10] Stefanie Diaz, *Coast Guard Weighs Safety Reforms After Fatal Boat Fire*, ASSOCIATED PRESS (Feb. 11, 2021), https://apnews.com/article/labor-day-fires-transportation-california-97cd8c4abbf5dc95caa2aef03577519e

[11] *See also Skilling v. United States*, 561 U.S. 358, 395-96 (2010) ("The seating of any juror who should have been dismissed for cause requires reversal.") (cleaned up); *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (similar).

here—a case concerning a mass casualty that has sustained significant media coverage since the accident, based upon which Mr. Boylan faces a manslaughter charge. *See, e.g.*, *United States v. Bakker*, 925 F.2d 728, 734 (4th Cir. 1991) ("In an era of rapid and widespread communications, trial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention surrounding a case.").

A. **Given the nature of the case and the significant pretrial publicity, the Court should use a written juror questionnaire to guarantee Mr. Boylan's Sixth Amendment right to a verdict by an impartial jury**.

One practical measure to effectuate a thorough and efficient voir dire process in a highly publicized trial is to require prospective jurors to complete a written questionnaire prior to the in-person voir dire process. Indeed, such written questionnaires are regularly used in high-profile trials in this district. *See, e.g., United States v. Beal*, C.D. Cal. No. 8:19-cr-00047-JLS-1, Dkt. Nos. 293 & 385 (June 2022 trial); *United States v. Pepe*, C.D. Cal. No. 2:07-cr-00168-DSF, Dkt. Nos. 629 & 678 (August 2021 trial). Mr. Boylan requests that the Court implement this basic measure here.

In many courtrooms, voir dire is restricted to in-person, group interviews, with some follow-up questioning of individual jurors in the presence of the whole pool. But social science research, including in the jury selection context, has consistently shown that self-administered questionnaires completed in private are more likely to elicit truthful responses and reveal harmful biases than in-person, oral questioning, such as the group questioning that generally takes place during voir dire proceedings. It follows that juror questionnaires represent an essential complement to traditional voir dire questioning for vindicating a defendant's constitutional right to an impartial jury. Juror questionnaires also have the added, practical benefit of making jury selection more efficient by quickly pinpointing for the court and the attorneys the specific areas requiring individual, follow-up questioning. For both of these reasons, a growing number of jurisdictions, including the United States District Court for the Northern

District of California and the Judicial Council of California (the policymaking body of the California courts) have adopted model questionnaires for use in criminal cases that include, inter alia, questions about whether prospective jurors are biased against defendants who exercise their constitutional rights and whether they will follow the law as it relates to requiring the government to prove guilt beyond a reasonable doubt.[12]

As discussed above, social science research, including in the jury selection context, has shown that that self-administered questionnaires (like juror questionnaires) are more likely to elicit truthful responses than in-person questioning (like the group questioning that takes place during in-court voir dire procedures).[13] This result flows in part from the fact that when respondents are questioned in the presence of others they often alter their answers to comply with social norms and avoid embarrassment.[14] Asking open-ended questions that do not require a response to a group in a formal setting like jury selection is unlikely to elicit honest and complete responses because of

---

[12] See Northern District of California Recommended Questionnaire reproduced in Elissa Krauss et al., *Jurywork: Systematic Techniques*, Thomson Reuters 153-162 (2020-2021 ed.); Cal. Jud. Council Form JURY-002.

[13] *See, e.g.*, Linchiat Chang & Jon A. Krosnick, *Comparing Oral Interviewing with Self-Administered Computerized Questionnaires: An Experiment*, 74 PUBLIC OPINION QUARTERLY 154, 154-55, 161-63 (2010) (experiment finding that false, "socially desirable" responses occurred more often in oral interviewing over an intercom as compared to self-administered questionnaires, which were more honest and less susceptible to social desirability response bias); *id*. at 162 (collecting and summarizing other studies with similar findings); *Roger Tourangeau & Ting Yan*, Sensitive Questions in Surveys, 133 PSYCHOL. BULL. 859, 863-65 (2007) (collecting research and explaining that "[s]tudies going back nearly 40 years suggest that respondents are more willing to report sensitive information when the questions are self-administered than when they are administered by an interviewer"); David M. Flores, *Methods of Expanded Voir Dire and Written Questionnaires: Experimental Results on Juror Self-Disclosure and Implications For Trial Practice* at 2, Annual Meetings of the American Society of Trial Consultants (June 9-11, 2011) (study comparing mock jurors' answers in oral voir dire to what they disclosed on written questionnaires found that panel members failed to provide candid answers to between 30 and 80 percent of the questions (depending on oral voir dire method)).

[14] *See, e.g.*, David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 IND. L.J. 245, 259-61 (1980) (citing studies); Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks-Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 CHI-KENT L. REV. 1179, 1194-98 (discussing research).

the psychological pressure of group conformity.[15] For example, in one study, the Honorable Gregory E. Mize of the Superior Court of the District of Columbia conducted an experiment in 30 criminal cases where the Court and parties privately questioned in chambers those jurors who did not respond to any questions in open court. Judge Mize found that in 27 of the 30 trials at least one and as many as four of these "silent" jurors revealed relevant information that led to their immediate removal for cause.[16]

It is not difficult to understand why jurors are more likely to provide more honest and complete answers on a jury questionnaire as compared to voir dire proceedings in open court. The private nature of a questionnaire is a relatively comfortable way to reveal one's actual views, particularly where they cut against the norm. Questionnaires also encourage completeness, as prospective jurors have more time to contemplate their answers than they would in open court.

To be sure, juror questionnaires are not a replacement for in-court *voir dire* questioning, but these authorities and others underscore that questionnaires are an essential complement for protecting the constitutional right to an impartial jury.[17]

Courts have upheld convictions in cases with significant pretrial publicity where the trial court used a juror questionnaire. For example, in *Skilling*, one of the Enron cases, the Supreme Court dismissed the defendant's challenge to the district court's jury selection process where the court "initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by [the defendant]." 561 U.S. at 388. As the Court noted, the questionnaire "helped to identify

---

[15] *See Suggs & Sales*, supra note 14, at 258-61 (collecting research). Questioning jurors individually, but still within the group setting, does not alleviate these problems. *See id*. In fact, psychologists often use this method of questioning to study social conformity. *See id*. at 260 (citing studies).

[16] Gregory E. Mize, *On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room,* COURT REVIEW 10, 12-15 (Spring 1999).

[17] Against this backdrop, it is unsurprising that a growing number of courts are issuing model questionnaires for criminal cases. *See, e.g., supra* note 12.

prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array." *Id*. The district court also "examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members. *Id*. at 389 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991)). And while the court did not permit attorney-conducted *voir dire* to the entire panel, it did permit the parties to ask follow up questions of every prospective juror brought to the bend for colloquy. *Id*. This process was, as the Court put it, based on the district court's awareness of "greater-than-normal need, due to pretrial publicity, to ensure against jury bias." *Id.*; *see also United States v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009) (favorably describing measures district court took "to reduce the risk of prejudice" from pretrial publicity, including excluding residents of the location of the crime from the jury pool, assembling a "590–person jury pool, twelve times the normal size," utilizing a written questionnaire, and providing the defense with 10 extra peremptory strikes); *United States v. Angiulo*, 897 F.2d 1169, 1183 (1st Cir. 1990) (affirming district court's denial of defendant's motion to change venue based on the "exhaustive procedures employed by the trial court below to screen prospective jurors and impanel an impartial jury," including examining 260 prospective jurors, requiring each to answer comprehensive written questionnaires and respond to oral questions regarding, among other things, their exposure to pretrial publicity, their knowledge of the case or familiarity with any of the parties, their attitude towards organized crime, etc.); *United States v. Petters*, No. CRIM.08-364, 2009 WL 3430133, at *1 (D. Minn. Oct. 16, 2009), *aff'd*, 663 F.3d 375 (8th Cir. 2011) (finding that use of written questionnaire and expanded jury pool that was "far larger than that usually summoned for criminal cases in this District" effectively prevented prejudice from pretrial publicity).

Because of the nature of the accident, including the tragic loss of life, along with the far reaching pretrial publicity and the likelihood that jurors will be familiar with the

case, a written juror questionnaire should be used. A proposed questionnaire is included herein as Exhibit A.

B. **The size of the jury pool for trial should be increased, but prospective jurors from Santa Barbara County, where the accident occurred and has received the most media coverage, should be excluded from it**.

Given the media coverage, it is reasonable to assume that many jurors called for service in this case will have heard about the accident and/or formed an opinion about it and Mr. Boylan's liability. It only makes sense then that the size of the jury pool should be increased to ensure that there are enough people called for service. *See, e.g.*, *United States v. Pepe*, C.D. Cal. No. 2:07-cr-00168-DSF, Dkt. No. 629 (calling pool of "approximately 120 jurors to complete a case specific questionnaire" prior to August 2021 trial); *Rodriguez*, 581 F.3d at 785 (favorably describing measures district court took "to reduce the risk of prejudice" from pretrial publicity, including assembling a "590–person jury pool, twelve times the normal size"); *Petters*, 2009 WL 3430133, at *1 (finding that use of expanded jury pool that was "far larger than that usually summoned for criminal cases in this District," along with other measures, effectively prevented prejudice from pretrial publicity). The government does not oppose this request, so long as the Court agrees with it.

At the same time, because the accident occurred in Santa Barbara County and the media reporting there has been particularly sustained, especially relative to the small size of the county, prospective jurors from Santa Barbara County should be excluded from the pool.

Recognizing the dangers of extensive pre-trial publicity, other courts have taken these same measures—expanding the jury pool while excluding jurors from the sub-region where the charged incidents took place—in lieu of transferring a case out of a district altogether. For example, in *United States v. Blom*, 242 F.3d 799 (8th Cir. 2001), the defendant was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), but he was also facing state kidnapping

and murder charges in a highly publicized case. *Id.* at 802-804. The Eighth Circuit affirmed his federal firearms conviction, concluding that the district court did not abuse its discretion in denying his motion to change venue based on the prejudice resulting from pretrial publicity. *Id.* at 803-805. The court reached this conclusion based on the extensive curative measures the district court took during the jury selection process, which convinced the Eighth Circuit that "the district court carefully exercised its discretion in resolving this difficult issue and succeeded in selecting a fair and impartial jury." *Id.* at 805. Those measures mirrored those Mr. Boylan seeks here, including "assembling a jury pool of 196, three times the normal size," and excluding prospective jurors from Minnesota's Fifth Division, where the kidnapping took place. *Id.* at 804. The trial court also required each prospective juror to fill out a written questionnaire prior to the in-person selection process, increased the number of peremptory strikes for each side, and conducted "three days of individualized voir dire of seventy-five prospective jurors," ultimately striking 37 prospective jurors for cause. *Id.*

As *Blom* demonstrates, the curative measures Mr. Boylan seeks—including expanding the jury pool while excluding prospective jurors from Santa Barbara County—are the least disruptive means available to effectuate a fair trial in this highly publicized case. *See also Rodriguez*, 581 F.3d at 785 (favorably describing measures district court took "to reduce the risk of prejudice" from pretrial publicity, including excluding residents of the location of the crime from the jury pool).

**C. Each side should receive additional peremptory challenges.**

Rule 24(b)(2) of the Federal Rules of Criminal Procedure provides: "The government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges when the defendant is charged with a crime punishable by imprisonment of more than one year." While the text of the Rule explicitly contemplates additional peremptory challenges in cases involving multiple defendants, nothing in the Rule or the case law prohibits the Court from increasing the number of

challenges in its discretion.[18] In fact, courts have rejected defendants' claims of prejudice from significant pretrial publicity where the district courts granted each side additional strikes, among other curative measures. *See, e.g.*, *Blom*, 242 F.3d at 804; *see also United States v. Campa*, 459 F.3d 1121, 1135-36 & 1147 (11th Cir. 2006) (affirming denial of change of venue motion because trial court conducted "model voir dire for a high profile case," which included granting two defense requests for additional peremptory challenges, ultimately "giving the defendants a total of 18 and the government 11, and 2 each for alternates"); *Rodriguez*, 581 F.3d at 785 (favorably describing measures district court took "to reduce the risk of prejudice" from pretrial publicity, which included providing the defense with 10 extra peremptory strikes); *United States v. Moussaoui*, 2002 WL 1987955 (E.D. Va. 2002) ("Each side will be permitted to exercise a maximum of 25 peremptory strikes, which may be used as to either alternates or regular jurors at the party's discretion.").

Based on the continuous pretrial publicity, including the front page Los Angeles Times article from September 2, 2023, Mr. Boylan requests that each side receive an additional four peremptory strikes to guarantee Mr. Boylan's right to an impartial jury. If the Court is inclined to deny this request, Mr. Boylan submits that the need for a written questionnaire is even heightened so as to assist in identifying jurors who are biased and should be stricken for cause.

---

[18] *United States v. McCollom*, 1987 WL 15387, *8 (N.D. Ill. 1987) ("This court does not doubt that it can refuse to grant additional challenges, …, but it believes that it has inherent authority despite Rule 24 to increase that number if it concludes that to be a proper means of ensuring a fair trial.") (citations omitted). The *McCollum* court cited *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) in support of its conclusion that a district court has the inherent authority despite Rule 24 to increase the number of peremptory challenges if it concludes that to be a proper means of ensuring a fair trial. In *Sheppard*, the Supreme Court stated: "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." 384 U.S. at 362

## IV. CONCLUSION

Given the high-profile nature of this tragic accident, the significant loss of life, and the sustained and recent media coverage, special jury selection procedures are necessary to fulfill the Sixth Amendment's guarantee of a fair trial by an impartial jury. These procedures proposed herein have been reviewed favorably as less drastic measures than other available alternatives, like a change in venue. Mr. Boylan respectfully requests that the Court adopt these procedures for trial.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 7, 2023 By /s/ *Georgina Wakefield*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for JERRY NEHL BOYLAN