E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental Crimes and Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-8644
        E-mail:  Matthew.O'Brien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-482-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S *EX PARTE* APPLICATION FOR GAG ORDER (DKT. NO. 81) |
| v. | |
| JERRY NEHL BOYLAN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, Brian Faerstein, and Juan Rodriguez, hereby files its opposition to defendant JERRY NEHL BOYLAN's ex parte application for a gag order and other relief (Dkt. No. 81).

    This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.  If the Court is inclined to grant the <u>ex parte</u>, the government would respectfully request a hearing.

Dated: September 8, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  MACK E. JENKINS
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____/s/_____
                                  MARK A. WILLIAMS
                                  MATTHEW W. O'BRIEN
                                  BRIAN R. FAERSTEIN
                                  JUAN M. RODRIGUEZ
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................1

II.    FACTUAL BACKGROUND..........................................................2

       A.   The LA Times Article..................................................2

       B.   The Government's Efforts to Protect the Criminal
            Discovery from Public Dissemination.......................3

       C.   The Defense's Dissemination of the Criminal Discovery.....6

III.   LEGAL FRAMEWORK.............................................................8

IV.    THE PROPOSED GAG ORDER SHOULD BE DENIED......................8

       A.   The Defense Has Failed To Establish Any "Clear and
            Present Danger" or "Serious and Imminent Threat".........9

       B.   Defendant's Proposed Gag Order Is Overly Broad..........11

       C.   Less Restrictive Means Exist to Safeguard a Fair Trial...14

       D.   The Defense's Request Puts the Prosecution Team in an
            Untenable Position......................................15

V.     THE PROPOSED SEALING REQUIREMENT FOR THE GOVERNMENT'S RULE
       404(B) MOTION IN LIMINE SHOULD BE DENIED......................16

VI.    CONCLUSION................................................................19

1

<u>**TABLE OF AUTHORITIES**</u>

2

**FEDERAL CASES:**

3

<u>Ctr. for Auto Safety v. Chrysler Grp., LLC,</u>
  809 F.3d 1092 (9th Cir. 2016) .................................... 17
<u>Demaree v. Pederson,</u>
  887 F.3d 870 (9th Cir. 2018) .............................. 17, 18
<u>Foltz v. State Farm Mut. Auto. Ins. Co.,</u>
  331 F.3d 1122 (9th Cir. 2003) .................................. 18
<u>Gentile v. State Bar of Nev.,</u>
  501 U.S. 1030 (1991) ............................................ 8
<u>Levine v. U.S. Dist. Ct. for C.D. Cal.,</u>
  764 F.2d 590 (9th Cir. 1985) ................................ 8, 9
<u>Nancy Fiedler et al. v. United States Department of Justice et al.,</u>
  23-CV-00985-PA (C.D. Cal.) ...................................... 4
<u>Nebraska Press Ass'n v. Stuart,</u>
427 U.S. 539 (1976) .............................................. 8
<u>Nixon v. Warner Commnc'ns, Inc.,</u>
  435 U.S. 589 (1978) ........................................... 17
<u>Oliner v. Kontrabecki,</u>
  745 F.3d 1024 (9th Cir. 2014) .............................. 17, 18
<u>Oregonian Publ'g Co. v. U.S. Dist. Ct. for Dist. of Or.,</u>
  920 F.2d 1462 (9th Cir. 1990) .................................. 18
<u>Press-Enter. Co. v. Super. Ct. of Cal.,</u>
  478 U.S. 1 (1986) ............................................. 18
<u>Seattle Times Co. v. U.S. Dist. Ct. for W. Div. of Wash.,</u>
  845 F.2d 1513 (9th Cir. 1988) .................................. 18
<u>Times Mirror Co. v. United States,</u>
  873 F.2d 1210 (9th Cir. 1989) .................................. 18
<u>United States v. Doe,</u>
  870 F.3d 991 (9th Cir. 2017) .............................. 17, 18
<u>United States v. Sleugh,</u>
  896 F.3d 1007 (9th Cir. 2018) .................................. 17

**REGULATIONS:**

28 C.F.R. §§ 16.21-16.29........................................ 4

2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Seven days after filing one of the most frivolous, untimely

4  motions to dismiss that the undersigned counsel have ever seen (Dkt.

5  No. 79), the defense now files a public, ex parte application for a

6  gag order likely to garner more publicity than the underlying and

7  mundane news article upon which the ex parte is supposedly based.  If

8  the LA Times article were so damaging to defendant's prospects for a

9  fair trial, why would the defense file a public motion casting a

10 spotlight on the article?

11      The answer is that the defense is straining to justify their

12 request for an overly broad, largely unenforceable gag order.  If the

13 Court were to approve the defense's proposed order, the next time

14 someone beyond the control of the prosecution team makes a comment to

15 the media about the *Conception* case, the defense would cry foul and

16 demand a dismissal to avoid the October 24 trial on similarly

17 frivolous grounds.[1]

18      The defense is proposing a gag order that, on the one hand, is

19 overly broad, and on the other hand, would fail to address the

20 purported source of their concern, all the while failing to meet the

21 heavy burden for a gag order.  The defense's separate request that

22 motions *in limine* be redacted or filed under seal, in the absence of

23 any specific concern about personally identifiable information or

24 other traditional confidential information being exposed, is

25 similarly unfounded and unnecessarily restrictive.  Taken together,

26

27  _____

28      [1] The defense has already sought dismissal of this case four
   times.

the unjustified relief the defense seeks is a solution in search of a problem.  The ex parte should be denied.

## II.  FACTUAL BACKGROUND

### A.    The LA Times Article

The event that allegedly instigated the defense's outrage was an article published in the LA Times on September 1, 2023, that described an investigative report by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regarding the origin and cause of the fatal fire that killed 34 people on the *Conception* on September 2, 2019 (the "ATF Report").  An unknown individual provided the ATF Report to the LA Times.  The article also contained a two-sentence quote in its 24th paragraph from an anonymous "official" regarding the thoroughness of the ATF's investigation into the *Conception* fire. The ex parte focuses on the unknown individual's disclosure of the ATF Report to the LA Times, and the anonymous quote.

On the morning of September 5, 2023, in response to defense counsel's inquiry, the undersigned counsel sent a three-page letter to the defense stating, unequivocally, that the prosecution team had nothing to do with the disclosure of the ATF Report to the LA Times or the anonymous quote, and had no idea who provided the ATF Report or the quote to the LA Times.  Nonetheless, and despite the absence of any supporting evidence, the defense lobs the following accusations at the prosecution team:

- Both the "leaker" of the ATF Report and the source of the anonymous quote "likely is a member of the prosecution team" (Mtn. at 1:8-9);

- The "statements to the media [were made] by an agent of the prosecution team" (id. at 1:13); and

- An "agent" was the source of the anonymous quote (id. at 10:3-10).

To be clear, there is no evidence whatsoever supporting these accusations.  Defense counsel's unfounded claims speak volumes as to their credibility here.

### B.   The Government's Efforts to Protect the Criminal Discovery from Public Dissemination

Contrary to the defense's claims, the government has gone to great lengths in this case to prevent the public dissemination of the criminal discovery, including the ATF Report.  The government has been so steadfast in its refusal to disclose the criminal discovery in this pending case to third parties that the third parties have sued the government for not disclosing the discovery materials. Against this backdrop, it is ironic that the defense suggests that the government was behind the "leak" of the ATF Report.

The fire on the *Conception* killed 34 people, who were alive and in need of rescue in the ship's bunkroom when defendant (the ship's captain) woke up and jumped overboard and ordered his crewmembers to do the same.  After the *Conception* and related evidence were salvaged from the seafloor and reconstructed on land, the ATF conducted an investigation as to the origin and cause of the fire.  The result of the investigation was the ATF Report, completed in January 2021.

Soon thereafter, the 34 victims' families, some through their lawyers, requested that the government share the ATF Report with them, so that they could learn more about how and why their loved ones perished.  Initially, the government refused, due to the ongoing criminal case.  After the victims' families persistently requested the ATF Report, the government relented, but with strict limitations.

Aware of the sensitivity of the ATF Report, the government required each recipient of the ATF Report to sign a Non-Disclosure Agreement barring the recipient from disclosing the ATF Report to anyone, including the media.

In addition, in April 2021 the government contacted defense counsel in this case to see if they objected to the government providing the ATF Report to the victims' families.  The government also provided defense counsel with a copy of the proposed Non-Disclosure Agreement.  Defense counsel did not object to the government providing the ATF Report to the victims' families or their attorneys.

Because of the ongoing criminal case, the government persisted in refusing to share other materials from the criminal investigation with third parties (including the victims' families), in consideration of the Department of Justice's Touhy regulations.  See 28 C.F.R. §§ 16.21-16.29.  That led to the lawyers for the victims' families filing a lawsuit against the government to obtain such materials.  See Nancy Fiedler et al. vs. United States Department of Justice et al., Case No. 23-CV-00985-PA (C.D. Cal.).  So as it stands, in Judge Anderson's courtroom the government is being sued for not disclosing the ATF Report with its underlying documents and other sensitive discovery, and in Your Honor's courtroom the government is responding to an ex parte accusing the prosecution team of "leaking" criminal discovery to the LA Times.  No matter what happens, the government gets blamed.

Another example of the lengths to which the government has gone in order to protect the criminal discovery is a 24-second video that the FBI was able to extract from the burnt and waterlogged smartphone

of one of the victims of the fire.  The video showed that the victims were alive when defendant jumped overboard and ordered his crew to do the same.  Given the highly sensitive nature of the video, and the 34 victims' families' intense and understandable interest in the video, the government agreed to let the victims' families view the video but only if they travelled to FBI offices and watched the video inside the FBI's offices, in the presence of FBI officials.  To prevent a leak of the video, the government did not provide copies of the video to the 34 victims' families.  To date, to the government's knowledge, no unauthorized parties have obtained copies of the video, as a result of the prosecution team's ongoing efforts to protect the criminal discovery from disclosure.

It is worth comparing (1) the <u>ex parte</u>'s unfounded allegations that the prosecution team leaked the ATF Report to the LA Times and provided the anonymous quote, with (2) the prosecution team's actual interactions with the media.  In a criminal investigation and prosecution that has spanned four years, the defense identifies only the following factual support:

- The United States Attorney's Office issued two press releases announcing the indictments of defendant (both press releases were limited, per the United States Attorney's Office practice, to the allegations set forth in the indictments themselves);[2]

- After this Court dismissed the indictment in the original case, the U.S. Attorney's Office gave a one-sentence statement to the media that "prosecutors would seek authorization from the

---

[2] Both press releases contained the same admonition:  "An indictment contains allegations that a defendant has committed a crime.  Every defendant is presumed innocent until and unless proven guilty beyond a reasonable doubt."

1  Department of Justice to appeal [the] ruling."
2  (https://www.reuters.com/world/us/judge-throws-out-indictment-
3  captain-2019-california-boat-fire-that-killed-34-2022-09-02/;
4  Mtn. at 4 n.8.)
5  As in most criminal prosecutions, here the United States Attorney's
6  Office, and the prosecution team as a whole, have had almost no pre-
7  trial interactions with the press.  The defense's assertions to the
8  contrary lack factual support.
9      The only other instance of "publicity" that the ex parte points
10 to is a presentation that a government witness made at a limited
11 industry training-conference in February 2023.  An ATF scientist gave
12 a presentation to the International Association of Marine
13 Investigators that included some of the findings of the ATF Report.
14 The defense asserts that over 100 people attended the conference (but
15 not necessarily the ATF presentation during the conference).  (Mtn.
16 at 7:1-2.)  To the government's knowledge, the presentation did not
17 generate any media coverage, and the ex parte does not claim
18 otherwise.
19     The single, unpublicized presentation by an ATF scientist to a
20 small number of colleagues in the marine-fire-investigation industry
21 for training purposes does not come close to justifying the proposed
22 gag order.
23     **C.    The Defense's Dissemination of the Criminal Discovery**
24     The defense's concerns about the public dissemination of the
25 criminal discovery is ironic given their own recent practices.  The
26 defense has publicly disclosed far more of the criminal discovery –
27 including details regarding the ATF report – than the government.
28

6

1    For example, the ex parte fails to inform the Court that defense

2    counsel themselves publicly disseminated previously unknown details

3    regarding the ATF Report just last week.  Two days before the LA

4    Times story about the ATF Report, the defense wrote the following in

5    their latest motion to dismiss:

6         The ATF conducted an investigation into the potential cause
         and origin of the fire, conducting intermediate scale
7        testing in March and April of 2020, and full-scale testing
         in October and November of 2020. The ATF issued a report on
8        January 4, 2021, which hypothesized that the fire
         originated in a garbage can on the main deck. ATF could not
9        determine the cause of the fire.

10   (Dkt. No. 79 at 8-13.)

11       To the government's knowledge, none of the foregoing was known

12   to the general public prior to the defense's "leak" of this

13   information.

14       In the same publicly filed motion, the defense attached 632

15   pages of witness statements from the criminal discovery, the bulk of

16   which were from witnesses who had somewhat positive things to say

17   about defendant.  Prior to the defense's publication, none of those

18   witness statements ever had been disclosed to the public.  Given that

19   the defense's motion relied on only a tiny fraction of those witness

20   statements, the government is aware of no legitimate reason why the

21   defense publicly filed the defendant-friendly statements in their

22   entirety.

23       In sum, the prosecution team here has gone to extraordinary

24   lengths to protect all of the criminal discovery – and specifically

25   the ATF Report – from being disclosed to the public.  And the

26   government has been far more restrained than the defense.  Against

27   this backdrop, the ex parte is seeking the wrong remedy against the

28   wrong party.

7

1    **III. LEGAL FRAMEWORK**

2         "Pretrial publicity even pervasive, adverse publicity does not

3    inevitably lead to an unfair trial." <u>Nebraska Press Ass'n v. Stuart</u>,

4    427 U.S. 539, 554 (1976).  Nonetheless, courts may impose limitations

5    on the public statements of "trial participants," including "a lawyer

6    actively participating in a trial." <u>Gentile v. State Bar of Nev.</u>,

7    501 U.S. 1030, 1072, 1073 (1991); <u>Levine v. U.S. Dist. Ct. for C.D.</u>

8    <u>Cal.</u>, 764 F.2d 590, 595 (9th Cir. 1985).  Such "limitations are aimed

9    at two principal evils: (1) comments that are likely to influence the

10   actual outcome of the trial, and (2) comments that are likely to

11   prejudice the jury venire." <u>Gentile</u>, 501 U.S. at 1075.  Those

12   concerns arise from the "fundamental right to a fair criminal jury

13   trial," <u>Levine</u>, 764 F.2d at 591, and reflect the fact that "[f]ew, if

14   any, interests under the Constitution are more fundamental than the

15   right to a fair trial by 'impartial' jurors," <u>Gentile</u>, 501 U.S. at

16   1075.

17        A court's limitations must be "narrow and necessary." <u>Id.</u> at

18   1075.  A gag order is permissible if and only if: "(1) the activity

19   restrained poses either a clear and present danger or a serious and

20   imminent threat to a protected competing interest, (2) the order is

21   narrowly drawn, and (3) less restrictive alternatives are not

22   available." <u>Levine</u>, 764 F.2d at 595 (internal citations omitted).

23   **IV.  THE PROPOSED GAG ORDER SHOULD BE DENIED**

24        The defense fails to meet its burden for a gag order.  The

25   defense cannot satisfy a single prong of the three part-test set

26   forth above (much less all three): (1) none of the pretrial publicity

27   poses a "clear and present danger or a serious and imminent threat to

28   a protected competing interest"; (2) defendant's proposed gag order

                                    8

is not "narrowly drawn"; and (3) "less restrictive alternatives" are available.  Levine, 764 F.2d at 595.

### A. The Defense Has Failed To Establish Any "Clear and Present Danger" or "Serious and Imminent Threat"

The ex parte fails to show any "clear and present danger or a serious and imminent threat to a protected competing interest." Defendant's right to a fair trial has not been jeopardized by the straightforward LA Times article about the ATF's investigation into the Conception fire.  Nor does the two-sentence quote by an anonymous "official" complementing the ATF Report pose a "serious and imminent threat" to defendant.

The disclosure of the ATF Report to the LA Times was not a significant event warranting the Court's intervention.  As set forth above, the defense, in a public filing on August 31, 2023 (i.e., two days before the LA Times article), voluntarily disclosed to the public: (1) the existence of the ATF Report; (2) that the ATF conducted "intermediate scale testing in March and April of 2020, and full-scale testing in October and November of 2020"; (3) the ATF Report was issued in January 2021; and (4) the ATF Report concluded that "the fire originated in a garbage can on the main deck.  ATF could not determine the cause of the fire."  (Dkt. No. 79 at 2:9-12.)

Although the LA Times article on the ATF Report did provide a few more details than the defense provided in its filing last week, the details amount to a few paragraphs containing mundane facts about fire testing.  That is a far cry from a "clear and present danger or serious and imminent threat" to a fair trial.

The LA Times article did not even disclose information particularly adverse to defendant.  The article disclosed (just as

9

1   the defense had disclosed in a public filing before the LA Times

2   article) that the ATF determined that the fire likely started in a

3   trash can.  The National transportation Safety Board ("NTSB") already

4   had announced, publicly, the conclusions of its own investigation,

5   which did not point to the fire likely originating inside the trash

6   can.  The defense has failed to show that defendant's right to a fair

7   trial has been jeopardized one iota by the negligible factual

8   revelations in the LA Times article.

9        The defense's real complaint seems to be the two-sentence quote

10  buried in the 24th paragraph of the 37-paragraph LA Times article by

11  an anonymous "official" complementing the thoroughness of the ATF's

12  investigation.  Ironically, the defense's ex parte application is

13  more likely to generate publicity on this quote than the article did

14  itself.  It is difficult to believe that this anonymous quote – which

15  doesn't even mention or allude to defendant – would sway a single

16  potential juror at the October 24th trial.

17       The defense also presumes with zero factual support that this

18  quote was provided by "an agent of the prosecution team."  (Mtn. at

19  1:13.)  But the quote itself – in particular, the "official's"

20  statement that "[t]hey did everything possible to re-create the fire"

21  – necessarily imports detachment between the purported official and

22  ATF, which conducted the fire reenactment analysis.  In any event,

23  the quote, and the broader article in which it appears, was and is

24  incidental to this proceeding, notwithstanding the defense

25  temporarily drawing it into focus through its motion.

26       If the defense wants to make sure no potential juror was

27  influenced by the LA Times article, it will have every opportunity to

28  do so during voir dire.  If the defense wants to challenge the

10

results of the ATF Report, or the ATF's underlying investigation, it will have every opportunity to do so at trial.  If the defense wants to file a motion to change venue, it has every opportunity to do so (tellingly, it has not), although such a remedy similarly would be unwarranted and unnecessary in this case.  But the defense's ex parte application asks for a far more drastic remedy than the relatively insignificant "leak" deserves.

### B.   Defendant's Proposed Gag Order Is Overly Broad

The wording in the proposed gag order is as problematic as the ex parte itself.  Here it is:

> IT IS HEREBY ORDERED that the parties — including federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant, and the prospective witnesses in this case — are restrained from providing information or opinions to the press or the public about this case until the conclusion of trial.

(Mtn., Proposed Order at 1.)

One can read this over and over again and still have no idea what it means.  To whom does it apply?  On its face, the order would apply to the United States of America, the plaintiff.  Apparently the order would apply to more than 2.25 million civilian employees and another 2.25 million military personnel employed by the federal government.  (See https://www.cbo.gov/topics/employment-and-labor-markets/federal-personnel.)

The order contains the "including" language that could suggest – but does not state – that the order is limited to a subset of the United States, such as the prosecution team.  Of course, that is not what the order states.  Even if, contrary to its plain text, the order were limited to "government officials participating in the investigation," that phrase is unbound.

11

Take, for example, the NTSB.  The NTSB conducted a parallel, independent, and largely public investigation into the *Conception* fire.  The NTSB investigation is, and always has been, completely separate from this criminal investigation.  The defense appears to concede that the NTSB is not part of the prosecution team in this case (indeed it is not), acknowledging that "[t]here was an independent NTSB investigation, report, and public hearing" consistent with the NTSB's normal practices.  (Mtn. at 3:8.)  The prosecution team here has absolutely no control over NTSB officials.  Does the proposed order apply to the NTSB?  It is impossible to tell.  If it does, as the defense is well aware, the prosecution team has no ability to police the conduct of the NTSB or its myriad "officials."  If – <u>hypothetically</u> – an NTSB official says something to the media about the *Conception*, is it the prosecution team's fault?  If, on the other hand, the proposed order does <u>not</u> apply to NTSB officials, and there is a "leak" attributed to an anonymous government "official" in the future, how is the Court supposed to determine if the "official" was from the NTSB and not some other agency?  The defense recognizes that the NTSB's public report and findings "received and continues to receive media coverage."  (Mtn. at 3:9.)  Prospectively holding the prosecution team accountable for statements <u>potentially</u> attributable to federal governmental individuals or entities outside of the prosecution team would unfairly penalize the prosecution team for matters outside of its control.

Next the proposed order covers "state and local law enforcement officers" involved in the "investigation."  Here, too, there are many entities that were involved in the investigation of the *Conception* that are not part of the prosecution team.  The proposed order would

appear to gag, for example, entities that supplied first responders to the *Conception* fire, such as the Santa Barbara and Ventura County Fire Departments, or even contractors (such as independent ambulance companies) retained by those agencies to assist in the emergency response, even where those agencies are not part of the prosecution team here.

Next, the proposed order applies to "prospective witnesses in this case." Who does this cover? The 34 victims' families? They are all prospective witnesses. Is the defense suggesting that the victims' families can't speak to the press about the case? Such a prior restraint would be a blatant violation of the First Amendment.

Even if the foregoing problems could be resolved (they cannot), the proposed order next prohibits "providing information or opinions" to "the public." What does that mean? The government is at a loss. If a widow or child or parent of a victim tells a neighbor that he or she thinks defendant is guilty, would there be a violation? If not, what if the neighbor told a friend, who told a friend, who told a reporter? Such a quagmire sounds more like a bad free-speech hypothetical in a law school exam than an issue properly addressed by this Court.

Despite being overbroad and riddled with ambiguities, the proposed order would do nothing to prevent the alleged harm caused by the disclosure of the ATF Report to the LA Times. Again, there is no evidence suggesting that the prosecution team – or anyone in the government – had anything to do with the disclosure of the ATF Report to the LA Times. As discussed above, numerous non-governmental third parties possess the ATF Report (albeit under strict non-disclosure agreements) and could have impermissibly "leaked" it to the LA Times;

1    the proposed gag order would do nothing to stop a future disclosure

2    by one of those third parties.

3         **C.   Less Restrictive Means Exist to Safeguard a Fair Trial**

4         Third, far less restrictive alternatives to the defense's gag

5    order are available.  First, as indicated above, defense counsel is

6    free to explore any potential bias during the jury selection process.

7    Second, while the government does not believe it is necessary, the

8    government nonetheless has informed the defense that it would not

9    object, assuming the Court agrees, to an expanded jury venire in this

10   case, to the extent the defense has concerns about finding a suitable

11   number of jurors who will be fair and impartial.  Third, during

12   trial, the government anticipates the Court will instruct the seated

13   jurors each day not to conduct any independent research, including in

14   the media, about the case.  See, _e.g._, Ninth Circuit Manual of Model

15   Criminal Jury Instructions, No. 2.1.

16        Finally, the prosecution team already voluntarily "gags" itself

17   regarding defendant's trial.  As noted above, the U.S. Attorney's

18   Office has – pursuant to its standard practice – limited its

19   publicity of this case to (1) two straightforward press releases in

20   three years, each of which announced defendant's indictment and did

21   not disclose anything beyond what was set forth in the indictments

22   themselves, with appropriate admonitions about the presumption of

23   innocence, and (2) a boilerplate comment that it was considering

24   appeal of this Court's September 2022 dismissal order.  To the

25   government's knowledge, the FBI, ATF, and Coast Guard Investigative

26   Service have not made <u>any</u> substantive comments to the media about

27   this case.  The proposed gag order purports to fix a nonexistent

28   problem.

### D. The Defense's Request Puts the Prosecution Team in an Untenable Position

As noted above, the government suspects that the defense is not all that concerned about the "leak" of the ATF Report or the anodyne anonymous quote recognizing the effort that went into the ATF Report. Instead, if the court grants the ex parte application, the next time an anonymous quote is made by some "official" in an article about the *Conception*, the government expects that the defense will file yet another motion to dismiss alleging government misconduct. The government predicts the defense will do so (1) regardless of whether the prosecution team had anything to do with such a quote, and (2) regardless of the harmlessness of such a quote.

As the defense is well aware:

- There is no way for the prosecution team to enforce a restraining order against 4.5 million federal employees, particularly where millions of those employees work for agencies other than the ATF, FBI, Coast Guard Investigative Service, and the DOJ;

- There will be no way for the Court (or the parties) to know whether an "official" quoted in a future news story about the *Conception* is from an agency working with the prosecution team, or an entirely separate agency, such as the NTSB;

- There is no way for the prosecution team to "police" the free speech of prospective witnesses; and

- There will be no way for the Court (or the parties) to know whether an anonymous "family member of a victim" quoted in a future news story about the *Conception* is one of the government's trial witnesses.

15

Yet when the next article is published about this case (perhaps, ironically, about the defense's ex parte), almost any anonymous quote provided will be fodder for the defense's next motion to dismiss or yet another ex parte seeking unwarranted emergency relief.  That is not how criminal trials, or the First Amendment, should work.

As described above, the prosecution team has gone to great lengths to prevent the dissemination of the criminal discovery in this case, and has made no anonymous quotes to the media.  The proposed gag order would seek to hold the prosecution team to an impossible – and unjustified – bar.

## V.   THE PROPOSED SEALING REQUIREMENT FOR THE GOVERNMENT'S RULE 404(B) MOTION IN LIMINE SHOULD BE DENIED

The second request in the ex parte also lacks merit.  Again exaggerating the media's focus on this case, the defense claims that the government's forthcoming motion in limine regarding Rule 404(b) evidence should be preemptively sealed.[3]  (Mtn. at 10-11.)

As the government's Rule 404(b) notices to the defense make clear, there is nothing salacious or uncommon about the contents of the government's forthcoming motion in limine.  In the experience of the undersigned counsel, sealed Rule 404(b) motions are unheard of (or extremely rare), even in high-profile cases.  (The ex parte does not cite a single case preemptively sealing a Rule 404(b) motion.)  The public, and particularly the 34 victims' families, who have an

---

[3] The government's Rule 404(b) notice letters to the defense make clear (and its forthcoming motion in limine will do the same) the government's position that the vast majority of the evidence described in the notices is admissible at trial as direct or inextricably intertwined evidence.  The government provided the notices to the defense describing this non-404(b) evidence, along with limited categories of potential 404(b) evidence, in an abundance of caution.

intense and compelling interest in the upcoming trial, has a right to know the contents of pretrial litigation.  For example, the defense has made numerous in camera filings to the Court over the past few months, to the immense frustration of the victims' families, who frequently have asked the government about the content of the defense's in camera filings.

"[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Commnc'ns, Inc., 435 U.S. 589, 597 (1978).  "Throughout our history, the open courtroom has been a fundamental feature of the American judicial system." Oliner v. Kontrabecki, 745 F.3d 1024, 1025 (9th Cir. 2014).  "Shrouding the mechanics of a criminal case in secrecy places the public's interest in a transparent judicial system at risk." United States v. Sleugh, 896 F.3d 1007, 1012 (9th Cir. 2018).

These sacrosanct principles arise from both the common law and the First Amendment, and they give rise to "a strong presumption in favor of access to court records." Sleugh, 896 F.3d at 1013; Demaree v. Pederson, 887 F.3d 870, 884 (9th Cir. 2018); United States v. Doe, 870 F.3d 991, 996-97 (9th Cir. 2017).  "A party seeking to seal a judicial record can overcome this presumption only by showing a 'compelling reason.'" Sleugh, 896 F.3d at 1013 (quoting Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1096 (9th Cir. 2016)); Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003).

Where, as here, the public has a First Amendment right of access, "criminal proceedings and documents may be closed to the public without violating the [F]irst [A]mendment only if three

17

1  substantive requirements are satisfied: (1) closure serves a

2  compelling interest; (2) there is a substantial probability that, in

3  the absence of closure, this compelling interest would be harmed; and

4  (3) there are no alternatives to closure that would adequately

5  protect the compelling interest." United States v. Doe, 870 F.3d

6  991, 998 (9th Cir. 2017) (citing Oregonian Publ'g Co. v. U.S. Dist.

7  Ct. for Dist. of Or., 920 F.2d 1462, 1466 (9th Cir. 1990); see also

8  Times Mirror Co. v. United States, 873 F.2d 1210, 1211 n.1 (9th Cir.

9  1989). "The court must not base its decision on conclusory

10  assertions alone, but must make specific factual findings." Doe, 870

11  F.3d at 998 (citing Oregonian, 920 F.2d at 1466).

12      Speculative conjecture and conclusory rationales "fall[]

13  woefully short" of satisfying the compelling-reasons standard.

14  Oliner, 745 F.3d at 1026-27; Seattle Times Co. v. U.S. Dist. Ct. for

15  W. Div. of Wash., 845 F.2d 1513, 1519 (9th Cir. 1988). Rather, a

16  sealing proponent must point to "specific, on the record findings"

17  demonstrating that "closure is essential to preserve higher values

18  and is narrowly tailored to serve that interest." Press-Enter. Co.

19  v. Super. Ct. of Cal., 478 U.S. 1, 13-14 (1986); Demaree, 887 F.3d at

20  884 (compelling reasons must be "supported by specific factual

21  findings"). To seal even a portion of a court record, a party "bears

22  the heavy burden of showing . . . that disclosure will work a clearly

23  defined and serious injury." Oliner, 745 F.3d at 1026.

24      The defense does not even come close to satisfying the three-

25  part compelling-reasons test set forth above. This request, too, is

26  a slippery slope. Is the defense next going to ask for the hearing

27  on pretrial motions to be closed to the public (including victims'

28  families)? The defense's request should be denied.

## VI.   CONCLUSION

For the foregoing reasons, the government requests that the Court deny the ex parte in its entirety.  If, despite the foregoing, the Court is inclined to grant the application, the government would respectfully request a hearing.

Dated: September 8, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  MACK E. JENKINS
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                  _____/s/_____
                                  MARK A. WILLIAMS
                                  MATTHEW W. O'BRIEN
                                  BRIAN R. FAERSTEIN
                                  JUAN M. RODRIGUEZ
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA