CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GEORGINA WAKEFIELD (Bar No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
JOSHUA D. WEISS (Bar No. 338918)
(E-Mail: Joshua_Weiss@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JERRY NEHL BOYLAN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JERRY BOYLAN,<br><br>Defendant. | Case No. 2:22-CR-00482-GW<br><br>**JERRY BOYLAN'S OBJECTIONS TO THE PRESENTENCE REPORT**<br><br>Sentencing Hearing: May 2, 2024<br><br>Courtroom of the Hon. George H. Wu |

1        Jerry Nehl Boylan, through his attorneys of record, Deputy Federal Public
2    Defenders Georgina Wakefield, Gabriela Rivera, Julia Deixler, and Joshua D. Weiss,
3    hereby files his objections to the Presentence Report.  Mr. Boylan will file his
4    sentencing position under separate filing.
5
6                                           Respectfully submitted,
7                                           CUAUHTEMOC ORTEGA
                                            Federal Public Defender
8
9    DATED:  April 15, 2024                 By   */s/*
10                                          GEORGINA WAKEFIELD
                                            GABRIELA RIVERA
11                                          JULIA DEIXLER
                                            JOSHUA D. WEISS
12                                          Deputy Federal Public Defenders
                                            Attorney for JERRY NEHL BOYLAN
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
                                            2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. LEGAL OBJECTIONS TO THE PSR ......................................................... 1

    A.    USSG § 3B1.3: Abuse of Position of Trust ..................................... 1

    B.    Adjustment for Zero Point Offender, U.S.S.G. § 4C1.1 ................... 5

    C.    Base Offense Level ........................................................................... 6

III. FACTUAL OBJECTIONS TO THE PSR .................................................... 6

    A.    *Vision* Fire ......................................................................................... 6

    B.    *Condor Express* Fire .......................................................................... 7

    C.    Crew Training .................................................................................... 8

    D.    Account of the September 2, 2019 Fire ......................................... 10

        1.    Kohls "then jumped down to the main deck to the port side of the sun deck. He ran past the fire station on the port side of the main deck twice, not knowing that it was there or how to use it" (¶ 31) ......................................................................... 11

        2.    "No one grabbed the fire ax or fire extinguisher from the wheelhouse prior to jumping." (¶ 32) ...................................... 12

        3.    "Boylan did not give any commands on how to fight the fire." (¶ 38) ................................................................................... 12

        4.    "When the fire was discovered on the Conception, Boylan was the first to abandon the boat by jumping into the ocean and ordered his crew members to abandon the boat without making any efforts to save the 33 passengers and one crewmember" (¶ 67) ................................................................................... 13

    E.    Speculation Regarding Potential Contributing Factors of the Accident .... 13

    F.    Passenger Boarding and Safety Briefing ....................................... 15

        1.    Boylan "allowed passengers to board the *Conception* and sleep in the bunkroom while it was docked the night before departure before crew members were required to report to the ship" (¶¶ 21, 25) and "did not require his crew to report to the ship until 3:00 a.m. on August 31, 2019" (¶ 24) ...................................... 15

        2.    "Boylan also allowed passengers to store coolers of beer on the top of the escape hatch in the salon. The escape hatch could not be opened from the bunkroom when a beer cooler was on top of it … The passenger saw ice chests being stored on top of the escpe hatch on multiple occasions, unsuccessfully tried to open

i

the escape hatch with an ice chest on top, and addressed his concerns to Boylan" (¶22) ...................................................................... 16

3.  "Boylan, a smoker, did not provide instructions as to where passengers should smoke cigarettes and how passengers should dispose of their lit cigarette butts." (¶28) ........................................ 17

4.  "[Boylan] also failed to inform his passengers that they should not overload the ship's electrical outlets when charging their equipment's batteries;" (¶28) and "[a] photograph of a power strip taken by a passenger that night depicted an overloaded power strip" (¶ 29). ...................................................................... 18

5.  "Boylan failed to have passengers don life jackets during the morning briefing despite Coast Guard regulations requiring him to do so." (¶28)................................................................................ 18

G.   Decedents' Cause of Death ........................................................................ 19

H.   Sewage Dumping ......................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Burrage v. United States,*
571 U.S. 204 (2014) ................................................................................................. 5

*United States v. Armstrong,*
   165 F.3d 918 (9th Cir. 1998) (unpublished) ................................................... 1, 3

*United States v. Belcher,*
   857 Fed. Appx. 390 (9th Cir. 2021) (unpublished) ............................................ 2

*United States v. Bighead,*
   131 F.3d 149 (9th Cir. 1997) ............................................................................. 2

*United States v. Christiansen,*
   958 F.2d 285 (9th Cir. 1992) .......................................................................... 1, 2

*United States v. Cuff,*
   999 F.2d 1396 (9th Cir. 1993) ........................................................................... 2

*United States v. Green,*
   988 F.2d 123 (9th Cir. 1993) ............................................................................. 2

*United States v. Thorn,*
   317 F.3d 107 (2d Cir. 2003) .............................................................................. 3

**Federal Statutes and Guidelines Provisions**

18 U.S.C. § 3553 ..................................................................................................... 1

U.S.S.G. §1B1.3 ..................................................................................................... 19

U.S.S.G. § 2A1.4 ............................................................................................. 2, 4, 6

U.S.S.G. § 4C1.1 ................................................................................................. 5, 6

U.S.S.G. § 3B1.3 .......................................................................................... 1, 3, 4, 5

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ................................................................ 1

# I.  INTRODUCTION

The PSR and recommendation letter contain numerous factual inaccuracies. These inaccuracies pervade both documents and are the purported bases to justify the guideline calculation and an upward departure and variance, which result in a guideline calculation and recommended sentence that are factually and legally flawed.  Given the number and pervasiveness of these incorrect assertions, which largely mirror those made by the government and already rejected by the Court for being unreliable, the PSR and its recommendation letter should be given very little weight by the Court in determining the appropriate sentence in this case.  Mr. Boylan files these objections to highlight some of the most significant problems with the PSR, both legal and factual, and will file a separate sentencing position paper with his requested sentence and a discussion of the sentencing factors under 18 U.S.C. § 3553.

# II.  LEGAL OBJECTIONS TO THE PSR

## A.    USSG § 3B1.3: Abuse of Position of Trust

The PSR's application of an enhancement for abuse of position of trust, U.S.S.G. § 3B1.3, is both legally and factually erroneous.  (*Contra* PSR ¶¶ 66-67.)  This enhancement should not apply for four reasons.

For starters, the enhancement cannot apply where, as here, the crime of conviction was not committed intentionally.  As the Ninth Circuit has explained, the enhancement applies only where "in addition to the elements of the crime, the defendant *exploited* the trust relationship to facilitate the offense."  *United States v. Christiansen*, 958 F.2d 285, 287–88 (9th Cir. 1992) (emphasis added); *see also United States v. Armstrong*, 165 F.3d 918 (9th Cir. 1998) (unpublished) ("For the enhancement to apply [] the defendant must have exploited the trust relationship to facilitate the offense." (quotation marks and citation omitted)).  To "exploit" a trust relationship, one must necessarily do so intentionally.  *See* Exploitation, Black's Law Dictionary (11th ed. 2019) (to "exploit" is to "tak[e] advantage of something," especially to "tak[e]

1

unjust advantage of another for one's own benefit or selfish ends").

The enhancement has thus been applied exclusively in cases where the defendant committed an intentional crime and, in so doing, exploited their position of trust. For example, the enhancement has applied to a credit union manager who used their position to embezzle funds and conceal the crime, to law enforcement officers who used their positions to deflect investigation into illegal drug trafficking activities or sexual abuse, and to a doctor who intentionally submitted false insurance claims. *See United States v. Belcher*, 857 Fed. Appx. 390, 394 (9th Cir. 2021) (unpublished); *United States v. Bighead*, 131 F.3d 149 (9th Cir. 1997); *United States v. Cuff*, 999 F.2d 1396, 1397 (9th Cir. 1993). The only case the defense has found where the enhancement was applied to a manslaughter case, the defendant had been convicted of *voluntary* manslaughter for "causing his infant daughter's death by beating her on the head." *United States v. Green*, 988 F.2d 123 (9th Cir. 1993). The defense is not aware of a single case in which the enhancement has been applied to a crime that was not committed with intention.

Mr. Boylan was convicted of an analogue to *involuntary* manslaughter, as demonstrated by the fact that the PSR bases the Guideline calculation on U.S.S.G. § 2A1.4, the involuntary manslaughter Guideline. (*See* PSR ¶ 57; *see also* Dkt. No. 371 at 7 (district court explaining that jury instruction here was modeled after involuntary manslaughter caselaw); Dkt. No. 320 at 5 (final jury instructions).) No one has ever alleged that Mr. Boylan acted with any intent to cause the deaths of the passengers on the *Conception*; there was no dispute that this was a terrible, tragic accident. Because Mr. Boylan was convicted of committing an unintentional crime—*involuntary* manslaughter—he cannot have "exploited the trust relationship to facilitate the offense." *Christiansen*, 958 F.2d at 287–88. The enhancement therefore does not apply.

Second, "[t]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a

difficult-to-detect wrong." *United States v. Armstrong*, 165 F.3d 918 (9th Cir. 1998) (unpublished); *see also United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003) ("Whether someone occupies a position of trust turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong." (cleaned up)).  As the Guideline application note explains, the enhancement applies only where the defendant used a position of trust to "facilitate[e] the commission or concealment of the offense."  U.S.S.G. § 3B1.3, Application Note 1.  Here, there was no concealment.  Multiple witnesses testified that the way Mr. Boylan ran his trips—including with respect to roving patrols—was consistent with how all trips were run on Truth Aquatics vessels.  (*See, e.g.*, Dkt. No. 336 at 92-93 (Deckhand Milton French testifying that no roving patrol was used on any of the Truth Aquatics trips he worked on, including with other captains and on other vessels); Dkt. No. 337 at 83-84 (Captain Matthew Curto testifying that he worked on multiple Truth Aquatics vessels with three different captains, and all of them had the same procedures as Mr. Boylan regarding roving patrols).)  Mr. Boylan never concealed his practices from crew members, the owners of the vessel, passengers, or regulators.  Indeed, one government witness—David Carter— testified that as a passenger on a trip, he once asked Mr. Boylan about the procedures on the boat when it was anchored overnight, and Mr. Boylan showed him the anchor alarm that was used to alert the crew in case of anchor drag.  (Dkt. No. 365 at 31-32.) Mr. Carter further testified that Mr. Boylan never concealed the fact that there was no crew member posted to stay awake all night.  (*Id.*)  And a Coast Guard Inspector— Daniel Hager—testified that he conducted the final annual inspection of the *Conception* in February 2019 (about six months before the accident), and he found no deficiencies with the vessel, its crew, or how it operated.  (Dkt. No. 369 at 16-18.)  To pass the inspection, Mr. Boylan did not conceal anything about his operation of the vessel; indeed, Officer Hager testified that he would not have asked about roving patrols or night watchmen during an annual inspection.  (*Id.* at 70-71.)  Because Mr. Boylan did not conceal his practices from anyone, the enhancement does not apply.

Third, it seems that the PSR suggests that the enhancement should apply simply by virtue of the fact that Mr. Boylan was the captain of the vessel, which is a trusted position. (*See* PSR ¶ 67.) But the PSR already increased the base offense level by four points based on this same fact—that the offense involved the "reckless operation of a means of transportation." (PSR ¶ 57.) Had Mr. Boylan been convicted of reckless involuntary manslaughter, not involving the "operation" of a boat, then the base offense level would be 18, not 22. U.S.S.G. § 2A1.4(2). Thus, applying the abuse of trust enhancement because Mr. Boylan was the captain of a vessel would amount to double counting—increasing the base offense level and adding an enhancement based on the same fact. And such double counting violates the text of the abuse-of-trust Guideline, which state that "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3.

Finally, the factual basis the PSR offers for the application of the enhancement is also incorrect. The PSR states that Mr. Boylan abused his position of trust in the following manner: "When the fire was discovered on the *Conception*, Boylan was the first to abandon the boat by jumping into the ocean and ordered his crew members to abandon the boat without making any efforts to save the 33 passengers and one crewmember, even after two other crewmembers returned to the *Conception* to look for survivors." (PSR ¶ 67.) This account of the facts contradicts the trial evidence. Milton French testified that when the fire was discovered, he ran forward to the wheelhouse, where the crew did a "five-second little huddle up" and Mr. Boylan told everyone to "get to the main deck and get people out of the bunkroom." (Dkt. No. 336 at 58.) The PSR is thus wrong to state that Mr. Boylan "ordered his crew members to abandon the boat without making any efforts to save the 33 passengers and one crewmember." Additionally, contrary to the claim that Mr. Boylan was first to abandon ship, the trial evidence consistently showed that he stayed up in the wheelhouse while it filled with smoke and flames in order to complete a mayday call to the Coast Guard. (*E.g.*, Dkt. No. 336 at 109-110.) All of the surviving crew testified that when Mr. Boylan finally

4

jumped out of the wheelhouse, he was "seemingly engulfed in smoke. . . . I thought he was on fire." (Dkt. No. 336 at 62, 111 (French); *see also* Dkt. No. 340 at 22 (Michael Kohls stating "we thought he was burning").).  And after he entered the water, Mr. Boylan did not abandon ship—he swam to the back of the vessel and reboarded it after Mr. French and Cullen Molitor.  (Dkt. No. 336 at 70.)  Mr. Boylan told Mr. French to abandon the lifesaving efforts only after it was clear that the crew would also be killed if they remained onboard.  (*See* Dkt. No. 336 at 117-118.)  The factual basis the PSR offers for the enhancement is thus incorrect.

The PSR's suggestion to apply U.S.S.G § 3B1.3 is thus premised on legal and factual error.

**B.    Adjustment for Zero Point Offender, U.S.S.G. § 4C1.1**

As the PSR correctly calculates, Mr. Boylan has zero criminal history points. His offense level should therefore be decreased by two for being a zero-point offender, under U.S.S.G. § 4C1.1(a).  The government might argue that this adjustment does not apply because it applies only where "the offense did not result in death or serious bodily injury."  *Id*. § 4C1.1(a)(4).  But the term "result in death" is a term-of-art carrying implications that the government previously argued, and the Court decided, do not apply to the offense here.  In *Burrage v. United States*, 571 U.S. 204 (2014), the Supreme Court explained that there is a bedrock principle in American law that where a person is charged with conduct that resulted in the loss of life, the government must prove that the conduct was the but-for, or "actual," cause of the loss of life.  *Id*. at 210-216.  The Court concluded, the phrase "'[r]esults from,' imposes, in other words, a requirement of actual causality."  *Id*. at 211.  Based on *Burrage*, Mr. Boylan asked for a jury instruction requiring the government to prove actual causation.  (Dkt. No. 246 at 15-16.)  The government responded by arguing that *Burrage* does not apply to the charge here; that actual cause is not an element of seaman's manslaughter; and that "the government did not allege nor can it prove 'actual cause' in this case."  (Dkt. No. 246 at

21.)  The Court ruled in the government's favor, and the final jury instructions did not require the government to prove actual causation.  (Dkt. No. 359 at 10-11; Dkt. No. 320 at 4-5.)  Given that the Supreme Court has held that when an offense is said to result in death, it means that the offense was the actual cause of the deaths, and that the government here conceded that it did "not allege nor can it prove 'actual cause' in this case," the carve-out to the zero-point offender guideline for offenses that "result in death" does not apply.  Mr. Boylan's offense level should therefore be decreased by two under U.S.S.G. § 4C1.1.

## C.    Base Offense Level

The PSR states that the base offense level is 22, based on the offense of involuntary manslaughter involving "the reckless operation of a means of transportation."  U.S.S.G. § 2A1.4(a)(2)(B).  In response to Mr. Boylan's motion for a new trial based on an error in the lesser-included offense jury instruction, the government has made arguments indicating that a captain of a vessel is not the "operator" of the vessel.  (*See* Dkt. No. 413.)  Depending on how the Court rules on that motion, and specifically on how it interprets the term "operator," Mr. Boylan may object to the base offense level at a later date.

## III. FACTUAL OBJECTIONS TO THE PSR

### A.    *Vision* Fire

The PSR asserts that the government "provided evidence that Boylan was aware of at least two fires that had occurred on ships similar to the Conception, including the Condor Express fire in 2013 and the Vision [] fire in 2018."  (PSR ¶ 23.)  In particular, the PSR claims that after a battery caught fire on the Vision in 2018, "[t]he Vision's captain later informed Truth Aquatic's owner and Boylan about the fire aboard the Vision."  (Id. ¶ 23(b); see also ¶ 59 (asserting "Boylan was aware of sister ship Vision's fire in October 2018").)

1           This is incorrect.  When interviewed by the government, the captain of the *Vision*

2    said that he "did not recall speaking to Jerry Boylan about the October 2019 battery fire

3    onboard the M/V VISION," and said that if he had spoken to Mr. Boylan, he "cannot

4    pinpoint a time."  Ex. A (Cappanneli ROI).  The Court excluded any evidence at trial

5    regarding the 2018 *Vision* fire unless the government could meet its burden to establish

6    Mr. Boylan's knowledge of it.  *See* Ex. C (2024-10-12 Tr.) (Under Seal) (The Court:

7    "there has to be some basis for the argument that he was aware of one of those three

8    fires, or all of the three fires").  The government could not meet that burden, so the

9    evidence of the *Vision* fire was not presented at trial.[1]  The government's attempt now to

10   reassert its unsupported and contradicted allegations through the Probation Officer

11   should be rejected.  The Court should strike from the PSR all references to the 2018

12   *Vision* fire (found at paragraphs 23, 23(b), and 59) because there is no evidence to

13   support a finding that Mr. Boylan was even aware of any fire, let alone the specific

14   circumstances surrounding it, before the *Conception* accident.  In addition, because the

15   Probation Officer relies on this fact to justify both some of the enhancements and the

16   recommended sentence, the entire PSR and the recommendation letter should be

17   reevaluated.

18   **B.    *Condor Express* Fire**

19          The PSR similarly repeats the government's unsupported allegations and outright

20   misstates the trial testimony regarding a 2013 fire on an unrelated boat, the *Condor*

21   *Express*.  The PSR incorrectly states that "the captain of the Condor Express testified at

22   trial that he was confident Boylan had knowledge and awareness about the fire due to

23   the significant attention at the Sea Landing and the media coverage that the Condor

24   Express fire had generated."  (PSR ¶ 23(a).)

25

26   _____

27      [1] The Court suggested that the government could voir dire Mr. Cappannelli
     outside the presence of the jury to attempt to show a sufficient basis that Mr.

28   Cappanneli had told Mr. Boylan of the fire and told him about it before the *Conception*
     fire, but the government did not do so.

In fact, the captain of the *Condor Express* provided no such testimony at trial regarding whether Mr. Boylan knew about the 2013 fire.  (*See* Dkt. 337 at 80-81.) Although the *Condor Express* captain speculated during a prior interview with the government that Mr. Boylan likely knew about the fire, he confirmed that he did not personally tell Mr. Boylan about it, nor did he hear of anyone else telling Mr. Boylan about it.  His assumption that Mr. Boylan was generally aware of the fire was thus nothing more than speculation.  As such, the Court ruled that the government could not introduce such evidence at trial unless the government could establish through employment records, witness testimony, or some other evidence that Mr. Boylan was working at Sea Landing at the time of the fire.  The government produced no such evidence.  Nor did it produce any other evidence that Mr. Boylan actually knew that a fire occurred on the *Condor Express*, let alone that he was aware of any of the specifics about that fire, including where it started, how it started, who discovered it, etc.  (*See id.* at 63 ("THE COURT: Then it gets to the point of whether or not he actually knew that there was a fire on that other boat . . . I thought you said you were going to provide evidence he was working at some point in time where the boats were next to each other, where somebody going to the *Conception* would have obviously seen the burnt [*Condor Express*]").)

Because there is no evidence to support the claim that Mr. Boylan was aware of the *Condor Express* fire or how that fire started, it is irrelevant to Mr. Boylan's conduct in this case and cannot justify any enhancements or the recommended sentence.  All references to the *Condor Express* fire should therefore be stricken from the PSR (found at paragraphs 23 and 23(a)) and not considered for sentencing purposes.

## C.    Crew Training

The PSR also made several inaccurate representations regarding Mr. Boylan's training of the *Conception* crewmembers.  In particular, the PSR alleges at various points that crewmembers on the accident voyage did not know how to use the fire

stations.  *See* PSR ¶¶ 21, 26(a) ("French testified that Boylan had never drilled French on how to use the Conception's fire stations"), 26(c) "Molitor testified that . . . he did not know how to use [the fire stations]"; 26(b) ("The testimonies of the surviving crewmembers indicated that Kurtz had never used the ship's fire stations because Boylan had never drilled her.").

Any assertion that these three crewmembers did not know how to use the fire stations is contradicted by the trial testimony.  Surviving deckhand Milton French testified that he knew where the fire stations were located and how to use them.  He specifically testified about the two ways to turn on the fire hoses on the *Conception*, and confirmed that he had personally run the fire pump on the boat "many times," including "just hours before the fire."  (*See* Dkt. 336 at 76:14-17.)  He went on to testify that Mr. Boylan personally showed him the portside fire station and told him "how to get the fire hose started from that fire station."  (*Id*. at 77:18-78:01.)  Mr. French testified to detailed knowledge of the component parts of the fire stations, including the green and red buttons to start and stop the pump and the valve to control the water flow of the hose.  (*Id*. at 78:08-19.)[2]

Surviving second captain Cullen Molitor also testified at trial that he knew where the fire stations were located and he knew how to use them.  (*See* Dkt. 333 at 59:21-60:08 (Counsel: "[Y]ou were shown where the fire extinguishers were on the boat?" Molitor: "Yeah." Q: You knew where all of those were? A: Yeah. Q: And you were shown where the fire hoses were on the boat; right? A: Yeah. Q: And you knew where those were? A: Yes. Q: You understood how those worked? A: Yes.").)  Mr. Molitor agreed that it was "pretty obvious where [the fire stations] were on the boat."  (*Id*. at 60:24-61:01.)

---

[2] Mr. French also testified about completing an annual inspection for the Coast Guard on the *Vision*, which had nearly identical fire stations in the same exact locations as those on the *Conception*.

9

Further, former crewmember Evan Jones Toscano testified that second deckhand Allie Kurtz, who perished in the accident, also received training regarding the fire stations and knew how to use them. He testified that both he and Ms. Kurtz were given a thorough orientation of the boat, which included being shown how the fire pump and fire suppression system worked. (*See* Dkt. No. 370 at 174:16-22.) He also testified that he and Ms. Kurtz were shown the fire stations on the port side and starboard of the salon. (*Id.* at 178.) From just a single trip on the *Conception*, Mr. Jones Toscano could recall that he and Ms. Kurtz were shown "fireboxes that house[] the hose nozzle assembly, and there is also a valve there." (*Id.*) He further recalled that the fire stations were identified and painted red. (*Id.* at 179.)

The reason that the fire stations were not used during the *Conception* fire is not because these crewmembers did not know how to operate them; it is because they were inaccessible due to the rapidly accelerating fire on the boat. Mr. Molitor testified at trial that he knew where the portside fire station was and tried to get to it to use the hoses to fight the fire, but he could not do so because the fire station was completely blocked by flames. (*See* Dkt. No. 341 at 86:04-87:25.) Similarly, Mr. French testified that he couldn't get to the portside fire station to activate the fire pump, either from the bow of the boat or from the stern, because the fire station was completely blocked by flames, whether he approached it from the bow of the boat or from the stern. (Dkt. No. 336 at 66 ("I had my eye on that fire station, basically, so that was my first intent, but I found it to be engulfed in flames"); *see also id.* at 78-80, 108-109, 115.)

## D.   Account of the September 2, 2019 Fire

As with the rest of the PSR, the section describing the events of the fire on the *Conception* is riddled with factual errors that are contradicted by the testimony at trial.

1

**1.    Kohls "then jumped down to the main deck to the port side of the**
**sun deck.  He ran past the fire station on the port side of the main**
**deck twice, not knowing that it was there or how to use it" (¶ 31)**

First, Mr. Kohls's memory that he jumped down to the main deck from the
sundeck, rather than from the wheelhouse along with the other crewmembers, was put
into question by the testimony of the other surviving crewmembers at trial.  Mr. Molitor
testified that all the surviving crewmembers, including Mr. Kohls, ran to the bow of the
boat after Mr. Kohls determined that the stairway down to the main deck was
impassable.  (*See* Dkt. No. 341 at 81:16-23.)  He also testified that he did not see
anyone jump over the side railing of the upper deck to get to the main deck.  (*Id.* at
83:16-18.)  Mr. French also did not see Mr. Kohls jump from the sundeck and believed
instead that he "used the port side wing station," as the other crewmembers had done.
(Dkt. No. 336 at 136:24-137:05.)

Second, Mr. Kohls's testimony directly contradicts the PSR's claim that he did
not know where the fire stations were located.  Mr. Kohls testified that during the fire,
he ran to retrieve a fire extinguisher from the galley not because he did not know about
the fire stations, but because, as a galleyhand, retrieving the fire extinguishers from the
galley was his assigned duty in case of a fire emergency.  (Dkt. No. 340 at 54-55 ("Q:
Okay. And at this point, your thought is to get down to the main deck and get to the
passengers; right? A: Help the passengers, get to the fire extinguishers in the galley
because that is -- Galley One and Galley Two are responsible for the three fire
extinguishers in the galley. Q: Okay. So you knew what your responsibilities were, and
you were going to try to fulfill those responsibilities? A Yes."); *see also id.* at 29-30.)
Mr. Kohls repeatedly stated that as a galleyhand, the fire extinguishers were his
responsibility, and he knew how to use them, including that he was supposed to point
an extinguisher "at the base of the fire."  (Dkt. No. 340 at 32.)  In contrast, Mr. Kohls
explained, the deckhands were responsible for manning the fire stations, and so they
were not his focus as a galleyhand.  (Dkt. No. 340 at 29.)  That is, he made clear that he

11

1    knew where the fire stations, or "hoses," were located, but manning them was not
2    within his job duties.  (Dkt. No. 340 at 29-30.)

3           **2.     "No one grabbed the fire ax or fire extinguisher from the**
4                  **wheelhouse prior to jumping." (¶ 32)**

5           This assertion in the PSR leaves out important factual context.  Mr. Sims testified
6    that Mr. Boylan *twice* ordered him to grab the fire extinguisher in the wheelhouse.  (*See*
7    Dkt. No. 337 at 15 ("he asked me twice to grab a fire extinguisher").)  However, Mr.
8    Sims was unable to get to the extinguisher because the wheelhouse was overcome by
9    smoke.  (*Id.*; *see also id.* at 19-20 (smoke was burning Mr. Sims's eyes, making him
10   dizzy, causing him to struggle to get to the fire extinguisher.)

11          **3.     "Boylan did not give any commands on how to fight the fire."**
12                 **(¶ 38)**

13          This assertion is plainly contradicted by testimony of the surviving
14   crewmembers.  Mr. French testified that, once the fire was discovered, Mr. Boylan
15   called the crew for a brief "huddle" in the wheelhouse to discuss a "plan of action."
16   (Dkt. No. 336 at 58:17-23.)  Mr. Boylan instructed the crew to "get to the main deck
17   and get people out of the bunkroom."  (*Id.*; *see also id.* at 106-107 ("Q: Jerry said to get
18   down to the main deck and get people out? A: Yes. Q: And you understood at that
19   moment that you should do whatever you could to save people? A: Correct. Q: At this
20   point, Jerry didn't tell you to abandon ship, right? He told you to get down and save
21   people? A: Yeah."))  And, as discussed above, Mr. Sims testified that Mr. Boylan
22   commanded him two different times to get the wheelhouse fire extinguisher to try to
23   fight the fire.  (Dkt. No. 337 at 15.)

24

25

26

27

28

                                              12

1       **4.**     **"When the fire was discovered on the Conception, Boylan was the**

2                **first to abandon the boat by jumping into the ocean and ordered**

3                **his crew members to abandon the boat without making any**

4                **efforts to save the 33 passengers and one crewmember" (¶ 67)**

5        The claim that Mr. Boylan was the "first to abandon the boat" is false.  As

6 discussed above, Mr. Boylan jumped into the ocean after the wheelhouse had become

7 engulfed by flames and Mr. Boylan was struggling to breathe.  Mr. French and Mr.

8 Molitor both testified that they believed Mr. Boylan was on fire when he jumped into

9 the water.  Nevertheless, he did not "abandon ship" at that time.  Instead, Mr. Boylan

10 swam to the back of the boat and reboarded it after Mr. French and Mr. Molitor.  (Dkt.

11 No. 336 at 70.)  Mr. Boylan was concerned for the crewmembers' safety after he, Mr.

12 French, and Mr. Molitor reboarded the boat.  Mr. French testified that at one point, he

13 "was getting very close to the fire, and I remember Jerry saying like, you know, get

14 away from it, basically." (*Id.* at 69.)  Mr. Boylan only told Mr. French to get off the

15 boat after it was clear that the crew would also be killed if they remained onboard. (*See*

16 *id.* at 117-118.)

17 **E.**     **Speculation Regarding Potential Contributing Factors of the Accident**

18        In its sentencing guidelines analysis, the PSR posits, without any factual support,

19 several "unknown" factors, which the Probation Officer seems to suggest contribute to

20 Mr. Boylan's culpability in the offense.  Several of these purported factors will be

21 addressed more fulsomely in Mr. Boylan's sentencing position.  But the defense notes

22 here that several of the arguments in this section of the PSR are based on plainly

23 inaccurate premises.  For example, the PSR asserts "[i]t is unknown whether the

24 victims in the windowless bunkroom could have escaped had they known the existence

25 of the escape hatch."  PSR ¶ 62.[3]  In fact, the answer to the question posed is that the

26 decedents **did** know where the escape hatch was.  Ms. Kurtz, the second deckhand who

27 _____

28        [3] *See also* PSR ¶¶ 22, 28 ("Boylan never showed his passengers where to access the escape hatch from inside the bunkroom.")

slept in the bunkroom on the accident trip, knew where the escape hatch was and how to access it. (*See* Dkt. No. 370 at 177-178 ("Q: Did Milton take you and Allie down to the bunkroom as well? A: Yes. Q: And did Milton show you and Allie and explain to you and Allie how this escape hatch worked from inside the bunkroom? A: Yes.") So did the trip's charter master, who had travelled on the *Conception* dozens of times before. And so did the passenger who emailed that charter master before the trip to specifically request that two other passengers be assigned to sleep in the bunks connected to the escape hatch. *See* Ex. B at 1 (Email filed under seal). Indeed, the undisputed testimony at trial was that the location of the escape hatch *was* discussed with the passengers on the accident voyage. (*See, e.g.,* Dkt. No 336 at 95 (French testified that he gave the safety briefing on the accident voyage while standing at the escape hatch and that he always discussed the location of the escape hatch during his briefings).) Any suggestion that the decedents did not use the escape hatch because they didn't know where it was is unsupported and contradicted by the trial testimony and evidence.

The PSR goes on to claim that "[i]t is unknown whether there was anything stored on top of the escape hatch, such as a cooler with beverages inside, which would have prevented the victims from accessing the escape hatch." PSR ¶ 62. Again, the answer to this question is in fact known—there *was not* any cooler or any other item stored on top of the escape hatch that would block its access. Not one person testified to seeing any such items on the escape hatch during the accident voyage. To the contrary, former crewmembers testified that they were trained to keep an eye on the escape hatch to make sure no one left any objects on top. (*See, e.g.,* Dkt. No. 369 at 177 ("[French] pointed out that people have a tendency to put their daypacks or their equipment on top of the hatch, and to be vigilant about making sure it is clear".) And several of the surviving crewmembers actually saw the escape hatch at the time of the fire, and did not see any objects blocking the hatch. (*See* Dkt. No. 341 at 100 (Molitor); Dkt. No. 340 at 65 (Michael Kohls testifying that "The whole entire doorway

14

was in flames, and the escape hatch was engulfed in flames. No one was coming out through the escape hatch.").) Mr. Kohls also testified to being in the salon between 1:30 a.m. and 2:35 a.m. in the minutes leading up to the fire and did not state that he saw any object blocking the escape hatch. The escape hatch could not be accessed because it was on fire, not because there was anything left on the hatch.

**F.    Passenger Boarding and Safety Briefing**

Prior to trial, the government submitted a sprawling motion seeking to admit extraneous evidence regarding the passenger safety briefings on Truth Aquatics trips. The government appears to have supplied the Probation Officer with much of the same evidence that the Court already deemed to be irrelevant or unreliable. The defense objects to several of these factual assertions in the PSR.

>   **1.    Boylan "allowed passengers to board the *Conception* and sleep in the bunkroom while it was docked the night before departure before crew members were required to report to the ship" (¶¶ 21, 25) and "did not require his crew to report to the ship until 3:00 a.m. on August 31, 2019" (¶ 24).**

At several points, the PSR cites to the fact that passengers were permitted to board the *Conception* before crewmembers, and incorrectly refers to this as "Boylan's practice." PSR ¶ 25. As the government well knows, this was not "Boylan's practice" but was instead a practice implemented by Mr. Boylan's employer, Truth Aquatics, and was common throughout the industry prior to the *Conception* fire. (*See*, *e.g.*, Dkt. No. 341 at 47 (Molitor testifying that on the dive boat he worked on prior to Truth Aquatics, the *Spectre*, passengers boarded the boat the night before the voyage without crew present); *see also* Dkt. No. 370 at 128 (Diane Brooks testimony that as a passenger on the *Spectre*, she was permitted to board the boat the night before it departed). In fact, it was Truth Aquatics who set the schedule for its employees, including Mr. Boylan, and Mr. Boylan had no control over what time other crewmembers reported to work. The company sent charter kits to passengers

"encourage[ing] [them] to spend the night on board the night before departure."  Ex. D (2019 TA Charter Kit).  Meanwhile, the company did not pay employees to arrive at the boat until the following morning, when the boat actually departed.  The PSR's assertion that this was "Boylan's practice," or to otherwise place the blame of this practice at Mr. Boylan's feet, is inaccurate and misleading.  To the extent the PSR's enhancements and recommended sentence are based on the false premise that this was Mr. Boylan's practice, rather than adhering to company-wide policy on every boat, those should be rejected.

   **2.    "Boylan also allowed passengers to store coolers of beer on the top of the escape hatch in the salon. The escape hatch could not be opened from the bunkroom when a beer cooler was on top of it … The passenger saw ice chests being stored on top of the escape hatch on multiple occasions, unsuccessfully tried to open the escape hatch with an ice chest on top, and addressed his concerns to Boylan" (¶22)**

   The source of this allegation is a former frequent passenger, Mark Copple, who testified at trial on behalf of the government.  However, Mr. Copple's own statements contradict the PSR's claim that it was *Mr. Boylan* who permitted a cooler to block the escape hatch, that this occurred more than once, or that Mr. Copple ever discussed this incident with Mr. Boylan.

   When first interviewed by the FBI, Mr. Copple stated that he had been on several trips with Truth Aquatics and "*on one occasion*, [he] noticed an ice chest *belonging to a passenger* which was placed on top of the escape hatch.  He addressed this issue with *a crew member* and was told that the ice chest was full of beer."  (Ex. E (Copple 302) (emphases added)).  Notable about this statement is not only that Mr. Copple only mentioned this occurring "on one occasion" (rather than multiple times) but that he discussed it with an unnamed "crew member."  Elsewhere in the interview, Mr. Copple referred to "Jerry" by name several times and referred to him as the Captain.  There is

16

no reason to believe that, had Mr. Copple had this conversation directly with Mr. Boylan, he would not have stated that directly.[4]  Moreover, Mr. Copple makes clear that it was a passenger's ice chest, not one provided by the crew or Truth Aquatics.

### 3.   "Boylan, a smoker, did not provide instructions as to where passengers should smoke cigarettes and how passengers should dispose of their lit cigarette butts." (¶28)

Despite the government's repeated and unsupported attempts to imply that the *Conception* fire was started by a smoldering cigarette, the cause of the fire, according to the government's own experts, remains unknown.  The sole purpose of including this allegation in the PSR is to imbue the sentencing proceedings in this case with improper speculation that a disposed cigarette may have caused the fire.  The relevance of the allegation that Mr. Boylan did not provide *passengers* with instructions about cigarette disposal is even further removed, because there is no evidence that any passenger on the accident voyage was a smoker.

Further, there is no statute, rule, regulation, company policy, or other authority that would have required Mr. Boylan or other members of the *Conception* crew to include information about safe cigarette disposal in the passenger briefing.  There is no reason to believe that the alleged conduct violated some duty or standard imposed on captains, and its inclusion in the PSR is improper.

---

[4] In fact, at another point during the interview (and when testifying at trial) Mr. Copple recounted a conversation he had with Mr. Boylan where he expressed concern about the boat drifting during the night.  Mr. Copple testified that Mr. Boylan took the time to show him the various instruments on the boat that were used to guard against anchor drift at night.  *See* Ex. E; *see also* Dkt. No. 365 at 25-27.

**4.      "[Boylan] also failed to inform his passengers that they should not overload the ship's electrical outlets when charging their equipment's batteries;" (¶28) and "[a] photograph of a power strip taken by a passenger that night depicted an overloaded power strip" (¶ 29).**

These assertions are improper to include in the PSR.  First, any discussion of overloading of the ship's electrical outlets is not relevant to the *Conception* fire, as there was no evidence that this was the cause of the fire.  It is neither part of the offense conduct, nor relevant conduct, and should not be considered for sentencing purposes.

Second, like the disposal of cigarettes, there is no statute, rule, regulation, company policy, or other authority that would have required Mr. Boylan to give passengers any specific instructions regarding the charging of electrical devices.  Nor is there any evidence that Mr. Boylan's training or experience would have suggested to him that he needed to give such an instruction.  Although one former passenger testified to having a concern about the number of electrical items that were being charged on the boat, he did not recall ever raising that concern with Mr. Boylan.  (*See* Dkt. No. 365 at 21-22.)

Third, the referenced photograph of an "overloaded power strip" is irrelevant for the same reasons.  (Although the Court excluded the photograph at trial, the government briefly published it to the jury during witness testimony).  *See* Ex. C at 14, 18-19.  There is no evidence that Mr. Boylan had any knowledge of the "overloaded power strip" in question.  The allegations at paragraphs 28 and 29 should be removed from the PSR.

**5.      "Boylan failed to have passengers don life jackets during the morning briefing despite Coast Guard regulations requiring him to do so." (¶28)**

The *Conception* tragedy had absolutely nothing to do with the passengers' knowledge of how to don life jackets.  As such, any evidence about life jacket

18

instructions was excluded from trial, and it is not relevant conduct for purposes of sentencing.  *See* U.S.S.G. §1B1.3.  This allegation should be removed from the PSR.

## G.   Decedents' Cause of Death

The PSR inexplicably asserts that "[a]s a result of the instant offense, 34 victims were burned to death."  PSR ¶ 130.  As the Probation Officer well knows, the decedents did not "burn to death" but rather died from smoke inhalation and asphyxiation by carbon monoxide poisoning.  *See id*. ¶ 42.  This flagrantly inaccurate statement should be removed from the PSR.

## H.   Sewage Dumping

Equally flagrant is the government's attempt, once again, to put forth irrelevant and sensational evidence regarding sewage dumping — this time through the Probation Officer.  *See* PSR ¶ 78.  The PSR appears to concede that this allegation is not relevant conduct for sentencing purposes but nonetheless includes it in a section titled "Offense Behavior Not Part of Relevant Conduct."  *Id*.  But an allegation regarding sewage dumping that occurred on an unrelated trip is not part of the "offense behavior" in this case.  It is completely irrelevant and needlessly salacious, which is why the Court properly excluded it from trial.  It should be stricken from the PSR for the same reasons.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  April 15, 2024          By  */s/*
_____
GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
JOSHUA D. WEISS
Deputy Federal Public Defender
Attorney for JERRY NEHL BOYLAN

19