E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental Crimes and Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3359/8644/3819/0304
     E-mail:  Mark.A.Williams@usdoj.gov / Matthew.O'Brien@usdoj.gov
              Brian.Faerstein@usdoj.gov / Juan.Rodriguez@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-482-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Sentencing Date: May 2, 2024 |
| JERRY NEHL BOYLAN, | Sentencing Time: 8:00 a.m. |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mark Williams, Matthew O'Brien, Brian Faerstein, and Juan Rodriguez, hereby files its Sentencing Position for defendant JERRY NEHL BOYLAN.

This Sentencing Position is based upon the attached memorandum of points and authorities, the Presentence Investigation Report and United States Probation Office sentencing recommendation letter, victim impact statements, trial testimony and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit at the sentencing hearing.

Dated: April 18, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
BRIAN R. FAERSTEIN
JUAN M. RODRIGUEZ
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................3

      A.    The *Conception*.......................................3

      B.    Defendant's Failure to Use a Roving Patrol.............5

      C.    Defendant's Failure to Train and Drill His Crew........6

      D.    The Labor Day Weekend Dive Trip in 2019................7

      E.    The Fire...............................................9

      F.    The Victims...........................................10

III.  THE USPO'S PRESENTENCE INVESTIGATION REPORT AND
      RECOMMENDATION..............................................12

IV.   SENTENCING GUIDELINES ANALYSIS..............................13

      A.    Reckless Operation of Means of Transportation.........13

      B.    Abuse of Position of Trust or Use of Special Skill....17

      C.    Grouping / Multiple Unit Adjustment...................19

V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION..................20

      A.    Nature and Circumstances of the Offense...............21

      B.    Defendant's History and Characteristics...............23

      C.    Seriousness of the Offense, Promoting Respect for the
            Law, and Just Punishment..............................24

      D.    Deterrence............................................25

VI.   CONCLUSION..................................................25

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

United States v. Calderon,
    127 F.3d 1314 (11th Cir. 1997) .................................. 18

United States v. Contreras,
    581 F.3d 1163 (9th Cir. 2009) .................................. 17

United States v. Ibarguen Palacios,
    815 F. App'x 481 (11th Cir. 2020) ............................. 19

United States v. Technic Servs., Inc.,
    314 F.3d 1031 (9th Cir. 2002) ............................. 18, 19

**Statutes**

18 U.S.C. § 1112 .................................................. 14
18 U.S.C. § 1115 .................................................. 14
18 U.S.C. § 3553(a) ............................................... 21
18 U.S.C. § 3661 .................................................. 8
18 U.S.C. § 3771(a)(4) ............................................ 24

**Rules**

U.S.S.G. § 2A1.4 .............................................. 13, 14
U.S.S.G. § 2A1.4(a)(2)(B) ..................................... 13, 14
U.S.S.G. § 3B1.3 .......................................... 13, 17, 18
U.S.S.G. § 3D1.4 ............................................. 13, 19
U.S.S.G. § 5K2.0(a)(3) ............................................ 20
U.S.S.G. § 5K2.1 .................................................. 21

**Regulations**

46 C.F.R. § 176.100 ............................................... 6
46 C.F.R. § 185.410 ............................................... 6
46 C.F.R. § 185.420(a) ............................................ 7
46 C.F.R. § 185.506(a) ............................................ 8
46 C.F.R. § 185.524(a) ............................................ 7

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Defendant JERRY NEHL BOYLAN killed 34 innocent people.  These husbands, wives, fathers, mothers, children, and friends died because of his reckless conduct.  Defendant has never apologized, much less taken any responsibility for the atrocity he caused.  The victim impact statements filed with the Court make clear how defendant's conduct devastated dozens of families:

> *"My family and I were devastated.  My parents, who were 94 and 98 at the time, were stunned into grief that they carried to their own graves."*

> *"Losing him was not only the worst thing that has ever happened to me in my entire life, but has impacted and devastated so many other people."*

> *"Boylan's reckless actions shattered the foundation of our existence and left a trail of devastation and despair."*

> *"[My loved one's life was] cut short along with 33 others because of the sheer laziness and negligence of Jerry Boylan to do his job.  She was just 26 years old. Jerry Boylan has had the opportunity to live his life free for the past 5 years while we have gone through hell, reliving the tragedy over and over..."*

> *"On September 2, 2019 my entire world crumbled. Finding the words to encompass the amount of hurt I have endured due to Jerry Boylan's actions and inactions has been an impossible task."*

> *"Captain Boylan's blatant and reckless disregard for his duties under maritime law and Coast Guard regulations requiring roving watch when humans are aboard a vessel overnight blew my life apart in ways I could never have imagined before September 2nd, 2019."*

> *"My daughter will not have her father here to walk her down the aisle.  My son will never have his father witness the man he has become.  The list of losses is endless and I will not share every single one in this statement.  As there are just too many.  Jerry Boylan took this all away*

*when he decided to write his own rules of engagement for his vessel and disregard the law."*

*"For much of your career, you rolled the dice – with your passengers' lives being the stakes.  Except, they, not being aware of the rules, trusted you with their lives, unaware of the risks that you and others exposed them to.  These 34 entrusted you to be a responsible mariner, to act prudently, in accord with best practices and the law.  You failed.  And they and we suffered because of that."*

*"Your hopes and dreams shattered in a tragedy that should have never happened.  A disaster that could have been avoided by the expert who was paid to follow minimum protections but ignored obligations."*

As a seasoned captain with decades of experience, defendant knew that his core duty was, above all else, to keep his 33 passengers and 5 crewmembers safe.  He was the Captain of the ship.  He, alone, was in command of the *Conception* and responsible for the lives of his passengers and crew on September 2, 2019.  Despite this responsibility, defendant set sail on the Labor Day Weekend trip with full knowledge of the potentially catastrophic consequences of his reckless conduct.  He knew that his crew was inexperienced and that he had not trained them to fight a fire.  He knew that he had never conducted a <u>single</u> fire drill with his crew.  He knew that he habitually ignored the most basic tenet of maritime fire safety in failing to maintain a roving patrol at night.

The stakes were life and death.  And yet defendant did nothing to keep his passengers and crew safe -- in the days, weeks, months, and years leading up to the Labor Day Weekend trip, and on the night of the fire itself.  Predictably, when the fire started and grew without any crewmember awake to detect and contain it, chaos ensued amongst his inexperienced and untrained crew.  Compounding his reckless failures and misconduct in the lead-up to the fire, during

2

the fire defendant failed to alert his passengers of the fire, failed to direct his crew on how to fight the fire, and failed to attempt any rescue whatsoever.

Instead, defendant saved himself.  He was the first to abandon ship.  He instructed his crew to do the same, multiple times.  In so doing, he left all 34 victims onboard the *Conception* to die.

Both the government and the United States Probation Office ("USPO") respectfully request that the Court sentence defendant to the statutory maximum 10-year term of imprisonment.  Anything less is insufficient to achieve the goals of sentencing and appropriately account for the 34 deaths that defendant caused.

## II.   STATEMENT OF FACTS[1]

### A.   The *Conception*

The *Conception* was a 75-foot, wood and fiberglass passenger vessel based in Santa Barbara, California.  Defendant had been the captain of the *Conception* for decades and had obtained his Master's License in 1985.  (Trial Exh. 4.)  The *Conception* was used to take passengers on dive trips, wildlife viewing trips, and other excursions to the Channel Islands.  For overnight trips, the *Conception* operated with six crewmembers -- a captain (almost always defendant), second captain, two deckhands, and two galleyhands.

Passengers slept in the *Conception's* bunkroom, which was located below the main deck.  A staircase led down from the galley on the main deck into the bunkroom below deck.  The *Conception* also had one emergency exit from the bunkroom -- an escape hatch in the ceiling

---

[1] Unless otherwise indicated, the facts described herein are set forth in the Presentence Investigation Report ("PSR") filed on March 28, 2024.  (See Dkt. No. 404.)

3

above two of the center bunks, which could be opened to lead to the salon on the main deck.



**Trial Exh. 60**                                    **Trial Exh. 119**

Despite the vital importance of the escape hatch to passengers' safety, defendant was dismissive of it.  During the "morning briefings" on the first day of his overnight dive trips (after his passengers had already slept in the bunkroom while the *Conception* was docked the night before departure), defendant failed to show his passengers where to access the escape hatch from inside the bunkroom, despite the difficulty of finding the escape hatch in the dark.  (See Trial Exh. 93 (video showing how difficult it was to find the escape hatch from within the bunkroom).)

The *Conception* also had a wide range of firefighting equipment, all of which was in good working order at the time of the Labor Day Weekend trip.  The boat had approximately six fire extinguishers spread around all three of its decks.  There also was a fire axe in the wheelhouse.  The engine room below deck had a specialized firefighting system in the event of an engine fire.  The *Conception* had smoke detectors in the bunkroom and heat sensors in the galley.

The *Conception* also had two firefighting stations located on the port and starboard sides of the main deck.  Each station had a heavy duty, 50-foot firehose connected to a fire pump that could pump

4

unlimited amounts of water from the ocean through the hoses to fight a fire.  Both fire stations could be used at the same time.

At trial, surviving crewmembers testified that defendant never trained or drilled them on how to use the firehoses onboard the *Conception*.  First Deckhand Milton French had never used or activated the *Conception*'s firehoses nor seen them activated, had never seen them unspooled from their stations, and had never done a fire drill on the *Conception*.  (Dkt. No. 361 at 170:16-18, 171:2-5, 172:5-6, 172:21-173:2.)  Second Captain Cullen Molitor was never instructed how to use the firehoses, never used or activated one, and had never done a fire drill on the *Conception*.  (Dkt. No. 364 at 75:22-76:9, 77:3-78:4; Dkt. No. 365 at 13:12-14.)  First Galleyhand Ryan Sims was never shown how to use the firehoses or where they were located and had never done a fire drill on the *Conception*.  (Dkt. 363 at 11:1-7.) And Second Galleyhand Michael Kohls, who was the longest tenured crewperson on the *Conception* at just under two years as of the time of the fire, never received training on the firefighting equipment on the *Conception* and never took part in or saw fire drills on the ship. (Dkt. No. 362 at 153:18-154:18.)

**B.   Defendant's Failure to Use a Roving Patrol**

Defendant was required to comply with the Coast Guard's "T-Boat" regulations (so named for Subchapter T of Title 46, Chapter I of the Code of Federal Regulations) as well as the *Conception's* two-page Certificate of Inspection ("COI"), which was the ship's operating license issued by the Coast Guard.  The COI hung in a frame in the *Conception's* wheelhouse, right behind where defendant steered the ship.  The COI set forth the following requirement in capital letters on the first page:

5

**A MEMBER OF THE VESSEL'S CREW SHALL BE DESIGNATED BY THE MASTER AS A ROVING PATROL AT ALL TIMES, WHETHER OR NOT THE VESSEL IS UNDERWAY, WHEN THE PASSENGER'S BUNKS ARE OCCUPIED.**

(See Trial Exh. 26.)  This "roving patrol" requirement first appeared in the *Conception's* COI in 1992 and was included in every COI issued for the *Conception* since then.  (See Trial Exh. 27 (the Conception's COIs over the past three decades).)  Coast Guard regulations required defendant to "be in full compliance" with the *Conception's* COI "when any passengers are aboard."  46 C.F.R. § 176.100.

In addition to the COI's requirement for a roving patrol, Coast Guard regulations also required defendant to use a roving patrol:

> The owner, charterer, **master**, or managing operator of a vessel carrying overnight passengers **shall have a suitable number of watchmen patrol throughout the vessel** during the nighttime, whether or not the vessel is underway, **to guard against, and give alarm in case of, a fire**, man overboard, or other dangerous situation.

46 C.F.R. § 185.410 (emphasis added).  The purpose of the roving patrol was to ensure that a crewmember was awake and patrolling the boat at night to spot a fire or identify any other emergencies.

When defendant became a licensed Captain in 1985, he swore an oath, "according to my best skill and judgment, and without concealment or reservation, [to] perform all duties required of me by the laws of the United States."  (Trial Exh. 4 at 4.)  Despite his oath and the Coast Guard's requirements, defendant never used a roving patrol -- not on the night of the fire, nor on hundreds of prior voyages, despite the catastrophic risk of a fire while at sea.

**C.   Defendant's Failure to Train and Drill His Crew**

Coast Guard regulations made clear defendant's duty as the master to train his crew in firefighting.  Most notably:

> Fire Fighting Drills and Training.  The **master shall conduct sufficient fire drills** to make sure that each crew member is familiar with his or her duties in case of a fire.

46 C.F.R. § 185.524(a) (emphasis added).  Likewise:

> Crew Training.  The owner, charterer, **master** or managing operator **shall instruct each crew member, upon first being employed and prior to getting underway for the first time on a particular vessel and at least once every three months, as to the duties that the crew member is expected to perform in an emergency** including, but not limited to, the emergency instructions listed on the emergency instruction placard required by § 185.510 of this part and, when applicable, the duties listed in the station bill required by § 185.514 of this part.

46 C.F.R. § 185.420(a) (emphasis added).

Despite his duty to do so, defendant failed to train his crew for the Labor Day Weekend trip regarding firefighting and to ensure each crewmember was aware of their duties in the event of a fire, as Truth Aquatics' internal Loss Control Program required him to do. (Trial Exh. 127.)  And, as explained above, defendant failed to conduct any fire drills on the *Conception*.  This was particularly egregious given that his crew had very little experience working on the *Conception* (or any other boats).

### D.   The Labor Day Weekend Dive Trip in 2019

The destination for the Labor Day Weekend trip was Santa Cruz Island, a remote location in the Channel Islands.  The *Conception* was scheduled to depart Santa Barbara Harbor at 4:00 a.m. on August 31, 2019, the normal departure time for overnight dive trips.  As was defendant's practice, he permitted passengers to board the vessel on the night before the trip, even though no crewmembers were onboard.

On both the *Conception's* final voyage and prior voyages, defendant waited to give his "morning briefing" to passengers until

7

several hours after the *Conception* had sailed from the dock at Santa Barbara Harbor (i.e., after passengers already had slept overnight in the bunkroom without a roving patrol). This is akin to a flight attendant waiting until after an airplane is airborne to give the safety briefing. Defendant's practice violated Coast Guard regulations, which required the passenger safety orientation to be given "before getting underway on a voyage." 46 C.F.R. § 185.506(a).

During the first two days of the Labor Day Weekend trip, passengers went scuba diving each day, ate their meals together in the salon on the main deck, and each night slept in the bunkroom.


**Trial Exh. 155**


**Trial Exh. 186[2]**


**Trial Exh. 171**

On September 1, 2019, the night before the fire, the passengers and crew had a birthday party in the salon on the main deck. Tia Nicole Adamic-Salika (pictured above in sunglasses with her friend Berenice Felipe during the Labor Day Weekend trip) celebrated her 17th birthday with cakes for the occasion. Tia and Berenice were on the trip with Tia's parents, Diana Adamic and Steven Salika. The Quitasol family -- sisters Angela, Nicole, and Evan Quitasol, their

---

[2] Several photographs contained herein were marked as government trial exhibits but not admitted into evidence. The Court may, of course, consider any "information concerning the background, character, and conduct of a person convicted of an offense" for purposes of sentencing. 18 U.S.C. § 3661.

1  father, Michael, and stepmother, Fernisa Sison -- celebrated

2  Michael's 62nd birthday at the party as well.

3      Defendant then moved the boat to Platt's Harbor near Santa Cruz

4  Island, where they anchored around 10:30 p.m.  The crew and

5  passengers went to sleep.  As was defendant's practice, there was no

6  roving patrol that night.

7      **E.   The Fire**

8      In the middle of the night on September 2, 2019, a fire started

9  while defendant and his crew were asleep.  After a crewmember saw the

10 fire and woke up defendant, several crewmembers lowered themselves to

11 the main deck where the fire had started.  Second Galleyhand Kohls,

12 the first crewmember to reach the main deck, ran past the fire

13 station on the port side of the main deck twice, not knowing that the

14 fire station was there or how to use it.  Instead of giving his crew

15 meaningful direction (especially in light of his prior failures to

16 train or drill them), or going to the main deck to fight the fire or

17 assist his crew, defendant made a Mayday call from the wheelhouse and

18 then jumped off the ship -- he was the first person to jump

19 overboard.  He then ordered his crew to jump overboard as well, even

20 though 34 people were alive in the bunkroom, waiting to be rescued.

21     At no time did defendant use, or direct or assist any crewmember

22 in using, the fire axe, fire extinguisher, or fire hoses to fight the

23 fire.  While defendant told First Galleyhand Sims to grab a fire

24 extinguisher in the wheelhouse, defendant did not help him do so and

25 quickly told Sims to abandon ship when Sims was unable to find it.

26 (Dkt. No. 363 at 16:4-5, 17:12-14.)  And although defendant called

27 the Coast Guard -- despite the fact that rescuers were miles away --

28

9

defendant failed to use the ship's public address system to alert the passengers about the fire or provide any directions to anyone.

All 34 people in the bunkroom were killed in the fire due to smoke inhalation.  At trial, the jury found that defendant's gross negligence and misconduct before and during the fire caused the deaths of the 34 victims aboard the *Conception*.



**Trial Exh. 229**

F.    **The Victims**

The victims ranged in age from sixteen to 62-years-old.  Many embarked on the *Conception* with their families, partners, or friends for the Labor Day Weekend diving excursion; others traveled alone. (Dkt. No. 360 at 109:23-114:7).  All trusted defendant to keep them safe, putting their lives in his hands.

//

//

//



**Trial Exh. 296**

During the fire, after defendant abandoned them, the victims were awake and awaiting rescue.  Many were found wearing shoes (including at least one victim with mismatched shoes) -- proving that the victims were awake and trying to escape from the bunkroom.  One victim was recovered holding a cell phone, and another was holding a flashlight.  Divers recovered several victims' bodies clutching each other so tightly that it was difficult to separate the bodies.  These victims had been hugging each other when they were killed.

Divers also found an empty fire extinguisher with the pin pulled in the wreckage.  (Trial Exh. 271.)  Because the surviving crew members told investigators that none of them used a fire extinguisher during the fire, the fire extinguisher must have been used by someone in the bunkroom.  Indeed, the recovered extinguisher was the same model as the extinguisher that had been stored in the bunkroom.

The FBI was able to recover a video from the iPhone of Patricia Beitzinger, one of the victims.  The damaged iPhone had been found in her coat pocket in the wreckage on the seafloor.  Metadata that the

11

FBI recovered from the iPhone showed that she had taken the video at 3:17 a.m. on September 2, 2019 – i.e., three minutes after defendant had made the Mayday call and jumped overboard.  The video confirmed that the 34 victims in the bunkroom were awake during the fire and could have been rescued were it not for defendant's failure to: (1) use a roving patrol, (2) train and drill his crew in firefighting, (3) direct and assist his crew on the night of the fire, and (4) attempt to fight the fire himself.  Victims can be heard saying "*there's gotta be a way out*," "*there's got to be more extinguishers*," "*unless we can get outta here*," and "*we're gonna die.*"  (Trial Exh. 180A.)

The video (Trial Exh. 180) is disturbing to watch, but is perhaps the most compelling evidence of defendant's reckless disregard for human life:  had defendant taken even the most basic safety precautions in the lead-up to the fire as he was required to do, or acted with any courage or composure during the fire, some or all of the 34 people in the bunkroom could have been saved.

**III.  THE USPO'S PRESENTENCE INVESTIGATION REPORT AND RECOMMENDATION**

The PSR and sentencing recommendation letter were filed on March 28, 2024.  (Dkt. Nos. 403 and 404.)  The USPO found that a Sentencing Guidelines range of 87-108 months applies (based on an offense level 29 and criminal history category I), and recommends that the Court sentence defendant to 10 years in prison, a three-year term of supervised release, and a special assessment of $100.  (Dkt. No. 403, pp. 1-2.)  The USPO also recommends that the Court schedule a deferred restitution hearing after imposing the sentence.  (Id.)

The government concurs with the USPO's Guidelines calculations (discussed further below) and recommended sentence, and does not object to the PSR.

Defendant filed objections to the PSR on April 15, 2024, in which he objects to the Guidelines calculations as well as factual assertions in the PSR.  (Dkt. No. 415.)  The government will respond to defendant's objections in a separate filing.

**IV.   SENTENCING GUIDELINES ANALYSIS**

The USPO found that the following Guidelines apply:

| | | |
|---|---|---|
| Reckless operation of means of transportation: | 22 | USSG § 2A1.4(a)(2)(B) |
| Abuse of position of trust: | +2 | USSG § 3B1.3 |
| Multiple unit adjustment: | +5 | USSG § 3D1.4 |
| Total offense level: | 29 | |
| Guidelines range: | 87-108 months | |

The government concurs and provides the following analysis regarding the applicable substantive Guidelines sections and a one-level upward departure/variance that is warranted in this case.

**A.    Reckless Operation of Means of Transportation**

Guidelines section 2A1.4(a)(2)(B) applies a base offense level of 22 if defendant is found to have recklessly operated a means of transportation, including a boat.  Application Note 1 to section 2A1.4 defines "reckless" as follows:

> **"*Reckless*"** means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.  "Reckless" includes all, or nearly all,

1        convictions for involuntary manslaughter under 18 U.S.C.
2        § 1112.

3   U.S.S.G. § 2A1.4, cmt. N.1.

4        Defendant requested (and obtained) a jury instruction at trial
5   requiring a unanimous finding that defendant acted recklessly.  The
6   jury instructions confirm that the jury found (beyond a reasonable
7   doubt) that defendant acted "with wanton or reckless disregard for
8   human life."  (See Dkt. No. 320 (Final Jury Instructions) at 4.)
9   Indeed, the Court instructed the jury, at defense counsel's request,
10  that "[t]o establish reckless disregard for human life, it must be
11  shown that (1) Defendant was aware of the serious risk to human life
12  which his conduct created, or Defendant knew of facts which, if
13  considered and weighed in a reasonable manner, indicate a substantial
14  and unjustifiable risk to human life; and (2) he deliberately
15  disregarded that substantial and unjustifiable risk of creating a
16  potentially life-threatening condition of which we was aware."  (Id.)
17  In other words, the heightened standard imposed by the Court -- and
18  found by the jury beyond a reasonable doubt -- was actually higher
19  than the "reckless" standard encompassed within Section
20  2A1.4(a)(2)(B).

21       Moreover, Application Note 1 recognizes that "'reckless'
22  includes all, or nearly all, convictions for involuntary manslaughter
23  under 18 U.S.C. § 1112."  U.S.S.G. § 2A1.4, cmt. N.1.  Throughout
24  this case, defense counsel and the Court have repeatedly analogized
25  seaman's manslaughter (18 U.S.C. § 1115) to involuntary manslaughter
26  (18 U.S.C. § 1112).  The Court dismissed the original indictment
27  specifically because it did not satisfy the pleading requirements of
28  18 U.S.C. § 1112.  (See Case No. 20-CR-600-GW, Dkt. No. 79.)  The

government obtained a new indictment in this case alleging, among other things, that defendant "acted with a wanton or reckless disregard for human life by engaging in misconduct, gross negligence, and inattention to his duties on [the *Conception*]." (Dkt. No. 1 at 2.)  The indictment further alleged that defendant knew "that his conduct was a threat to the lives of others, and kn[ew] of circumstances that would reasonably cause him to foresee that his conduct might be a threat to the lives of others."  (Id. at 5.)  And the Court, at the defense's request, has borrowed from and used jury instructions, elements, and standards from involuntary manslaughter cases throughout this proceeding, including in the final jury instructions.  Accordingly, the base offense level is 22 because the jury necessarily found beyond a reasonable doubt that defendant acted recklessly (as defined by the Guidelines and its ordinary meaning), and he did so operating the *Conception*, a means of transportation.

Consistent with the jury's finding that defendant acted with a wanton and reckless disregard for human life, the evidence also establishes that defendant acted recklessly as that term is defined in Section 2A1.4.  In addition to defendant's numerous failures described above, that evidence also includes the following:

- There were fires on the *Condor Express* (the *Conception's* neighbor at the Santa Barbara dock) and a fire involving charging batteries onboard the *Vision* (the *Conception's* sister ship), which put defendant on notice of the (obvious) risk of fire at sea, but defendant did not change his behavior one bit in response to those fires.  (PSR ¶ 23.)

- Despite the obvious risk that overcharging of batteries posed every night on the *Conception*, defendant failed to instruct his

passengers not to charge their batteries overnight or to implement a roving patrol at night -- as the COI and regulations required him to do -- while the batteries were charging.

- When galley crewmember Ryan Sims asked defendant to discuss safety measures on the *Conception* on the day before the fire, defendant was dismissive, "chuckled," and told Sims: "When we get to it, Ryan."  (Dkt. No. 363 at 13:4-11, 46:20-25.)

- When passenger Mark Copple complained to defendant that a passenger's beer cooler was blocking the bunkroom's escape hatch, defendant told Copple that there was nowhere else on the 75-foot ship to put the beer cooler.  (PSR ¶ 22, 22 n.1.)

- Defendant, a smoker, failed to give his passengers any guidance on where and when they could smoke cigarettes or how to dispose of their cigarette butts.  (Id. ¶ 28.)

- It would have cost nothing for defendant to train and drill his crew regarding the location of the fire hoses and how to use them.  And it would have taken only 10 or 15 minutes to do so, including during leisure time the surviving crewmembers testified they and other crewmembers had while working on a trip.  (See Dkt. No. 362 at 48:8-12, 129:14-130:12; Dkt. No. 341 at 11:11-12:5, 13:17-14:8.)

- It would have cost nothing to use a roving patrol.  The *Conception* had six crewmembers on overnight trips -- defendant easily could have implemented a roving patrol using two-hour shifts for each crewmember throughout the night, as other captains routinely did.  (One such captain, David Harvey, testified about the ease of implementing a roving patrol on a comparable dive boat.)  (See, e.g., Dkt. No. 352 at 50:15-53:9.)

16

- The *Conception* was a relatively small ship -- all that a roving patrol would have needed to do was patrol the main deck and periodically check the salon, bunkroom, engine room, and wheelhouse for a fire.  A fire at night would have been easily visible to anyone.

Yet defendant did nothing to mitigate the risk of a catastrophic fire on the *Conception*.  Instead, he acted recklessly by disregarding his legal obligations to use a roving patrol, to train and drill his crew regarding firefighting, and to ensure his passengers' safety.

**B.   Abuse of Position of Trust or Use of Special Skill**

Section 3B1.3 provides for a two-level upward adjustment if defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  This enhancement applies for at least two reasons.

First, defendant abused his position of private trust (if not also public trust) as a licensed captain authorized to take passengers out to sea.  He swore an oath to uphold the law, including complying with Coast Guard regulations and the *Conception's* COI, for the benefit of his passengers and crew.  In turn, they trusted that he would do so to keep them safe in the remote waters of the Pacific Ocean.  Defendant exercised virtually unfettered "professional [and] managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)" in his operation of the *Conception*.  U.S.S.G. § 3B1.3 cmt. n.1.  This exercise of discretion is the "decisive factor" and "explicit focus" in the application of the abuse of trust enhancement.  United States v. Contreras, 581 F.3d 1163, 1166 (9th Cir. 2009), aff'd in part, vacated in part en banc,

593 F.3d 1135 2010 (citations omitted).  As the Master of the *Conception*, defendant owed a duty of care to his crew and the victims who entrusted their lives to him over the Labor Day Weekend trip. United States v. Technic Servs., Inc., 314 F.3d 1031, 1048 (9th Cir. 2002) (position of trust "established from the perspective of the victim").  Defendant betrayed that trust, not only through his failures on the night of the fire but also in his abdication of his duties to train and drill his crew.

Second, as a licensed captain, defendant also had a "special skill" that falls within Section 3B1.3.  Application Note 4 states that "special skill" "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  (Emphasis added.)  The enhancement specifically contemplates "licensing," which is exactly what defendant needed to obtain every five years in order to continue captaining the *Conception*.  See Technic Servs., Inc., 314 F.3d at 1051 (defendant's "license renders him eligible for an enhancement under the 'special skill' prong" where it "appears that he had the expertise and opportunity to commit his crimes only because of this specialized skill").  If an airplane pilot is within the scope of Section 3B1.3, a commercial boat captain must be as well.  Both operate means of transportation with dozens of passengers, and require special training for the safe navigation of their vessels.  See, e.g., United States v. Calderon, 127 F.3d 1314, 1339 (11th Cir. 1997) ("[W]e are convinced that captaining a vessel on the high seas is the type of activity that requires skills not possessed by members of the general public, and, therefore, requires

18

'special skills' within the meaning of section 3B1.3."); United States v. Ibarguen Palacios, 815 F. App'x 481, 485 (11th Cir. 2020) (Section 3B1.3 applies to defendant piloting a boat).

But for his privileged position as a licensed captain, defendant could not have committed this crime:  the reason why he was entrusted with the lives of his 33 passengers and five crewmembers was his special status as a credentialed mariner.  Armed with his special skill as a licensed captain and the imprimatur it carried with his passengers and crew, defendant nonetheless operated the *Conception* with little regard for regulations or safety requirements.  His special skill provided him the "expertise and opportunity" to commit his crime through his recklessness and misconduct.  Technic Servs., Inc., 314 F.3d at 1051.  Defendant's abuse of his special skill and position of trust shows why the two-level enhancement applies.

### C.   Grouping / Multiple Unit Adjustment

Pursuant to Section 2A1.4(b)(1), the one count of violating Section 1115 must be treated as 34 counts, i.e., one putative count for each person killed.  Because there is no basis to group the 34 putative counts under Section 3D1.2, they count as 34 separate units under Section 3D1.4.  Section 3D1.4 contains a ceiling of five additional levels for an offense involving more than five units, regardless of the 34 units (i.e., 34 deaths) here, so only a five-level enhancement applies pursuant to Section 3D1.4.  Nonetheless, Section 3D1.4 provides that, "[i]nasmuch as the maximum increase provided in the guideline is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 Units."  U.S.S.G. § 3D1.4 cmt.  As the

USPO recognizes, given the scale of death and devastation caused by defendant's recklessness and misconduct, this is that unusual case.

## V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

The *Conception* fire was the worst maritime disaster in California history.  It was not an "accident" or "tragedy," as those terms are normally used and as the defense unsuccessfully argued to the jury, because it was entirely preventable and was a predictable result of defendant's reckless conduct.  A strong message needs to be sent to ship captains and the dive-boat industry that misconduct such as defendant's will result in severe punishment.  The recommended 10-year prison sentence serves that purpose.

An above-Guidelines sentence is appropriate here for numerous reasons, discussed above and below.  Perhaps most of all, the Guidelines simply do not account for the manslaughter of 34 victims. The grouping enhancement pursuant to Sections 2A1.4(b)(1) and 3D1.4 corresponds to only five deaths being caused by a manslaughter. Here, defendant's misconduct and gross negligence killed 34 people -- 34 people who all put their lives in defendant's hands when they stepped aboard the *Conception*.  The gravity of defendant's offense should be measured by the number of lives he caused to be lost.

The Guidelines do not account for such a massive scale of death, and contemplate such situations where the offense level understates the seriousness of the offense.  See generally U.S.S.G. § 5K2.0(a)(3) ("A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which

ordinarily is involved in that kind of offense.").  Indeed, the Guidelines specifically provide that "[i]f death resulted, the court may increase the sentence above the authorized range."  U.S.S.G. § 5K2.1.  Section 5K2.1 lists, as several of the factors to be considered, "whether multiple deaths resulted" and "the extent to which death or serious injury was intended or knowingly risked."  Id. Through his recklessness, defendant knowingly put at risk the lives of the 34 victims whose deaths he caused on September 2, 2019 (not to mention the lives of countless other passengers in the past).[3]

The factors set forth in 18 U.S.C. § 3553(a) also necessitate a sentence of 10 years' imprisonment here.

**A.   Nature and Circumstances of the Offense**

The 34 deaths onboard the *Conception* were preventable.  None of the victims should have died in the small fire that started in a trash bin onboard the *Conception*.  There was not an explosion.  The fire did not flashover in seconds.  The expert testimony presented at trial established that the fire started small and took time to develop.[4]  The Court acknowledged this during trial, stating that "[t]here is no evidence of a fast-starting fire."  (Dkt. No. 372 at 51:24-25.)

The victims died because they were trapped in the bunkroom -- trapped because defendant had not ordered a roving patrol to protect

---

[3] A 10-year sentence equates to a one-level upward departure or variance from the Guidelines range -- specifically, from a range of 87-108 months (offense level 29) to a range of 97-121 months (offense level 30).  This one-level increase would be the equivalent of just one additional unit, or death, under section 3D1.4 (for a total of six victims), and not defendant's 34 victims.

[4] The fire experts testified that the fire started small.  Fire tests took an average of 27.5 minutes to develop to the point where the crew would have first observed the fire from the upper deck. (Dkt. No. 366 at 38:3-21, 132:17-22.)

them from and alert them to emergencies at night.  A roving patrol would have detected the fire, quickly started to fight it, alerted the passengers, awoken other crewmembers, or taken other fast and simple steps that would have saved lives.  Had defendant simply followed the law, the COI, and prudent seamanship and put a roving patrol in place, some or all of the victims would have survived.  Although the victims all died due to smoke inhalation, it was defendant's unlawful and reckless practices that killed them.

Defendant swore an oath to follow the law.  He broke that oath when he failed to comply with any of the applicable Coast Guard safety regulations, and defendant's failures started well before the fire even began.  Defendant did not provide any meaningful fire training or any drills whatsoever for the inexperienced crew onboard the *Conception* on September 2, 2019.  Defendant also failed to show the passengers how to use the emergency exit from the bunkroom and did not take any other basic fire safety precautions, such as instructing passengers where to smoke cigarettes or not to overuse outlets for charging batteries.

After the fire started, defendant worsened an already life-threatening situation by failing to perform basic emergency actions.  Instead of using the *Conception's* PA system to alert the passengers, he chose to call the Coast Guard even though he knew any emergency response was far away from his remote location.  Instead of getting the fire axe or fire extinguisher within arm's distance in the wheelhouse, defendant jumped off the boat.  All the other crewmembers went down to the main deck; defendant jumped into the water.  Even the trapped passengers attempted to use a fire extinguisher to save

themselves.  While the victims were fighting for their lives, defendant was safely in the ocean.

Defendant created the deadly situation in which 34 victims found themselves trapped in a windowless bunkroom.  Then he did nothing to save them.

### B.   Defendant's History and Characteristics

Although defendant is 70 years' old, he was not too old or unable to do his job on September 2, 2019.  Accordingly, his age does not justify a lenient sentence here.

Defendant was a very experienced captain who failed to comply with basic regulations and rules of prudent seamanship.  Defendant has held a master's license for decades.  (Trial Exhs. 1, 4-10.)  He cannot (credibly) claim that he did not know that the Coast Guard had safety regulations that applied to him.  Defendant also knew, as all captains do, that fire is a serious danger at sea -- that is why the *Conception* had numerous fire extinguishers, smoke detectors, a fire axe, two heavy-duty fire hose stations, and an engine room fire suppression system.  And that is why Truth Aquatics' Loss Control Program, which defendant signed and acknowledged reviewing, listed "Fire Fighting Procedures" as the number one set of protocols under "Emergency Procedures."  (Trial Exhs. 127, 128.)  Yet defendant chose to do nothing to safeguard his passengers from fires at night.

Perhaps most importantly, defendant has never accepted responsibility for any of his failures and the devastation he caused on September 2, 2019.  Nor is there any indication that, before or after his indictment in 2020, defendant has done a single thing to contribute to his community or to manifest any remorse.  Instead, he has chosen to point his finger at his boss, Glen Fritzler.  This sets

defendant apart from defendants who take steps to apologize for or remedy their actions, or otherwise contribute to society.

### C. Seriousness of the Offense, Promoting Respect for the Law, and Just Punishment

The 34 deaths that resulted from defendant's conduct warrant the statutory maximum prison sentence.  Captains hold their passengers' lives in their hands.  Miles out at sea, with rescue far away, captains owe their passengers an incredibly high duty of care to keep them safe, particularly from serious risks like fires.  That includes following the applicable Coast Guard regulations and a ship's straightforward operating requirements (i.e., its COI).  Defendant either did not read and follow the applicable requirements and regulations for fire training, fire drills, and roving patrols before taking dozens of passengers out to sea on the Labor Day Weekend trip (much less countless others during his decades-long career), or he read them and didn't care.  Either scenario makes this offense gravely serious and requires a lengthy sentence to reflect the seriousness of the offense and promote respect for the law.

The sentence must also provide just punishment for the offense. Defendant's recklessness killed 34 people and forever shattered the lives of their families and friends -- many of whom came to court every day of the grueling trial in memory of their loved ones.  Their own words best express the horror and devastation that defendant brought upon their lives.  The government is filing under seal herewith the victim impact statements it has received thus far.  As is their right, a number of the victims' family members will seek to be heard in person at the sentencing hearing.  18 U.S.C. § 3771(a)(4).

### D.   Deterrence

Finally, general deterrence is a key objective in this case.  At trial, the defense called several witnesses with captain's licenses to testify that they, too, did not maintain a roving patrol.  The jury saw through defendant's cynical attempt to mount a defense based on others' violations of their duties as captains.  But the apparent reality remains that some captains are not following critical requirements for safety at sea.  And the potential stakes of that abdication remain life or death.

A light prison sentence would send the wrong message to captains and excuse defendant's misconduct.  When passengers die as a result of the captain's reckless conduct, the captain must be held accountable.  Under no circumstances may captains abandon their safety obligations.  Nor may reckless captains simply blame their employers when disaster strikes.  Defendant's failure to even attempt to comply with any of the applicable training, drilling, and roving patrol requirements underscores the need to send a message to ship captains, the dive-boat community, and the general public.

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to (1) 10 years' imprisonment, (2) a three-year period of supervised release, (3) a special assessment of $100, and (4) restitution to be determined at a deferred restitution hearing.