UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CR 22-482-GW | Date | April 19, 2024 |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

Interpreter   NONE

| Javier Gonzalez | None Present | Brian R. Faerstein - not present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Jerry Nehl Boylan | not | | ✔ | Gabriela Rivera, DFPD | not | | ✔ |

**PROCEEDINGS:**   **IN CHAMBERS - TENTATIVE RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON ERROR IN LESSER-INCLUDED OFFENSE INSTRUCTION [387]; and DEFENDANT'S MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33 DUE TO NAPUE VIOLATION [U/S 391]**

Attached hereto is the Court's Tentative Ruling on Defendant's Motions [387, 391], set for hearing on April 22, 2024 at 10:00 a.m.

Initials of Deputy Clerk   JG

<u>**United States of America v. Boylan**</u>, Case No. 22-CR-482-GW
Tentative Rulings on: (1) Motion for a New Trial Based on Error in Lesser-Included Offense Instruction, and (2) Motion for a New Trial Under Fed. R. Crim P. 33 Due to *Napue* Violation

Defendant Jerry Nehl Boylan ("Defendant") has filed two motions for a new trial under Federal Rule of Criminal Procedure 33. Rule 33 permits a court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." *See* Fed. R. Crim P. 33(a), (b)(2).[1]

Defendant seeks a new trial because he believes the Court erred in the restrictions it placed on the jury's consideration when the Court acceded to Defendant's last-minute request for a lesser-included offense instruction under 46 U.S.C. § 2302(b). He also seeks a new trial because of an alleged *Napue*[2] violation connected to the testimony of prosecution witness Brian Priddin ("Priddin").[3]

<u>Lesser-Included Offense</u>

Defendant's first motion is based on the argument that, in *giving* the Section 2302(b) lesser-included instruction, the Court nevertheless should *not* have excluded from that instruction the charge that Defendant had violated 18 U.S.C. 1115 – the charged statute – because of his alleged failure to have night watchmen/roving patrols. As background, Section 1115 states, in pertinent part, that "[e]very captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, . . . shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 1115. Section 2302(b), meanwhile, provides that "[a] person operating a vessel in a grossly negligent manner that endangers the life, limb, or property of a person commits a class A misdemeanor." 46 U.S.C. § 2302(b).

---

[1] Although Rule 33 requires that any such motion that is "grounded on any reason other than newly discovered evidence" be filed within 14 days after the verdict or finding of guilty, a court may extend that deadline, *see United States v. Leung*, 796 F.3d 1032, 1034-35 (9th Cir. 2015), which is what occurred here, *see* Docket No. 350.

[2] *See Napue v. Illinois*, 360 U.S. 264 (1959).

[3] This second motion was filed under seal. This Tentative Ruling is initially filed under seal as it references materials previously filed under seal which were designated as "confidential." Defendants shall advise the Court whether they request that any portion of this Tentative Ruling remain sealed in the final version of the order. If so, within three days of the hearing, Defendants shall submit proposed redactions via email to the Courtroom Deputy Clerk.***

1

Briefly-stated, Defendant asserts that it was error "to single-out and exclude one of the government's factual allegations from the jury's consideration of the lesser-included offense." Docket No. 387, at 1:22-23; *see also id.* at 23:22-23 ("There is no room in this elements-based analysis for carving-out from the jury's consideration of the lesser offense certain factual allegations . . . ."). Defendant believes that a rational jury could have acquitted him of the Section 1115 charge in connection with the roving patrol allegations because of uncertainty about causation, but still convicted him of the Section 2302(b) lesser-included as to that allegation.

However, as explained below, plaintiff United States of America ("the Government") has convincingly demonstrated to the Court that the error it committed, if any, was in instructing the jury as to the lesser-included offense at all. Because the Court now concludes that the jury never should have been so instructed, and because Defendant was only convicted of the original charge under 18 U.S.C. § 1115 anyway, any error Defendant perceives in the manner of the Court's lesser-included instruction is beside the point.

Both sides agree that the question of whether a lesser-included offense instruction must be given looks *first* to whether "the elements of the lesser offense are a subset of the elements of the charged offense," *United States v. Medina-Suarez*, 30 F.4th 816, 819 (9th Cir. 2022) (omitting internal quotation marks), meaning that "it is impossible to commit the greater without first having committed the lesser," *Schmuck v. United States*, 489 U.S. 705, 719 (1989). *See* Docket No. 406, at 1:22-23 ("As the government agrees, to determine whether the greater offense categorically includes the lesser, the question is whether it is impossible to commit the greater without also committing the lesser. That is, there is a categorical match if by committing the greater offense, one necessarily also commits the lesser offense."); *see also Schmuck*, 489 U.S. at 716 ("Under [the 'elements'] test, one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense."); *id.* at 719 (referencing the Ninth Circuit's application of the "elements" test prior to the adoption of Federal Rule of Criminal Procedure 31(c),[4] when the Circuit stated that "[t]o be necessarily included in the greater offense the lesser must be such that it is impossible to commit the greater without first having committed the lesser") (quoting *Giles v. United States*, 144 F.2d 860, 861 (9th Cir. 1944)); *United States v. Pierre*, 254 F.3d 872, 875 (9th Cir. 2001). Or, as the Government summarizes the inquiry, "[i]f it

---

[4] "Lesser Offense or Attempt. A defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged; . . . ." Fed. R. Crim P. 31(c)(1).

2

is possible to commit Crime B without also committing Crime A . . . , then Crime A cannot be a lesser-included offense of Crime B." Docket No. 394, at 9:10-13.

As the Government also notes, it is clearly *possible* to commit the greater, Section 1115, offense, without having committed the lesser, Section 2302(b). At a minimum, a person need not be "operating a vessel" to be convicted under the plain language of Section 1115. *See, e.g.*, Docket No. 394, at 14:25-15:24. Thus, conviction under Section 1115 does not require that an individual have also, necessarily, violated Section 2302(b).

To this, Defendant responds that he was charged as a *captain*. As an initial matter, however, the lesser-included inquiry compares *the statutes' elements*. Defendant's opening brief effectively admits as much, when it states that the lesser-included offense analysis "focuses on the elements of the greater and lesser offenses, not on specific factual allegations." Docket No. 387, at 23:2-3; *see also id.* at 22:16-19; *Pierre*, 254 F.3d at 875 ("Defendant argues [that the court should find a required lesser-included offense] because, on the particular facts of this case, the government in fact charged that Defendant had made physical contact with the victim [*i.e.*, a required element of the alleged lesser-included offense], and the jury was so instructed. But *Schmuck* forecloses that argument by requiring a comparison of statutory elements rather than of the particular conduct in each case."). This is by design. *See Schmuck*, 489 U.S. at 716-17 (choosing the "elements" test over the "inherent relationship approach," the latter of which would mandate a comparison "to conduct proved at trial regardless of the statutory definitions"); *id.* at 720-21 ("The objective elements approach, moreover, promotes judicial economy by providing a clearer rule of decision and by permitting appellate courts to decide whether jury instructions were wrongly refused without reviewing the entire evidentiary record for nuances of inference.").

In an attempt to avoid the problems with his argument in this respect, in his Reply brief, for the first time, Defendant argues that the word "captain" in Section 1115 is an *element* of that crime under the "modified categorical approach" – indeed, that "captain, engineer, pilot, or other person employed on any steamboat or vessel," are "alternative elements." *See* Docket No. 406, 7:7-9:2. He therefore takes meaning from the fact that "[t]he government has not made a single argument that Section 1115 is broader than Section 2302(b) *when the defendant is charged only as a 'captain*.'" Docket No. 406, at 10:4-5 (emphasis added). But as the Government explains in its Sur-Reply, Defendant has not cited any case that supports his view as to "divisibility" in this manner, notwithstanding the late stage at which he now makes this argument. *Mathis v. United*

3

*States*, 579 U.S. 500 (2016) – which did not involve or consider a lesser-included offense instruction issue[5] – alone certainly does not get him there.

Put simply, the Court agrees with the Government that "[t]he different types of officers and crew are not four elements for four 'separate sub-crimes,' one for each type." Docket No. 413, at 3:19-20. The Government supports its view by way of citation to, and quotation from, Defendant's favored decision of *Mathis* itself:

> To use a hypothetical adapted from two of our prior decisions, suppose a statute requires use of a 'deadly weapon' as an element of a crime and further provides that the use of a 'knife, gun, bat, or similar weapon' would all qualify. Because that kind of list merely specifies diverse means of satisfying a single element of a single crime – or otherwise said, spells out various factual ways of committing some component of the offense – a jury need not find (or a defendant admit) any particular item: A jury could convict even if some jurors 'conclude[d] that the defendant used a knife' while others 'conclude[d] he used a gun,' so long as all agreed that the defendant used a 'deadly weapon.'

579 U.S. at 506 (omitting internal citations). Moreover, the Government also notes that even if the Court were to focus only on the use of the term "captain," "[e]ven then, . . . the defense does not explain why a captain couldn't be guilty in some factual scenarios of negligently killing someone without 'operating' the vessel." Docket No. 413, at 2:10-12.

For the foregoing reasons, the Court now concludes – after briefing and adequate time for consideration – that it should not have given a lesser-included instruction in this case. It consequently denies this new trial motion.

*Napue*

As previously-mentioned, Defendant's second new trial motion (filed under seal, *see* Footnote 3, *supra*) is based on *Napue v. Illinois*, 360 U.S. 264 (1959). "One of the bedrock principles of our democracy, 'implicit in any concept of ordered liberty,' is that the State may not use false evidence to obtain a criminal conviction." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (*en banc*) (quoting *Napue*, 360 U.S. at 269). Similarly, "[t]he Supreme Court has repeatedly acknowledged that the introduction of false testimony is corrosive to the 'truth-seeking function' of our adversarial system." *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (quoting *United States v. Agurs*, 427 U.S. 97, 103-04, 103 n.8 (1976)). Thus, "[d]ue process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony,

---

[5] The Court has not been able to find any reported decision from within the Ninth Circuit that relies on *Mathis* in the context of a lesser-included offense issue.

or any other form of admissible evidence." *Hayes*, 399 F.3d at 981. As a result, "'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" *Id.* at 978 (quoting *Napue*, 360 U.S. at 269).

"A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008) (quoting *Hayes*, 399 F.3d at 984); *see also Dickey*, 69 F.4th at 636. "In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears." *Hayes*, 399 F.3d at 978; *see also Soto v. Ryan*, 760 F.3d 947, 968 (9th Cir. 2014) ("[T]he state has a constitutional duty to correct false testimony given by its witnesses, even when the defense knows the testimony was false but does nothing to point out such falsity to the jury or judge."). Even a "false impression" created by presentation of evidence can be sufficient for such a claim. *See Alcorta v. State of Texas*, 355 U.S. 28 (1957) (indicating that "false impression" created by witness's testimony – notwithstanding prosecutor's actual knowledge of true facts – that avoided both impeachment of witness's credibility and corroborative effect of truthful testimony was sufficient to conclude habeas petitioner was not accorded due process of law); *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); *Soto*, 760 F.3d at 958.

Defendant asserts that Priddin's testimony "gave the clear impression that, following his conversation with [Defendant on Priddin's last trip on the *Conception*], he resigned rather than continue following [Defendant's] practice of not posting a night watch" and "also left the jury with the impression that a captain in [Defendant's] shoes would consider the lack of a night watch a substantial and unjustifiable risk to human life." Docket No. 391, at 1:9-15; *see also id.* at 10:22-24 ("Priddin's testimony at trial created the false impression that he resigned from Truth Aquatics rather than continue working for a company that, in failing to pose a roving night watch, created a substantial and unjustifiable risk to human life."). "The truth," according to Defendant's view (referencing Priddin's interview with the NSB, his interview with the United States Attorney's Office, and his handwritten complaint to the NOAA), "is that Priddin resigned from Truth Aquatic because he felt the company violated rules related to sewage disposal." *Id.* at 11:21-23. The specific testimony Defendant has in mind consists of the following exchange at the conclusion of the prosecution's direct examination of Priddin:

5

> Prosecutor:  Why did you quit?
>
> Priddin:  I felt that I was – two things, really. . . .  I felt I was putting my captain's license in jeopardy[.]  There were times when the defendant had stated to me, I know that is what the Coast Guard would want you to do. . . .  So the defendant told me directly, I know that's what the Coast Guard would want you to do, but I want you to do this.  And I felt that the things that he was asking me to do could cost me my captain's license. . . .  The second thing was, I did not feel safe.

Docket No. 337, at 103:15-104:9 (omitting internal colloquies between court and counsel; omitting paragraph breaks).

The Court has reviewed Priddin's direct examination testimony, in its entirety, the interviews he gave to the NTSB and to the prosecution in the wake of the *Conception* fire, the complaint Priddin filed with the NOAA (that he signed a little over two weeks *before* the *Conception* fire), and other communications Priddin had with the Coast Guard Investigative Service.  *See* Docket No. 337, at 91:1-104:10; Docket No. 392, Exhs. A (No. 392-1), C (No. 392-3), E (No. 392-5); Docket No. 397, Exh. B.  Having reviewed that material, the Court concludes that Priddin neither testified falsely nor did his testimony create a "false impression."

Contrary to Defendant's argument, Priddin never communicated to anyone, pre-trial, that the *only* reason he quit his job with Truth Aquatics was because of a concern about improper sewage dumping (though that was the only topic of his NOAA complaint, *see* Docket No. 392-5).  The closest he ever got to suggesting that the lack of a roving patrol was not one of the reasons he quit was during his interview with the U.S. Attorney's Office and associated investigators when he told them that the "strange" feeling he got about there apparently not being a night-watch was when he "had already decided to quit, really, and that's my last trip."  Docket No. 392-3, at pgs. 2, 47-48 of 56.  The Court does not interpret this discussion as clearly indicating that this reason did not then become *another* reason he took into consideration in ultimately quitting.

In fact, Priddin told the NTSB that "one of the reasons [he] left was because he "didn't feel overly comfortable on the vessel" in response to a question of whether he had "any safety concerns on the vessel?"  Docket No. 392-1, at pg. 7of 16.  When later asked, during that same interview, why he "didn't stay with the company," he responded that he "had observed some things that I wasn't too thrilled with," *i.e.* a *plural* response.  *Id.* at pgs. 9-10 of 16.  Although he then *specified* a single concern, there is no indication that the concern so-specified was the only one he had.  *See also* Docket No. 392-3, at pg. 43 of 56 (recounting text to Truth Aquatics owner wherein he quit his employment, indicating that he "basically . . . said" "I'm a Christian missionary, I don't want

6

to be involved with an organization that's doing illegal things.' So, I didn't specifically say the sewage dumping, I just said illegal things.").

In addition, Defendant's assertion that Priddin's reference to "safety reasons" must have been a reference to – or taken as a reference to, as a "false impression"[6] – the lack of a roving patrol is not a reasonable assertion. As the Government points out, Priddin had discussed a number of other safety-based issues in his direct testimony, and there were pages of testimony and colloquies between the Court and counsel in between his reference to roving patrols and when he testified as to his reasons for why he quit. His testimony about why he quit did not occur "[m]ere moments" after he had testified about the issue of roving patrols; moreover, if it was contemporaneous with his roving patrols testimony (it was not), it was just as tied temporally to his testimony about other safety concerns. *See* Docket No. 337, at 94:11-19, 95:22-101:10, 103:13-104:10.

Even if the Court were to conclude that it was a close call on the first two *Napue* elements – it does *not* reach that conclusion – Defendant would fail the *Napue* materiality prong. "In assessing materiality under *Napue*, we determine whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury;' if so, then 'the conviction must be set aside.'" *Hayes*, 399 F.3d at 984 (quoting *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003), *vacated by Brown v. Belmontes*, 544 U.S. 945 (2005)) (omitting internal quotation marks); *see also Jackson*, 513 F.3d at 1076 (emphasizing "any" and "could"); *Dickey*, 69 F.4th at 636 (same). Thus, "*Napue*'s materiality standard is considerably less demanding than the standard for *Brady* [*v. Maryland*, 373 U.S. 83 (1963] claims . . . 'not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'" *Dickey*, 69 F.4th at 637 (quoting *Agurs*, 427 U.S. at 104). Ultimately, "[t]he fundamental question in the materiality analysis is whether, despite the prosecution's errors, the defendant 'received . . . a trial resulting in a verdict worthy of confidence.'" *Jackson*, 513 F.3d at 1076 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see also Hayes*, 399 F.3d at 984 ("Under this materiality standard, '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

---

[6] The Court notes that, due to a pre-trial evidentiary ruling, the prosecution and Priddin were limited, in a certain respect, in the type and amount of detail Priddin was allowed to go into in covering this topic

confidence.'") (quoting *Hall v. Dir. of Corr.*, 343 F.3d 976, 983-84 (9th Cir. 2003)) (omitting internal quotation marks).

Defendant's theory on materiality is that "a pivotal question before the jury was whether [Defendant] knew that he was disregarding an unjustifiable risk by failing to post a roving night [watch] while anchored offshore," that "Priddin's testimony gave the impression that a captain in [Defendant's] position would not feel safe on the boat without a night watch and that any captain of good conscience would resign altogether rather than risk passengers' lives and his own captain's license," and that Priddin's "false testimony and credibility were powerful evidence for the government's case." Docket No. 391, at 13:22-28. Priddin, a relatively minor witness in the whole scope of the trial, did not remotely provide the only evidence on any of these points.

There was plentiful evidence in this case that, as Defendant's opening brief puts it, "a captain in [Defendant's] shoes would consider the lack of a night watch a substantial and unjustifiable risk to human life." *Id.* at 1:9-15. As Defendant effectively admits in his companion new trial motion, *see, e.g.*, Docket No. 387, at 4:16-5:22, Priddin was not the only witness who testified to roving patrol practices and expectations, and there was other key non-testimonial evidence on these points in the form of the Conception's COI and governing regulations. Given this state of affairs, Defendant would not be able to meet *Napue*'s materiality requirement even if the Court felt the need to reach that aspect of the analysis. *See United States v. Alahmedalabdaloklah*, 94 F.4th 782, 832 (9th Cir. 2024) ("Moreover, Al-Dhari's testimony was substantially corroborated by other evidence in the record; that is the most important consideration in our overall materiality analysis for the *Napue* claims."); *Gentry v. Sinclair*, 705 F.3d 884, 904 (9th Cir. 2013) (concluding that there was no materiality as to aggravating circumstance finding because expert testimony and crime scene evidence meant that purportedly false testimony "was not needed to prove the aggravating circumstance found by the jury"); *Phillips v. Ornoski*, 673 F.3d 1168, 1190-92 (9th Cir. 2012) (rejecting materiality finding after reviewing other evidence of guilt); *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006) ("We conclude . . . that Petitioner suffered no prejudice [from possible *Napue* violation] because the witness' testimony was thoroughly discredited at trial and there was independent, compelling evidence of Petitioner's guilt."); *cf. Dickey*, 69 F.4th at 646 (rejecting habeas petitioner's guilt-phase *Napue* claims – under applicable AEDPA review standards – after considering other, non-false, evidence linking petitioner to participation in robbery and burglary, including evidence that corroborated false-

testifier's testimony on that point); *Blumberg v. Garcia*, 687 F.Supp.2d 1074, 1115 (C.D. Cal. 2010) ("As *Napue* and its progeny make clear, whether the materiality standard is met depends on the intended and actual use of the false evidence, and whether that evidence was otherwise corroborated, or effectively impeached, by non-tainted evidence such that it is not reasonably likely that the false evidence could have affected the jury's judgment."); *compare Dow v. Virga*, 729 F.3d 1041, 1049-50 (9th Cir. 2013) (finding *Napue* materiality standard met under *de novo* review where "[t]he evidence against [the petitioner] was weak and the prosecutor's arguments undoubtedly had an effect on the jury's decision" and petitioner's case was "a close one" and "a weak one"); *Hall*, 343 F.3d at 984 (ordering issuance of writ of habeas corpus, unless retried, because of lack of evidence – other than false evidence and "curious and largely uncorroborated confession" – connecting defendant to body or alley in which it was found).

    As a result of the foregoing reasoning, the Court also denies this motion seeking a new trial.