CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GEORGINA WAKEFIELD (Bar No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
JOSHUA D. WEISS (Bar No. 338918)
(E-Mail: Joshua_Weiss@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JERRY NEHL BOYLAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JERRY NEHL BOYLAN,<br><br>Defendant. | Case No. 2:22-cr-00482-GW<br><br>**JERRY NEHL BOYLAN'S SENTENCING POSITION; EXHIBITS** |

//

//

//

Jerry Nehl Boylan, by and through the undersigned, hereby submits his sentencing memorandum. This submission is based on the attached memorandum of points and authorities, all pleadings and records in this case, and any further argument this Honorable Court might require.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  April 25, 2024        By  */s/ Georgina Wakefield*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
JOSHUA D. WEISS
Deputy Federal Public Defenders
Attorneys for JERRY NEHL BOYLAN

3

# TABLE OF CONTENTS

Page

1  I.    INTRODUCTION ................................................................. 1

2  II.   THE SENTENCING GUIDELINES ...................................... 2

3  III.  BECAUSE THE COURT'S MANDATE IS TO CRAFT A SENTENCE
4       THAT IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO
        ACHIEVE THE PURPOSES OF SENTENCING, A THREE-YEAR
        PERIOD OF HOME INCARCERATION TO SUBSTITUTE FOR A
5       THREE-YEAR PRISON SENTENCE UNDER THE CORRECT
6       GUIDELIN CALCULATION IS WARRANTED. ................................ 5

7       A.   Mr. Boylan's History and Characteristics Support a Sentence of Home
             Incarceration Instead of Prison. ................................................ 5

8            1.   Mr. Boylan served a decades-long career as a safe and well-
9                 respected captain for Truth Aquatics. ................................ 5

10           2.   ████████████████████████████████████████ 10

11           3.   Mr. Boylan participated in the rescue efforts and immediate
12                investigation into the accident. ......................................... 13

13           4.   Mr. Boylan is 70 years old with several significant health issues... 14

14           5.   Prison rather than home incarceration would not serve the
                  sentencing goals of rehabilitation or specific deterrence in this
15                case. ......................................................................................... 16

16      B.   Systemic Failures Outside of Mr. Boylan's Control Contributed to the
             Tragedy on the *Conception*............................................................ 17

17           1.   The NTSB concluded that the Coast Guard's oversight failures
18                and Truth Aquatics' company-wide policies and practices
                  significantly contributed to the accident and the loss of life on
19                the *Conception*.................................................................... 17

20           2.   The Coast Guard determined after the accident that its manning
                  requirements on the *Conception* were insufficient. ........................ 21

21           3.   The Coast Guard's post-accident inspection of the *Conception*'s
22                sister ship revealed structural deficiencies that were not in Mr.
                  Boylan's control. ............................................................... 23

23           4.   A post-accident inspection campaign by the Coast Guard
24                resulted in a two-hour roving patrol recommendation, which
                  would not have altered the outcome here. ...................................... 24

25      C.   The Sentencing Goal of General Deterrence has Already Been Met
             Through New Regulatory Requirements and Changes in Industry-
26           Wide Practices ......................................................................... 26

27           1.   Regulatory changes ......................................................... 26

28           2.   Industry changes............................................................. 27

# **TABLE OF CONTENTS**

Page

D. The government and Probation Office's sentencing recommendations would create severe and unwarranted sentencing disparities ...................28

    1. Disparities with other defendants convicted of seaman's manslaughter, Section 1115.............................................................28

    2. Disparities with other defendants convicted of involuntary manslaughter, Section 1112.............................................................31

E. The Court should reject the Probation Office's flawed recommendation for an upward departure or variance...............................35

IV. CONCLUSION....................................................................................................37

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*United States v. Armstrong*,
   165 F.3d 918 (9th Cir. 1998) (unpublished) ............................................... 3

*United States v. Christiansen*,
   958 F.2d 285 (9th Cir. 1992) ................................................................ 3, 4

*United States v. Christopher Hutchinson*,
   2:16-cr-00168-NT (D. Me.) ..................................................................... 29

*United States v. Culligan*,
   C.D. Cal. No. 2:20-cr-263-AB ............................................................. 33, 34

*United States v. Joseph Shore*,
   02-cr-10413-RWZ (D. Mass.) ................................................................... 30

*United States v. Kilty*,
   C.D. Cal. No. 5:16-24-JGB ........................................................ 2, 3, 33, 34

*United States v. Low*,
   N.D. Cal. No. 3:23-cr-439 ....................................................................... 34

*United States v. Mirabal*,
   ---F.4th---, No. 22-50217, 2024 WL 1628673 (9th Cir. Apr. 16, 2024) .................... 4

*United States v. Moser*,
   E.D. Cal. No. 1:14-cr-115-LJO-SKO ........................................................... 34

*United States v. Patrick Ryan*,
   1:04-cr-673-ERK (E.D.N.Y.) ..................................................................... 29

*United States v. Richard J. Oba*,
   3:05-cr-00502-HA (D. Or.) ................................................................. 29, 30

*United States v. Richard Smith*,
   04-cr-00700-ERK (E.D.N.Y.) ............................................................... 28, 29

**Federal Statutes**

18 U.S.C. § 1112 ..................................................................... 31, 33, 34, 35

**Sentencing Guidelines**

U.S.S.G. § 2A1.4 ............................................................................. *passim*

# TABLE OF AUTHORITIES

Page(s)

U.S.S.G. § 3B1.3.............................................................................................. 3

U.S.S.G. § 5K2.1 ........................................................................................... 36

**Other Authorities**

*Centers for Disease Control and Prevention, Life Expectancy for the United States*, (available at https://www.cdc.gov/nchs/fastats/life-expectancy.htm (last visited April 25, 2024)) ........................................... 16

Corrections, Correctional Health Care: *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004).................................... 15

Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* ................................................................................................... 15

*NTSB Marine Accident Report: Fire Aboard Small Passenger Vessel Conception*, (available at https://data.ntsb.gov/Docket/Document/docBLOB?ID=11566688&File Extension=pdf&FileName=MAR2003-Rel.pdf) ...............................23, 24, 25

OIG, U.S. Dept. of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, (*available at* https://oig.justice.gov/reports/2015/e1505.pdf) ................................... 14, 15

U.S. Dept. of Justice, National Institute of Corrections, Correctional Health Care: *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) (available at https://info.nicic.gov/nicrp/system/files/018735.pdf) ............................. 15

United States Sentencing Commission's Interactive Data Analyzer (available at https://ida.ussc.gov/analytics/saw.dll?Dashboard) ............................. 31

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Jerry Boylan is an indigent, 70-year-old man in poor health who devoted over three decades of his life to working on Truth Aquatics boats.  Since the terrible tragedy on the *Conception*, it has become widely known that regulations require a roving patrol while a boat is anchored at night, and there is no dispute that there should have been a roving patrol posted on the *Conception* and every other Truth Aquatics boat.  But the undisputed evidence is that Truth Aquatics did not instruct its employees to implement a roving patrol or provide any training about it.  The undisputed evidence shows that no captain on any Truth Aquatics boat, or any other local boat for that matter, posted a roving patrol at night.  The terrible reality is that the devastating loss of life that occurred on the *Conception* on September 2, 2019, could have occurred on any other Santa Barbara dive boat, regardless of who the captain was.

This is a tragic case when viewed from any perspective.  Thirty-four people lost their lives when the *Conception* caught fire, and many more lives have been profoundly and permanently changed as a result of the accident.  Because of the number of victims, the government seeks a ten-year term of imprisonment, which is the statutory maximum sentence for Mr. Boylan's offense.  But the parsimony principle is not abandoned even when there is such a significant loss of life, and the Court must still craft a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing.  While the loss of life here is staggering, there can be no dispute that Mr. Boylan did not intend for anyone to die.  Indeed, Mr. Boylan lives with significant grief, remorse, and trauma as a result of the deaths of his passengers and crew.

Because this was an unintentional crime committed by a dedicated employee following company-wide procedures ███████████████████████████ ███████████████████████████████, the defense requests that the Court substitute home incarceration for imprisonment given the unique circumstances of the case.

1

Thus, for the reasons explained below, the defense requests that the Court impose a five-year probationary sentence, with three years to be served under home incarceration.  Additionally, the defense requests that the Court impose location monitoring, mental health treatment, and 500 hours of community service.

## II.  THE SENTENCING GUIDELINES

As discussed in the previously filed objections to the Presentence Report, Mr. Boylan submits that the correct guideline calculation is as follows:

| | | |
|---|---|---|
| Base offense level: | 18 | (§2A1.4(a)(2)(A)) |
| Multiple count adjustment: | +5 | (§3D1.4) |
| Zero-point offender reduction: | -2 | (§4C1.1) |
| Total offense level: | 21 | |
| Guideline range: | 37-46 months | |

Mr. Boylan's previous filing addresses this Guideline calculation at length, and so the defense will only clarify three main points here.  First, as to the enhanced base offense level for an offense that "involved the reckless operation of a means of transportation," U.S.S.G. § 2A1.4(a)(2)(B), Mr. Boylan submits that it should not apply here.  In responding to Mr. Boylan's motion for a new trial regarding the lesser-included offense instruction, the government argued that a captain on a voyage can be guilty of seaman's manslaughter without "operating" the vessel by, "for example, starting a fire with a cigarette."  *See* Dkt. No. 413 at 4.  In denying Mr. Boylan's motion for a new trial, the Court cited to this argument of the government's.  *See* Dkt. No. 421 at 5.  This ruling should apply equally in the sentencing context.  Under the government's narrow definition of "operating," Mr. Boylan's offense did not involve the operation of a vessel; the vessel was anchored and he was not driving or otherwise operating the vessel at the time of the fire.  That is, the term "operation" implies active conduct.  For that reason, the enhanced base offense level typically applies to those who drive while drunk or under the influence of drugs.  *See United States v. Kilty*, C.D. Cal. No. 5:16-cr-24-JGB, Dkt. No. 132 at 3 (Probation Office letter recommending a

2

1
2
3
4
5
6
7

downward variance in part because "in mitigation, Kilty's conduct did not include severe intoxication as is often the case for defendants subject to the base offense level under USSG §2A1.4(2)(B)"); *see also id.* Dkt. No. 136 at 8 (government sentencing position paper quoting the Probation recommendation letter).) Mr. Boylan was not driving the boat or engaged in recklessly driving or maneuvering the boat while, for example, under the influence. His crime is that of failing to do something, not actively doing it.

8
9
10
11

Even if the Court concludes that Mr. Boylan was operating the boat at the time of the fire, as discussed in *infra* Section III.D.2, Mr. Boylan's mental state was not as culpable or reckless as individuals convicted of manslaughter who operate cars while under the influence of drugs or alcohol.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Second, the PSR's Guidelines calculation also includes the abuse of trust enhancement, U.S.S.G. § 3B1.3, but, as Mr. Boylan previously submitted to the Court, the enhancement cannot apply here. *See* Dkt. No. 415 at 6-10. The government attempts to defend the PSR's application of the enhancement, but its arguments lack merit. In short, the Ninth Circuit has stated that the enhancement applies only where "in addition to the elements of the crime, the defendant *exploited* the trust relationship to facilitate the offense." *United States v. Christiansen*, 958 F.2d 285, 287–88 (9th Cir. 1992) (emphasis added); *see also United States v. Armstrong*, 165 F.3d 918 (9th Cir. 1998) (unpublished) (quoting same). As explained in detail in Mr. Boylan's previously filed objections to the PSR, to "exploit" a trust relationship, one must necessarily do so intentionally. *See* Dkt. No. 415 at 6. The government does not dispute that *Christiansen* stands for this proposition, nor does it claim that *Christiansen* has been overruled. *See* Dkt. No. 426 at 7-8. It argues, though, that the Court should disregard *Christiansen* because it was decided in 1992. *See id.* But, as the government has previously pointed out, "Ninth Circuit precedent binds this Court unless 'the reasoning or theory of [the] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority.'" Dkt. No. 246 at 26 (quoting *Miller v.*

1   *Gammie*, 335 F.3d 889, 893 (9th Cir. 2003)).  The government points to no authority—

2   higher or otherwise—indicating that *Christiansen* has been overruled.  *Christiansen*

3   thus remains binding and, as the government fails to rebut, stands for the proposition

4   that the abuse of trust enhancement can apply only to intentional crimes.

5          The Court should also disregard the government's perplexing claim that Mr.

6   Boylan's crime was intentional.  *Contra* Dkt. No. 426 at 9.  Indeed, prior to trial, the

7   government argued that the but-for cause requirement articulated by the Supreme Court

8   in *Burrage* should not apply here since "*Burrage* involved a different statute (drug

9   distribution) and also intentional conduct.  Here, defendant did not intend to kill his

10  victims[.]" Dkt. No. 246 at 26.  The government cannot now reverse its position,

11  having earlier asked the Court to make a critical ruling regarding jury instructions on

12  the basis of the fact that Mr. Boylan's was an unintentional crime.  *Cf. United States v.*

13  *Mirabal*, ---F.4th---, No. 22-50217, 2024 WL 1628673, at *4 (9th Cir. Apr. 16, 2024)

14  (holding that "formal, signed statements made by a government attorney in filings

15  before a court" are admissions of a party-opponent, admissible by a defendant at trial).

16  As the government previously agreed, Mr. Boylan's was not an intentional crime, and

17  so, under *Christiansen*, the abuse of trust enhancement does not apply.

18         Finally, both the government and the Probation Office recommend that the Court

19  vary upward and sentence Mr. Boylan to 10 years' imprisonment, the statutory

20  maximum sentence.  Varying upward to reach this sentence is unreasonable for the

21  reasons discussed below.  Moreover, a sentence of 120 months would approach a total

22  offense level of 32 at criminal history category one.  That would be the same or a

23  similar offense level to vastly more serious crimes requiring a heightened mental state,

24  including second degree murder (offense level 33).

25

26

27

28

1
2
3
4
5
6

## III.   BECAUSE THE COURT'S MANDATE IS TO CRAFT A SENTENCE THAT IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING, A THREE-YEAR PERIOD OF HOME INCARCERATION TO SUBSTITUTE FOR A THREE-YEAR PRISON SENTENCE UNDER THE CORRECT GUIDELINE CALCULATION IS WARRANTED.

7
8

### A.   Mr. Boylan's History and Characteristics Support a Sentence of Home Incarceration Instead of Prison.

9
10

#### 1.   Mr. Boylan served a decades-long career as a safe and well-respected captain for Truth Aquatics.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Mr. Boylan began working for Truth Aquatics as a deckhand in 1983 and eventually worked his way up to earning his captain's license.  In his decades of experience prior to the *Conception* fire, Mr. Boylan had a reputation among the company's crew and passengers of being a safety-conscious captain.  Chris Spiros, a former Truth Aquatics captain who has worked as a licensed captain for forty years, notes in his letter to the Court that he was "always impressed with Jerry's paramount concern for the safety of the passengers, crew and the vessel.  He showed this concern with his attention to the minutest detail." Ex. 2 (Spiros Letter).  Another former crewmember, Julie Frans, writes that Mr. Boylan's "dedication to ensuring the safety and well-being of both crew and passengers was unparalleled, and his meticulous approach left an indelible mark on my work ethic. His attention to detail was legendary, and he expected nothing less from his crew." Ex. 3 (Frans Letter).  "He was always alert to the smallest noise or anything that was 'off.'  He was knowledgeable and attuned to the conditions of the sea, what was happening on the boat with the crew and passengers." Ex. 4 (Buchanan Hallenberger Letter).

26
27
28

Several former Truth Aquatics crewmembers note in particular the attention that Mr. Boylan gave throughout his career to crew training.  He maintained high standards

and rigorously trained crewmembers on all aspects of the boat operations. As one former crewmember, Chris Wilcox explains:

> "The first thing that I noticed in working with Jerry during this time, was that he ran, as the saying goes, a VERY tight ship. The crew worked with absolute diligence under his command, in every aspect of the operation. From cleaning the heads to safely managing the days long dive trips, and ensuring the vessel was always in top operating condition, Jerry kept a watchful eye over all aspects of the operation. He was quick to correct any transgression from regular, safe operating procedures and always aspired to make the systems we used better, safer and more efficient."

Ex. 5 (Wilcox Letter). Mr. Boylan's training also included fire safety. He "would run safety drills as often as we could with our demanding schedule, testing the fire hoses and underwater recall, and practicing man-overboard drills." Ex. 6 (Friedland Letter). Former crewmember Jessica Friedlander recounts, "Jerry personally trained me many times on how to operate our fire hoses and emergency shut-off valves, where they were located, and when to use them, and I would train crew with him." *Id*.

Many other crewmembers recall how Mr. Boylan went out of his way to teach them necessary skills for operating the boat safely. *See, e.g.*, Ex. 5. At trial, former crewmember Baron Kelly testified that he shadowed Mr. Boylan so often on the boat that another captain joked to Mr. Boylan, "you've got a fly on your back." Dkt. 374 at 50:18-25. Mr. Kelly also testified about how Mr. Boylan took the time on off days to train him without pay so that Mr. Kelly could practice driving the boat in and out of the harbor. *Id*. at 48:21-49:05. Mr. Spiros states that Mr. Boylan "was so good at training his crew, I could tell who had been trained by Jerry when I worked with them on other boats." Ex. 2.

Because scuba-diving trips made up the majority of Truth Aquatics' business, and because of the myriad risks inherent with the sport, Mr. Boylan's "utmost concern was for scuba diver safety." Ex. 7 (Shemet Letter). Several former crewmembers

6

attest that Mr. Boylan was one of the most conservative captains when it came to diving safety, sometimes even disappointing passengers for refusing to visit certain dive sites when conditions were not up to his safety standards. *See, e.g.,* Ex. 8 (Debbie Buchanan Letter) ("I remember many trips, but, one in particular, where the spearfishermen were adamant about wanting to dive at a certain spot. Jerry said no. The conditions were not good and it would not be safe."). Mr. Boylan would always "pick the dive sites based on weather, water conditions and the physical ability of the passengers on board." Ex. 2. He "did not like taking risks and was very conservative about choosing dive sites and anchorages compared to other captains." Ex. 6. "Diving and boating come with inherent risks. Jerry was attuned to those risks at all times and did everything within his power to keep his people safe." Ex. 4.

Even when taking all precautions with respect to diver safety, accidents are a regular occurrence on scuba-diving boats, for myriad reasons. Several crewmembers and passengers recount how Mr. Boylan and his trained crew "sprang into action" in such scenarios to administer often life-saving care. Chris Wilcox, for example, recalls an incident in which a passenger came to the ocean's surface bleeding and foaming at the mouth, "a worst nightmare for crew of a dive vessel." Ex. 5. "Jerry coordinated efforts seamlessly, and we had the passenger in stable condition with a USCG helicopter en-route within minutes." *Id*. Ms. Friedland recounts that as a crewmember,

> "We faced many life-and-death emergencies and I would always fall back
> on my training, reporting to [Jerry] while carrying out his orders,
> managing how the crew responded, administering CPR or medical aid,
> deploying a rescue swimmer or responding in our inflatable skiff while he
> operated the vessel, communicated with the Coast Guard and gave us
> precise instructions. He always kept a cool head under pressure,
> responding methodically and swiftly to whatever circumstances we faced,
> which ranged from injuries to illness to drownings."

7

Ex. 6.  Ed Stetson, a long-time customer of Truth Aquatics who has been organizing dive charters for 45 years, writes that "Jerry and his crew were directly responsible for saving the lives of several people who either got into trouble or had medical emergencies while diving.  He took his job as a captain very seriously.  He's one of the best captains I've ever worked with."  Ex. 9 (Stetson Letter).

In general, Truth Aquatics passengers loved being on trips with Mr. Boylan, and felt safe with him.  "Jerry stood out as that captain who put safety first."  Ex. 8.  Indeed, the only passengers who the government called as witnesses at trial testified to their positive experiences with Mr. Boylan.  Jacque Palmer, who travelled on the *Conception* shortly before the accident, testified that the crew was "totally awesome," and that she not only wanted to go on another trip on the *Conception* but wanted to create a PowerPoint presentation "to get more people to come on a trip with me."  Dkt. 361 at 107:02-13.  Similarly, government witness Mark Copple testified that he had been on several trips with Truth Aquatics over the years and that both he and the Finstad family (who owned Worldwide Diving Adventures, the charterer for the accident trip) "preferred to book trips with Jerry."  Dkt. 365 at 29:17-21.  Mr. Copple further testified that the conditions on Truth Aquatics boats were "very good" and the diving operations were "extremely safe."  *Id*. at 29:24-30:04.

These positive passenger experiences are not limited to those who chose to testify at trial or submit letters to the Court.  All passengers were provided with written surveys at the end of each Truth Aquatics trip in which they were asked to provide ratings on a 1-5 scale regarding several aspects of the trip.  The ratings across all trips captained by Mr. Boylan were very high; his trips averaged a rating of 4.73 for "Staff Knowledge and Professionalism," 4.88 for "Captain Manner," and 4.82 for "Overall Trip Experience."  *See* Ex. 23 (Customer Surveys Chart).[1]

---

[1] This exhibit is a demonstrative that was created by the defense team through a review of all customer surveys produced by the government in discovery.  The raw data used to compile the demonstrative is available for the Court's review if requested.

These letters demonstrate that Mr. Boylan devoted his working years to Truth Aquatics because he wanted to share his love for the ocean with others.  He did not do it because it was particularly lucrative.  He made a modest daily wage, had no retirement plan, and now survives entirely on social security payments.  Though he was the most experienced captain employed by Truth, his annual income in 2019 was $38,000; in 2018 it was $44,000.  Ex. 24 (Boylan Tax Return Summary).  Since the accident, his social security payments are unable to cover his monthly expenses and he has not made any payments on the trailer where he resides in over 4 years.  PSR ¶¶ 107, 111.

Despite his career-long record of safety, Mr. Boylan now faces sentencing for a horrible accident that occurred on his watch.  But the accident did not occur because Mr. Boylan was less safe or more reckless than his other Truth Aquatics colleagues.  To the contrary, the uncontroverted opinion of former crewmembers is that Mr. Boylan was more conscientious about safety than most other captains.  As former Truth Aquatics captain Chris Wilcox writes:

> "It is painfully ironic to me that Jerry was the captain aboard the Conception during the fire that took so many lives.  I have worked in the maritime industry as crew, captain and business owner ever since Jerry took me under his wing 25 years ago, and I have known many captains during this time.  None of them compare to Jerry in the depth of knowledge, diligence and care for the safety of his crew, passengers, and vessel.  He did everything in his power to do his job as master of the vessel to the absolute best of his abilities, which were nothing short of exceptional."

Ex. 5.  Chris Spiros similarly shares that, in the span of a 40-year career as a licensed captain on several different types of vessels, "I can say, without reservation, Jerry is the most conscientious captain I have ever met.  This fact makes the terrible tragedy aboard

the *Conception* all the more horrifying.  I still shu[dd]er to think about the fact that if this could happen with Jerry Boylan as captain, it could happen to any of us." Ex. 2.

**2.    Mr. Boylan** ███████████████████████████████

█████████████████████.

The *Conception* accident was a terrible tragedy, and the sudden loss of 34 people has caused unspeakable pain and heartbreak to their loved ones.  Although he did not lose a relative, Mr. Boylan too has experienced profound grief, remorse, and emotional despair since the accident.  He had deep personal relationships with some of the decedents.  Alexandra Kurtz, the first deckhand who slept in the bunkroom with the passengers on the Labor Day weekend trip, was the youngest crewmember on the *Conception* and had worked with Mr. Boylan before.  Kristina Finstad, the charter master for the trip, co-owned Worldwide Diving Adventures ("WDA"), a scuba-diving company that had worked with Mr. Boylan and Truth Aquatics for over four decades.  Mr. Boylan was close personal friends with Ms. Finstad and her family, particularly her father, who founded WDA.  Mr. Boylan watched Ms. Finstad grow up since she was a young girl.  As one former crewmember notes, she and Mr. Boylan both "had known many of the passengers who passed away for many years and considered them to be our friends." Ex. 6.  Another former crewmember has observed Mr. Boylan's grief and sorrow since the accident, noting that "[t]he crew and passengers were not just crew and passengers, they were a community.  They were Jerry's people, some of whom he had known since childhood, like me." Ex. 4.  The lives lost in the accident were deeply personal to Mr. Boylan, and that loss will pain him for the rest of his life.

The enduring grief and remorse that Mr. Boylan experiences ████████████

█████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████

5       Those close to Mr. Boylan have also seen that he has been crippled with pain and

6 guilt in the years since the accident.  Some observe that he is a "shell of the man he

7 once was," Ex. 12 at 2, and a "shadow of a man since the accident," Ex. 6 at 2.  Mr.

8 Boylan shared with Chris Spiros, another Truth Aquatics captain, that he was glad it

9 wasn't Mr. Spiros operating the boat the day of the accident, because Mr. Spiros has a

10 family that would have been devastated.  Ex. 2.  Mr. Boylan, conversely, has almost no

11 family after the recent death of his sister in 2022.  But "[h]e has always and will always

12 care for others over himself."  *Id*.  Mr. Spiros writes to the Court, "I know he has been

13 dealing with an incredible amount of guilt even though, in my opinion, he did all that

14 he could given the circumstances."  *Id*.  To those that have been in contact with him

15 since the accident, "it's clear that he lives in mourning for the losses endured in the

16 horrible accident that was beyond his control."  Ex. 3.  As one former crewmember

17 writes, "Knowing Jerry the way I do, I can imagine the weight of this tragedy on his

18 heart and mind every second of every day.  It absolutely breaks my heart to know what

19 he has gone through these past years."  *Id*.  Another former colleague of Mr. Boylan's

20 writes, "It is so very hard to convey to anyone not knowing Jerry how this tragedy

21 weighs on his heart and in his mind as well as ours.  It is immeasurable.  Saddened and

22 at a loss, words cannot convey the ache.  Forever changed."  Ex. 11.

23       In addition to the grief and remorse that Mr. Boylan feels for the loss of the 34

24 decedents, ████████████████████████████████████████████████

25 ████████████████████████  Mr. Boylan himself nearly died in the *Conception* fire.  Even

26 while making the mayday call to the Coast Guard, he could be heard struggling to

27 breath due to the thick black smoke that was filling the wheelhouse as he attempted to

28 seek help during the fire.  Two of the surviving crewmembers testified that they

11

believed Mr. Boylan was actually *on fire* because of the amount of smoke that trailed him when he narrowly escaped the fire surrounding the wheelhouse. *See* Dkt No. 336 at 63:16-19; Dkt. No. 341 at 92:16-24. And once he was rescued by first responders, Mr. Boylan was seen sobbing, vomiting, dry-heaving, laying in the fetal position, and muttering to himself incoherently. *See* Ex. 25 (Belitski Tr. Excerpt) at 7-8. He "collapsed with emotion to the deck several times." Ex. 26 (Hayward ROI). He was covered in soot with no shoes and partially clothed. *Id*. Mr. Boylan appeared so emotionally distraught that first responders on the scene determined that he needed to be observed for his own safety. Ex. 27 (Barrera ROI).

Mr. Boylan's own near-death experience, as well as coping with the grief of 34 deaths, ███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████

12

The government attempts to portray Mr. Boylan as callous and uncaring, as a person who has "never apologized"[2] and who only sought to "save himself" during the fatal fire.  That insensitive portrayal is based on nothing but a cruel caricature.  It in no way reflects the real person who continues to suffer on a daily basis since the day of the horrible *Conception* accident in which he nearly lost his own life.

### 3.    Mr. Boylan participated in the rescue efforts and immediate investigation into the accident.

While the government tries to paint Mr. Boylan as someone who callously abandoned the boat and "never apologized," the truth is that he stayed on scene to assist with rescue efforts and cooperated with the immediate investigation into the accident. While he went to trial and is not therefore entitled to the three-level reduction for acceptance of responsibility under the guidelines, the Court can and should consider Mr. Boylan's efforts under the statutory sentencing factors and impose a sentence of home incarceration as a substitute for prison.

Mr. Boylan did not abandon the vessel.  He stayed in the wheelhouse as it filled with smoke to alert the Coast Guard and get immediate assistance.  He jumped out of the burning wheelhouse only at the last possible second, with the surviving crew believing he was on fire as he jumped into the ocean.  He then reboarded the vessel at the back, helped free the skiff, and rescue the surviving crew who were in the ocean. He then got on the radio from the *Grape Escape*, staying on the boat to answer all the questions posed to him by the Coast Guard over the radio so that help could arrive as soon as possible.

Once the Coast Guard and fire boats arrived, Mr. Boylan insisted on staying on scene to assist their efforts while the rest of the crew went back to shore.  Rescue personnel described Mr. Boylan's distraught demeanor.

---

[2] In making this argument, the government implicitly and improperly asks the Court to punish Mr. Boylan for exercising his Fifth Amendment constitutional right.

13

Mr. Boylan eventually returned to shore with the Coast Guard. At the base, he made out a written statement, admitting that he was asleep at the time the fire was discovered. He also submitted to a breathalyzer at the station, which was negative for alcohol. Mr. Boylan was then driven to a drug testing facility, which was closed due to the Labor Day holiday. He returned to the drug testing facility the next day and submitted a urine sample, which was negative for drugs.

In the immediate aftermath of the accident, the NTSB, in coordination with the Coast Guard, began an investigation. They asked to interview Mr. Boylan and he agreed. He appeared for a voluntary interview, but the NTSB told him to return the following day. Mr. Boylan returned the following day and waited several hours to be interviewed. The USAO asked the NTSB not to interview Mr. Boylan because it would be pursuing criminal charges against him. But Mr. Boylan was willing and made himself available for an interview with investigators.

In conclusion: Mr. Boylan made an emergency call to the Coast Guard, helped the crew get to safety, stayed on the radio with the Coast Guard from a nearby boat, boarded a Coast Guard boat and stayed on scene to assist rescue efforts, returned to the base where he submitted a written statement admitting he was asleep that night and gave a breathalyzer, submitted to drug testing, and appeared for a voluntary interview with investigators. Because of the USAO, the interview did not proceed. Mr. Boylan wanted to and did assist investigators. The Court should consider this and impose home incarceration as a substitute for prison.

**4.      Mr. Boylan is 70 years old with several significant health issues.**

A non-custodial sentence is also appropriate given Mr. Boylan's age and numerous health issues. Mr. Boylan's age alone would make incarceration far harsher than it would be for a younger person. The DOJ considers those who are 50 and older to be "aging inmates" – a population that DOJ has determined to be more costly to incarcerate, far less likely to recidivate, and lacking in programming and adequate

staffing to meet their needs in BOP facilities.[3]  According to a study by the Department
of Justice's National Institute of Corrections, this is because incarceration accelerates
the aging process, due to factors such as "the amount of stress experienced by new
inmates trying to survive the prison experience unharmed; efforts to avoid
confrontations with correctional staff and fellow inmates; financial stress related to
inmates' legal, family, and personal circumstances….".[4]  The OIG agrees, citing
studies that show that "an inmate's physiological age averages 10-15 years older than
his chronological age due to the combination of stresses associated with incarceration
and the conditions that he or she may have been exposed to prior to incarceration."
OIG Report at 1-2.  Aging inmates are also particularly vulnerable to the threat of
assault by younger predatory inmates, and the lack of protection from this threat
"contributes to the emotional stress and physical deterioration [elderly inmates]
routinely experience."  NIC Report at 9.  Inmates over the age of 50, let alone aged 70
like Mr. Boylan, are "'easy prey' for more experienced predatory inmates."  *Id*. at 11.

In addition to his age, Mr. Boylan suffers from multiple health issues that would
make incarceration more punitive and could risk his ability to access necessary medical
care.

---

[3] *See generally* OIG, U.S. Dept. of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*," rev'd Feb. 2016 ("OIG Report"), *available at* https://oig.justice.gov/reports/2015/e1505.pdf

[4] U.S. Dept. of Justice, National Institute of Corrections, Correctional Health Care:  *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) ("NIC report") at 8, *available at* https://info.nicic.gov/nicrp/system/files/018735.pdf

15



The average life expectancy of a male in the United States is 73.5 years.[6]  Mr. Boylan turns 71 in October.  He does not deserve to die in prison.  But given his age and health condition, the excessively punitive sentence recommended by the government and Probation could very well result in that fate.  Such punishment is far greater than necessary to meet the goals of sentencing in this case.

### 5. Prison rather than home incarceration would not serve the sentencing goals of rehabilitation or specific deterrence in this case.

A sentence of home incarceration as a substitute for prison is also sufficient to serve the sentencing goals of rehabilitation, specific deterrence, and protection of the public.  *See* 18 U.S.C. § 3553(a)(2).  There is no need here to incarcerate Mr. Boylan in prison rather than in his trailer so that he learns from his mistakes or receives "correctional treatment."  Nor is prison needed to deter Mr. Boylan from similar conduct in the future.  His captain's license has expired and he will never captain a boat again.[7]  That in itself is no small loss for Mr. Boylan, who has worked as a boat captain

---

[5] The defense is still in the process of obtaining further records and information regarding the follow-up treatment that Mr. Boylan will need for each of these conditions.

[6] Centers for Disease Control and Prevention, Life Expectancy for the United States, *available at* https://www.cdc.gov/nchs/fastats/life-expectancy.htm (last visited April 25, 2024).

[7] Probation recommends that the Court impose a condition of supervision that Mr. Boylan "not seek, apply for, or obtain employment in any position on a boating vessel."  Dkt. 403 at 3 (Proposed Condition No. 9).  Mr. Boylan has no objection to this condition and he has not sought, applied for, or obtained employment on a boat since the accident.

16

for nearly his entire adult life. Indeed, several of those who know Mr. Boylan well attest to the fact that "his job was his life." Ex. 8; *see also* Ex. 6 ("He was a boat captain in every sense of the title, and his entire life was on that boat. It was our whole world."). Even Mr. Boylan's trailer is "filled with pictures of the boat" that he will never again set foot on. *Id*. Instead, Mr. Boylan will likely live out the rest of his life unable to sleep or function in the world, barely surviving on Social Security benefits, and under self-imposed isolation ▮▮▮▮▮▮▮▮▮▮▮▮▮ overwhelming grief. Because of these consequences, there is a near zero risk that Mr. Boylan would commit any similar offense or endanger another person for any reason. A term of imprisonment rather than home incarceration is not necessary.

**B.     Systemic Failures Outside of Mr. Boylan's Control Contributed to the Tragedy on the *Conception*.**

**1.     The NTSB concluded that the Coast Guard's oversight failures and Truth Aquatics' company-wide policies and practices significantly contributed to the accident and the loss of life on the *Conception*.**

The National Transportation Safety Board ("NTSB") immediately began an investigation into the sinking of the *Conception*, with the objective of determining the contributory causes of the fire.[8] In the course of its investigation, the NTSB interviewed dozens of witnesses, collected and analyzed numerous documents and regulations, and conducted site visits. A little over a year after the fire, the NTSB released a full report documenting its investigation.[9] While the NTSB was not able to

---

[8] The NTSB is an independent federal agency tasked with investigating transportation accident and making recommendations for improving transportation safety. The NTSB has primary jurisdiction over civil transportation investigations, but not criminal investigations.

[9] The report is maintained on the NTSB's publicly available docket along with factual reports and transcripts of some interviews. The report is available at https://data.ntsb.gov/Docket/Document/docBLOB?ID=11566688&FileExtension=pdf&FileName=MAR2003-Rel.pdf

determine the definitive cause of the fire, it found that the likely origin point was in the aft part of the salon on the main deck, and the most likely sources included the electrical distribution system, unattended battery charging, or improperly discarded smoking materials. *Id*. at viii. The NTSB concluded that the probable cause of the accident was the failure of Truth Aquatics to provide effective oversight of its vessels and crewmember operations, including requirements to ensure that a roving patrol was maintained. *Id*. at 75. Additionally, the NTSB found that the U.S. Coast Guard was responsible for contributing causes such as the inadequate regulation of smoke detection aboard passenger vessels and inadequate emergency escape arrangements. *Id*.

In determining that Truth Aquatics' lack of oversight of its vessels and crewmember operations was the probable cause of the fire, the NTSB noted that Truth Aquatics was a well-respected operator among regulators, current and former crewmembers, competitors, and passengers. *Id*. at 69. Indeed, a Coast Guard representative stated to the NTSB that the company "had a good reputation for being good operators." *Id*. at 70. And a former Truth Aquatics captain with decades of experience described the company's vessels as "the safest boats on the coast." *Id*. Despite its reputation, however, the post-accident investigation by the NTSB revealed several unsafe practices on Truth Aquatics vessels, including a lack of crew training, emergency drills, and the roving patrol. In reviewing the company's policies and procedures, the NTSB found that Truth Aquatics had been deviating from required safe practices for some time. *Id*. The owner of Truth Aquatics stated to the NTSB that there were no company-wide operating procedures; instead, he said, watch standing, crew training, and operating procedures, including hiring, training, and dismissal of crewmembers, were the responsibility of the captains of the company's vessels. The NTSB noted, however, that the lax practices it discovered—lack of roving patrol, failure to provide a passenger safety orientation before getting underway, failure to require all crewmembers conduct fire drills or training on emergency scenarios—were

18

not single incidents or isolated to the *Conception*.  Indeed, as was revealed at trial, these practices were common across the Truth Aquatics fleet of vessels.  The NTSB found that, had Truth Aquatics been "actively involved in ensuring the safe practices required by regulations were enforced, most notably the requirement for a roving patrol, they could have identified unsafe practices and fire risks on the *Conception* and taken corrective action before the accident occurred."  *Id*. at viii.  Accordingly, the NTSB concluded that "Truth Aquatics provided ineffective oversight of its vessels' operations, which jeopardized the safety of crewmembers and passengers."  *Id*. at ix.

In assessing that the Coast Guard also bore responsibility for fire due to its failure to implement and enforce safety regulations, the NTSB examined the Coast Guards regulations regarding smoke detection and emergency egress.  As an initial matter, the NTSB noted that the *Conception* was in compliance with Subchapter T regulations regarding smoke detection and emergency escape arrangements.  *Id*. at vii.  Regarding smoke detection, the only compartment that was required to be fitted with smoke detectors was the passenger bunkroom, since it was the vessel's only overnight accommodation space.  *Id*.  In addition to those smoke detectors the Conception was also heat detectors in the galley and engine room.  *Id*.  The smoke and heat detectors were not interconnected to other alarms or a central operating station in the wheelhouse.  *Id*. at 42.  The NTSB found that, "The circumstances of this accident make clear that interconnected smoke detectors in all accommodation spaces would have given early warning of the fire to the passengers and crew and likely would have allowed time for the crew to fight the fire and assist passengers in evacuating the bunkroom."  *Id*. at 64.  Accordingly, the NTSB recommended that the Coast Guard revise Subchapter T "to require all vessels with overnight accommodations, including vessels constructed prior to 1996, have interconnected smoke and fire detectors such that when one detector alarms, the remaining detectors also alarm."  *Id*.

Similarly, the NTSB concluded that the means of escape from the *Conception* bunkroom, while in compliance with Coast Guard regulations, were inadequate in

19

circumstances such as the fire that claimed the *Conception*.  The *Conception* had two means of escape from the bunkroom, both of which led to the salon.  *Id*. at 67.  The primary access was a spiral staircase from the starboard forward part of the main deck salon to the starboard forward corner of the bunkroom.  *Id*.  The secondary emergency exit for the bunkroom occupants was the square escape hatch on the centerline in the overhead.  *Id*.  The *Conception*'s escape hatch was accessible from either port or starboard aisles by climbing into one of the top aftermost inboard bunks.  This emergency exit opened into the aft part of the salon, where the fire was most intense. Because the *Conception* was designed in accordance with the Old T regulations, it was required only to have "not less than two avenues of escape from all general areas accessible to the passengers or where the crew may be quartered or normally employed, so located that if one is not available the other may be," and there were no additional requirements regarding size, egress times, vertical access, or obstructions.  *Id*. Analyzing the design of the escape hatch, the NTSB opined that even if "the bunkroom escape hatch not been blocked by fire, there still may have been difficulties evacuating a large number of people through the hatch in a timely manner. The escape path through the hatch was impeded by the bunks below it."  *Id*. at 68.  The NTSB concluded that "[i]f regulations had required the escape hatch to exit to a space other than the salon, optimally directly to the weather deck, the passengers and crewmember in the bunkroom would have likely been able to escape."  *Id*. at viii.  Thus, the NTSB recommended that the Coast Guard review the Subchapter T regulations regarding means of escape for all vessels constructed prior to 1996 and modify regulations to ensure that there are no obstructions to egress.  *Id*. at 69.

Additionally, the NTSB noted that it was imperative that the Coast Guard develop means to verify compliance with roving patrol requirements.  When questioned by investigators, Coast Guard inspectors stated that they could not verify compliance with the roving patrol requirement, since inspections were not conducted during overnight voyages and because there was no requirement for a log for the roving patrol.

1   *Id*. at 66.  Indeed, the NTSB noted that Coast Guard inspection aids and checklists did
2   not include line items to verify or even discuss regulatory watch standing requirements
3   or the terms of the COIs.  *Id*.  The NTSB also found that Coast Guard records show
4   that, since 1991, no owner, operator, or charterer has been issued a citation or been
5   fined for failure to post a roving patrol.  *Id*.  Accordingly, the NTSB concluded that the
6   Coast Guard did not have an effective means of verifying compliance with and actually
7   enforcing roving patrol requirements.  *Id*.  Accordingly, the NTSB recommended that
8   the Coast Guard develop and implement a means to verify that small passenger vessel
9   owners, operators, and charterers are conducting roving patrols.  *Id*. at 67.

10      Ultimately, as a result of its investigation into the accident, the NTSB issued
11   seven new safety recommendations to the Coast Guard that focused on improving
12   regulations regarding smoke detection, verification of roving patrols, and means of
13   escape aboard all small passenger vessels, including existing vessels.  *Id*. at ix-x.

14   ### 2.   The Coast Guard determined after the accident that its manning
15   requirements on the *Conception* were insufficient.

16      After the *Conception* accident, the Coast Guard's Marine Board of Investigation
17   (MBI) conducted an inquiry into the accident.  Among other things, the MBI found a
18   "safety concern" regarding the manning of the *Conception* prior to the tragedy—that is,
19   the MBI found that the *Conception* did not have sufficient crew to safely conduct multi-
20   day trips.  Captain Jason D. Neubauer—chief of the Office of Investigations &
21   Analysis at Coast Guard Headquarters[10]—documented the issue in an email.  Ex. 29.
22   Captain Neubauer wrote: "When considering CONCEPTION's operations, which
23   included both day and night dives where the deckhands were serving in numerous dive
24   related duties (filling dive tanks, outfitting divers, prepping the small boat, watching
25   diver bubble trails) in addition to their shipboard engineering, hotel services (sewage
26   pumping, cleaning), and navigation duties (lookout, anchoring ops), it seems that the

27
28      [10] *See* https://media.defense.gov/2017/Feb/02/2001693825/-1/-
     1/0/CAPT%20NEUBAUER%20BIO-02FEB17-MEDIA%20KIT.PDF.

crew was stretched very thin." *Id.* He further noted that leading up to the accident voyage, the *Conception* deckhands "were working more than 18-hours each day with very little sleep." (*Id.*)

The captain also wrote that the two galleyhands on the *Conception*, or "food handlers," could *not* have made up for the deficient staffing: "many outside observers to this casualty believe that one of the food handlers should have been standing the roving watch, when in fact they were prohibited from conducting safety sensitive positions because they weren't officially listed as deckhands and subject to drug testing." *Id.* The captain noted that he looked at the Certificates of Inspection (COI) for other similarly sized vessels and concluded that a more "appropriate" manning requirement would have required a captain, a mate, and *four* deckhands for overnight trips on a vessel the size of the *Conception*—that is, twice the number of deckhands as were required on the *Conception* before the accident. *Id.*

Captain Neubauer wrote that he conducted a survey of the manning requirements in COIs for small passenger vessels around the country, and he found that the Los Angeles / Long Beach Coast Guard sector (which cover Santa Barabra) "manning requirements are generally less than other CG units nationwide and Sector LA/LB often only requires 2 deckhands for the largest overnight T-boats." *Id.* The email concluded that this manning issue was a safety issue that needed to be addressed in the whole sector. *See id.*

As was addressed at length in the trial, the *Conception* COI required only 4 crew members—the captain, mate, and two deckhands—and Truth Aquatics would provide only those minimum required crewmembers for overnight trips (not counting the kitchen staff, who were not permitted to conduct safety sensitive duties, as Captain Neubauer wrote). The *Conception*'s sister vessel, the *Vision*, had the same manning requirements before the *Conception* accident. *See* Ex. 30 (2018 Vision COI). But after the accident, the Coast Guard revised the *Vision*'s COI to require an additional deckhand on any overnight trips. *See* Ex. 31 (2021 Vision COI).

The MBI revealed that the *Conception*, like many other vessels overseen by the Los Angeles / Long Beach Sector of the Coast Guard, was critically undermanned prior to the accident. The crew was working very long hours, and, with that level of manning, likely could not realistically comply with all Coast Guard safety requirements (including rest required for safety sensitive crew). The government has previously argued that if the vessel did not have sufficient manning, then a safe captain should not have left the dock. Maybe so. But the question for sentencing purposes is whether the blame for these safety failures—including persistent and dangerous undermining of Truth Aquatics vessels and other vessels in Southern California—should fall entirely on Mr. Boylan, or whether his culpability is lessened in light of the fact that these were systemic problems with the safety of small passenger vessels in Southern California, and, more specifically, with all Truth Aquatics vessels. Indeed, today the *Vision* (the *Conception's* sister vessel) has a Certificate of Inspection requiring an extra deckhand so that there are enough rested crew to be able to have a roving patrol at night.

### 3. The Coast Guard's post-accident inspection of the *Conception*'s sister ship revealed structural deficiencies that were not in Mr. Boylan's control.

The Coast Guard carried out annual inspections of the *Conception* and its sister vessels, the *Truth* and the *Vision*, in April of 2019. During the April 2019 inspection of the *Vision*, the Coast Guard marine inspector noted no deficiencies. However, in the immediate aftermath of the fire aboard the *Conception*, the Coast Guard returned to Truth Aquatics and conducted an inspection of the *Vision*—this time reaching different conclusions. *See* NTSB Marine Accident Report at 52. Despite having noted not a single deficiency six months before, during the October and November 2019 inspections of the Vision, the Coast Guard noted a total of 40 deficiencies. Ex. 32 (Coast Guard summary of inspection). Among the deficiencies noted by the Coast Guard was the *Vision*'s failure to comply with a requirement to provide a means of escape from a below-deck passenger accommodation area (the shower room) that leads

to an area that does not contain any source of fire (such as a galley stove).  In the bunkroom, a deficiency was issued for an inoperable public address system speaker. Furthermore, the Coast Guard noted that the double bunks did not allow for free and unobstructed escape for the inside occupant as required by the regulations. Significantly, this bunk arrangement deficiency had never been cited during the previous 40-year history of the vessel.  Additionally, the Coast Guard inspection found 19 electrical system deficiencies throughout the *Vision*, with deficiencies in the salon and galley area for corrosion, improper connectors, and signs of overload on a power strip.

After the fire on the *Conception* and the post-accident inspections by the Coast Guard, Truth Aquatics began modifications to the *Vision* and the *Truth*.  *See* NTSB Marine Accident Report at 52.  Truth Aquatics installed an integrated fire-detection system and an electronics-charging cabinet on each vessel.  The cabinet was equipped with self-closing doors and a fire-suppression system that vented to the exterior and was integrated with the fire-detection system.  *Id*.  Additionally, an improvement to the fire detection system was designed to shut down all ventilation if smoke is sensed in any compartment on board the *Truth* or *Vision*. Truth Aquatics also dramatically improved bunkroom emergency egress on the *Vision* by installing hatches from the bunkroom to the exterior main deck walkways on both the port and starboard side of the vessel.  *Id*.  These changes could only be made by Truth Aquatics, not by Mr. Boylan.  And while the Court ultimately excluded a defense-noticed financial expert under relevance grounds, it is clear that Truth Aquatics had the financial ability to make these safety changes and the ability to hire an extra crewmember to serve as a roving patrol.  Indeed, today the *Vision* is operated by a different company, but it employs an extra crew member who sleeps during the day and serves as a roving patrol at night.

    **4.    A post-accident inspection campaign by the Coast Guard resulted in a two-hour roving patrol recommendation, which would not have altered the outcome here.**

Following the fire aboard the *Conception* and the public scrutiny of the Coast Guard, the Coast Guard initiated a "concentrated inspection campaign" of all Subchapter T-inspected vessels with overnight accommodation for passengers, paying special attention to compliance with roving patrol and fire training requirements. *See* NTSB Marine Accident Report at 52.  The concentrated inspection campaign was conducted independent of the required regulatory inspections for certification and focused on firefighting, fire protection, means of escape systems, and crew proficiency regarding the elements of firefighting, fire protection, and means of escape.  In the course of this inspection campaign, the Coast Guard inspected 383 vessels across the United States and various Coast Guard Marine Safety Detachments ("MSD").  *Id*. Significantly, in educating vessel operators about the roving patrol requirement, different Coast Guard Marine Safety Detachments suggested different means of implementing the roving patrol requirement.  For example, the Panama City MSD issued detailed reports memorializing that vessel operators in that sector were educated that they must post a roving watch who will conduct rounds of the vessel with "no more than 2 hours between each round," and the MSD further recommended that the vessel operators keep a written record demonstrating their compliance with the roving watch regulation.  Ex. 33 at 14 (Activity Summary Report, Vessel Inspection of *Tradewinds* ("It was highly recommended that the operator designate the individual(s) in writing along with their duties and log their patrols. We recommended no more than 2 hours between each round to be conducted and discussed items that should be checked as part of the round.").)  Another MSD inspecting a vessel that "[did] not have a . . . night watch program in place," noted that the vessel owner would be required to "create a written program to include 24hr watch logs and crew responsibilities during night watches." *Id*. at 19 (Activity Summary Report, Vessel Inspection of *Kate*).)

The inspection campaign revealed not only that different Coast Guard MSDs had different ideas about how to implement a roving patrol and ensure compliance, but also that owners and operators were not always aware of the roving patrol requirement.

Accordingly, during the inspection campaign, the Coast Guard took the opportunity to educate the operators about the regulations and clarify any confusion the operators might have about when a roving patrol is required.  Ex. 32 at 2 (Activity Summary Report, Vessel Inspection of *Brilliant*) ("The captain thought that while the vessel was anchored it did not count as underway therefore he was not meeting the 24 hour watch requirements assigned on his COI. The master was informed of the regulations as well as the vessel management."); Ex. 32 at 7 (Activity Summary Report, Vessel Inspection of *Mercantile*) ("Discussed the Night watchman requirements with the O/O, past practice was intermittent based on weather conditions, expected weather/sea conditions, number of pax onboard, etc. Notified O/O that a night watchman shall remain up at all times when passengers are onboard regardless of weather conditions or operational status, at anchor or underway.").

**C.    The Sentencing Goal of General Deterrence has Already Been Met Through New Regulatory Requirements and Changes in Industry-Wide Practices**

The *Conception* tragedy spurred enormous changes among regulators and industry professionals to attempt to avoid any similar tragedy in the future.  That is, the horrific nature of the accident created general deterrence and spurred a sea change in the industry and among regulators.  A term of imprisonment rather than home incarceration is not needed to further the sentencing goal of general deterrence.

**1.    Regulatory changes**

After the *Conception* tragedy, the Coast Guard conducted an extensive revision of the Subchapter T regulations that apply to small passenger vessels.  *See* 86 Federal Register No. 245 at Table 1 (Dec. 27, 2021), *available at* https://www.govinfo.gov/content/pkg/FR-2021-12-27/pdf/2021-27549.pdf (table summarizing all regulatory changes and listing specific regulations that were amended in lieu of the *Conception* accident).  After the accident, the Coast Guard: required small passenger vessels to install an alarm system to ensure compliance with night watch

26

requirements; required vessels to install interconnected fire alarm systems, so that a fire in one location on a vessel will trigger alarms throughout; required older vessels, constructed before 1996 and subject to "Old-T regulations," to conform to structural regulations imposed on newer vessels, including requirements regarding emergency exists from passenger berths; updated the regulations addressing how crews must be trained in firefighting and other emergency procedures to include far more details on the substance and frequency of trainings; added a requirement for a master to conduct emergency egress drills with passengers; and added requirements for the storage and handling of potentially hazardous items, including certain batteries and electric devices. (*Id.*)

In short, after the *Conception* tragedy the Coast Guard saw that many of its regulations permitted potentially unsafe conditions to exist on a vessel.  For example, while the *Conception* was permitted to have two emergency exits in the passenger bunkroom that both led to the inside of the salon, which was engulfed in flames and prevented any access to or escape from the passenger bunkroom, today, a small passenger vessel must have "two independent means of escape that prevent one incident blocking both means of escape."  (*Id.* at 73167.)

That is, the accident itself motivated the Coast Guard to attempt to prevent similar tragedies in the future.  No further motivation, or general deterrence, is needed to motivate the agency to prevent future tragedies.

### 2.    Industry changes

The government argues in its sentencing position that Mr. Boylan should receive a 10-year prison sentence in part because *other* captains admitted to not using a roving patrol at night, making general deterrence "a key objective in this case."  Dkt. No. 420 at 25.  This argument disregards Mr. Boylan's personal culpability and instead seeks to punish him for the failings of an entire industry.  It further ignores the fact that the industry has *already* changed its practices with respect to a roving patrol—not because this Court's sentencing decision, but because of the accident itself.  At trial, one Santa

Barbara captain who operated a competitor business to Truth Aquatics testified that, before the *Conception* fire, his practice was to not have a roving patrol at night if the boat was anchored in a safe location, despite the fact that the boat's COI required a "designated patrolman" at all times. Dkt. No. 374 at 82:14-83:17. The day that the *Conception* fire happened, that policy changed. *Id*. at 84:14-16. The boat "immediately . . . hired someone to be a full-time night watch roving patrol person. So we added a crew member." *Id*. at 84:17-85:05. The company that now operates the *Vision* after Truth Aquatics implemented the very same change. And, as discussed further above, the Coast Guard implemented several changes that the industry is now required to follow. Subjecting Mr. Boylan to a lengthy prison sentence is not necessary promote general deterrence in and industry that has already implemented extensive reforms in response to this tragedy.

**D.    The government and Probation Office's sentencing recommendations would create severe and unwarranted sentencing disparities**

**1.    Disparities with other defendants convicted of seaman's manslaughter, Section 1115**

An examination of seaman's manslaughter cases involving conduct that was more obviously reckless than Mr. Boylan's reveals that the sentence requested by the defense is not out of step and in fact serves to avoid unwarranted sentencing disparities.

In *United States v. Richard Smith*, 04-cr-00700-ERK (E.D.N.Y.), Smith, the captain of a 6,000-passenger Staten Island ferry, "dozed off" under the influence of synthetic opioids and painkillers and caused the ferry to collide at full speed with a concrete pier, tearing open the side of the vessel where passengers had crowded to disembark. As a result, 11 people were killed and 70 people were injured, some severely and permanently. Smith fled the scene and was later found at his home. Smith was also convicted of making false statements in his application to renew his Coast Guard license, falsely representing that he did not suffer and had never suffered from any illness and was not taking any medications despite the fact that he had filled a

total of 75 prescriptions for six different medications in the years leading up to the accident and had filled prescriptions for a variety of medications in the weeks and months before submitting his medical form to the Coast Guard. (Dkt. 11.)  Ultimately, Smith was sentenced to 18 months' imprisonment.

In *United States v. Patrick Ryan*, 1:04-cr-673-ERK (E.D.N.Y.), stemming from the same deadly Staten Island ferry accident as *Smith*, the New York City Ferry Director was convicted of seaman's manslaughter and making repeated false statements to the NTSB, the Coast Guard, NYPD, and the United States Attorney's Office for the Eastern District of New York in an apparent effort to obscure his failure to enforce a century-old rule requiring two pilots remain in the wheelhouse during docking to guard against the hazard of a pilot's sudden disability.  He was sentenced to a year and a day in prison.

In *United States v. Christopher Hutchinson*, 2:16-cr-00168-NT (D. Me.), Hutchinson, the captain, owner, and operator of a 45-foot lobster boat called *No Limits*, took his boat and two crewmen into a forecasted storm, for which the National Weather Service had issued a Gale Watch.  Hutchison did so after drinking alcohol, smoking marijuana, and abusing illegally-obtained prescription opioid oxycodone.  The boat capsized, and the bodies of the crewmen, one of whom was a minor, were never recovered. (Dtk. 1 at 1-2.)  Defendant Hutchison continued to abuse opiates while on pretrial release and continued to operate a lobster boat while on pretrial release (Dkt. 41.)  Hutchison had a criminal history that included speeding, losing control of his vehicle on two separate occasions, and two convictions for operating a motor vehicle under the influence. (Dkt. 119 at 4.)  Hutchison was sentenced to 48 months' imprisonment.

In *United States v. Richard J. Oba*, 3:05-cr-00502-HA (D. Or.), Oba, the captain and operator of a chartered fishing vessel, steered his boat into restricted, treacherous waters near the entrance to a port after nightfall despite having received multiple oral communications and admonishments directly from the Coast Guard in the hours and

minutes leading up to the accident specifically advising him to avoid the area which was experiencing unusually large waves; Oba repeatedly falsely represented to the Coast Guard that he did not intend to enter the restricted area. Friends of Oba along with other charter operators reached out to him to describe the dangerous conditions and to urge him to avoid the area. Oba disregarded the orders he received from the Coast Guard and the warnings he received from friends and other operators, and he entered the restricted and dangerous waters of the port as night fell. The boat was struck by a large wave and sunk, resulting in the death of three of the passengers; the body of one of the passengers was never recovered. Oba was the only person on the boat wearing a life jacket during the difficult and ultimately deadly port crossing. The accident came only two years after another charter fishing vessel, the *Taki-Tooo*, sailed into dangerous waters from a nearby bay under similar conditions (attempting the crossing of a "bar" separating a bay from the ocean) and capsized, resulting in 11 deaths. Ultimately, Oba was sentenced to 51 months' imprisonment.

*United States v. Joseph Shore*, 02-cr-10413-RWZ (D. Mass.), arose out of an incident in which a 20-year-old passenger on a "booze cruise" fell overboard through a railing that the captain and owner of the vessel, Joseph Shore, was aware was broken following a collision with another boat. Before the trip, Shore loaded the vessel with large quantities of alcohol that were placed in various locations to make it freely available to all passengers. The voyage was advertised as providing unlimited alcohol, and Shore did not check any passengers for identification to determine whether they were of legal drinking age. At one point during the trip, the vessel was anchored and drifted into another boat, causing a section of the railing to break off the side of the boat. The captain continued the cruise and was seen dancing with passengers away from the boat's control area. The passengers were not warned of the broken railing or instructed to avoid it, despite heavy consumption of alcohol on the vessel. Shore continued the cruise, during which an underage passenger fell overboard. When Shore learned of the passenger falling overboard, he failed to call the Coast Guard for 50

30

minutes, delaying efforts to rescue the passenger, who was later found to have drowned.  Shore was sentenced to three years' probation with six months of home confinement.

### 2. Disparities with other defendants convicted of involuntary manslaughter, Section 1112

In addition to creating significant sentencing disparities with other defendants convicted of seaman's manslaughter, under Section 1115, the government and Probation's sentencing recommendation would also create significant disparities between Mr. Boylan and other defendants sentenced under the involuntary manslaughter guideline, U.S.S.G. § 2A1.4, or convicted of involuntary manslaughter under 18 U.S.C. § 1112.

The Sentencing Commission analyzed every case from 2015 to 2023 in which someone was sentenced using as the "primary guideline" the involuntary manslaughter guideline, U.S.S.G. § 2A1.4."[11]  In total, the commission analyzed 335 such cases, and found that the average sentence imposed was 42 months' imprisonment, and the median sentence was 36 months:

//

//

//

---

[11] This data can be accessed at the United States Sentencing Commission's Interactive Data Analyzer, under the "Sentencing Outcomes" tab, by filtering by year and primary guideline.  *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (hereinafter "Sentencing Commission Data Analyzer").

1
2
3
4
5
6
7
8



**Average and Median Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023

■ Sentence Length (Average Months)  ■ Sentence Length (Median Months)

9
10
11
12

The figure includes the 335 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2A1.4; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

13
14
15

Narrowing this data to cases in which the defendant was, like Mr. Boylan, in Criminal History Category I, yielded a set of 214 cases in which the average sentence was 36 months, and the median sentence was 30 months:

16
17



**Average and Median Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023

■ Sentence Length (Average Months)  ■ Sentence Length (Median Months)

18
19
20
21
22
23
24

The figure includes the 214 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2A1.4; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

25
26
27
28

1    While useful for providing averages, the Sentencing Commission's data does not
2    offer more details about these 214 involuntary manslaughter cases where the
3    defendants were in criminal history category I.  To offer more details and produce a
4    clearer picture of more "typical" involuntary manslaughter cases, the defense used
5    PACER to pull the details of every involuntary manslaughter prosecution, under
6    Section 1112, in California federal courts since 2005 (when the Supreme Court decided
7    in *Booker* that the Guidelines are discretionary).  While this search revealed that federal
8    involuntary manslaughter prosecutions are rare in California, the results also show that
9    Mr. Boylan's mental state was far *less* culpable than the average involuntary
10   manslaughter defendant's.

11   First, in *United States v. Culligan*, C.D. Cal. No. 2:20-cr-263-AB, pled guilty to
12   involuntary manslaughter after he drove a stolen car, while under the influence of
13   "illegal narcotics," into the oncoming traffic lane of a road on a military base.  (*Id.* Dkt.
14   No. 30 at 5-6 (plea agreement).)  He then collided head-on with an oncoming car,
15   causing the death of one person and serious injuries to another.  (*Id.*)  Culligan was also
16   charged with fleeing the scene after the accident, but that charge was dropped as part of
17   the plea agreement.  Because the offense involved the reckless operation of a vehicle,
18   his base offense level was 22—the same base offense the Probation Office suggests
19   applying to Mr. Boylan.  (*Id.* at 7.)  The defendant was in criminal history category IV,
20   and the Honorable Andre Birotte, Jr., sentenced him to 46 months' imprisonment.  (*Id.*
21   Dkt. Nos. 43 & 37 at 2.)

22   The only other involuntary manslaughter prosecution the defense has found in
23   this district is *United States v. Kilty*, C.D. Cal. No. 5:16-24-JGB.  In that case,
24   defendant-Kilty was convicted at trial of involuntary manslaughter, under Section 1112.
25   The trial evidence showed that he parked his tractor-trailer truck, which was hauling a
26   heavy military tactical vehicle, "in the middle of the right lane of traffic" on a military
27   road.  (*Id.* Dkt. No. 136 at 3-4 (government sentencing position describing facts); *see*
28   *also* Dkt. No. 133 (PSR).)  After parking in the middle of the dark road, Kilty turned

33

off the lights on his truck, and "did not place any warning cones or triangles, or activate any warning lights, to alert other drivers he was parked in a moving lane. Instead, he went to sleep in the sleeper berth of his semi-truck.." (*Id.*) While he was sleeping, "a commuter bus carrying a load of passengers, crashed into the military tactical vehicle." (*Id.*) One bus passenger died from the accident, and many others were injured, including one who had his arm amputated as a result of the accident. (*Id.*) At sentencing, Kilty's base offense level was also 22—the same base offense the Probation Office suggests applying to Mr. Boylan. (*Id.* Dkt. No. 133 at 6 (Kilty PSR); *see also id.* Dkt. No. 174 (sentencing transcript, where the court adopted the PSR calculation).) The Honorable Jesus G. Bernal varied downward from the applicable guidelines range and sentenced Kilty to 22 months' imprisonment. (Dkt. No. 174 at 25-26.)

Moving to other districts in California, in *United States v. Moser,* E.D. Cal. No. 1:14-cr-115-LJO-SKO, the defendant pleaded guilty to involuntary manslaughter, under Section 1112, and to operating a vehicle under the influence of alcohol or drugs, under 36 U.S.C. § 4.23(a)(1). In the plea agreement, the defendant admitted that he was driving a pickup truck while under the influence of marijuana and alcohol, with a blood alcohol level above the legal limit. (*Id.*, Dkt. No. 3 at 2-3.) He was driving with four passengers, three of whom were sitting unsecured in bed of the pickup truck. (*Id.*) He drove recklessly, crashed, and caused the death of one passenger and the hospitalization of the other three. (*Id.*) The district court sentenced Moser to 46 months on the involuntary manslaughter count and 6 months on the drunk driving count, for a total sentence of 52 months. (*Id.* Dkt. No. 14.)

Finally, in *United States v. Low*, N.D. Cal. No. 3:23-cr-439, the defendant was charged with drunk driving and involuntary manslaughter, under Section 1112, for driving "while under the influence of alcohol to a degree that rendered the defendant incapable of safe operation" and thereby caused the death of one person. (*Id.* Dkt. No.

1  2   1.)  The defendant pled guilty to both counts, and is scheduled for sentencing in July
2024.  (*Id.*, Dkt. No. 27.)

3   These cases—the total set of federal involuntary manslaughter charges
4   prosecuted in California since 2005—demonstrate that the heartland of involuntary
5   manslaughter involves reckless driving while under the influence of drugs and/or
6   alcohol.  The Probation Office has elsewhere agreed with this conclusion: in *Kilty*, the
7   Central District's Probation Office recommended a downward variance in part because
8   "in mitigation, Kilty's conduct did not include severe intoxication as is often the case
9   for defendants subject to the base offense level under USSG §2A1.4(2)(B)."  (C.D. Cal.
10  No. 5:16-cr-24-JGB, Dkt. No. 132 at 3 (Probation recommendation letter); *see also id.*
11  Dkt. No. 136 at 8 (government sentencing position paper quoting the Probation
12  recommendation letter).)  Compared to the typical case subject to the involuntary
13  manslaughter guideline, Mr. Boylan's conduct is far less culpable; far from operating a
14  vehicle while under the influence of drugs or alcohol, he operated a boat in the same
15  manner as everyone else who worked at his company, as he had been trained to do by
16  his employer, and as many others in his industry.  His conduct should thus be viewed
17  on the less culpable end of defendants in criminal history Category I sentenced under
18  the involuntary manslaughter guideline, § 2A1.4—that is less culpable than the
19  defendants who received an average sentence of 36 months and a median sentence of
20  30, according to the Sentencing Commission.

21  **E.**   **The Court should reject the Probation Office's flawed recommendation**
22       **for an upward departure or variance**

23  The Probation Office has recommended an upward departure or variance, but its
24  recommendation is premised on legal and factual error.

25  In discussing a departure, the Probation Office notes that "USSG §5K2.1
26  provides that a sentence increase above the authorized guideline range may be
27  warranted if death resulted[.]"  (Probation Recommendation Letter, Dkt. No. 403, at 6.)
28  Section 5K2.1 is not applicable here.  The Guideline notes that in assessing whether to

35

apply the upward departure, the Court should consider "the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury.  For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud."  U.S.S.G. § 5K2.1.  Mr. Boylan is being sentenced based on the involuntary manslaughter Guideline, which, by definition, already takes into account the risk of death or bodily injury.  And he already faces a substantial increase to his offense level based on the number of decedents.  Per the Guideline's plain text, no further upward departure is warranted based on this same fact—that the offense involved the loss of life.

The other factors mentioned by the Guideline—other factors "that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation," *id.*—also counsel against an upward departure.  The deaths in this case were an accident and there was no "planning or preparation."  Additionally, as addressed above, a departure would be especially inappropriate since Mr. Boylan's Guidelines range is already significantly higher than the average federal sentence for involuntary manslaughter, even though his conduct— his state of mind and degree of recklessness—was far less culpable than most involuntary manslaughter cases that involve driving under states of "severe intoxication."  *See Kilty,* C.D. Cal. No. 5:16-cr-24-JGB, Dkt. No. 132 at 3 (Probation recommending a downward variance in part because "in mitigation, Kilty's conduct did not include severe intoxication as is often the case for defendants subject to the base offense level under USSG §2A1.4(2)(B)") ; *see also id.* Dkt. No. 136 at 8 (government sentencing position paper quoting the Probation recommendation letter).

As to a variance, the Probation Office's recommendation for an upward variance is premised on factual claims that contradict the trial evidence, as was addressed at length in Mr. Boylan's Objections to the PSR.  (*See* Dkt. No. 415.)  For example, the Probation Office's letter states that an upward variance is warranted because, the

Probation Office claims, Mr. Boylan did not inform his passengers where the escape hatch was located in the bunkroom; allowed passengers to cover the escape hatch with an ice chest; did not train his crew; and "did not attempt to fight the fire and was the first to abandon ship." (Dkt. No. 403 at 4.)  As addressed in detail in Mr. Boylan's filing addressing the PSR, all of these allegations were disproven at trial and they are thus an inappropriate basis for an upward variance. (*See* Dkt. No. 415.)

At bottom, the Probation Office's recommendation letter parrots discredited factual claims made by the government throughout this litigation, despite the fact that the trial evidence discredited these prejudicial allegations.  Its recommendation also fails to account for any of the mitigating circumstances described in this position paper. For these reasons, the Court should reject the Probation Office's (and the government's) argument for an upward departure or variance.

## IV.  CONCLUSION

For these reasons, the undersigned respectfully requests that the Court impose a sentence of five years of probation to include three years of home incarceration with location monitoring and 500 hours of community service.  Such a sentence is a significant punishment for Mr. Boylan that also accounts for the extensive mitigating factors addressed above.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  April 25, 2024          By  */s/ Georgina Wakefield*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
JOSHUA D. WEISS
Deputy Federal Public Defenders
Attorneys for JERRY NEHL BOYLAN

37